# EXHIBIT E

*(Briefs Filed on Appeal to CSC)**

*Please note that these briefs have been modified by the defendants to undermine the plaintiff's arguments and create errors in the plaintiff's work. They hacked her personal email accounts. The hacking has been documented over time. The plaintiff declined correcting the documents, because the defendants established a pattern of the discrepancies in analysis evidencing their impropriety. Such discrepancies show their will to compromise our judicial system and betray their oaths to the Constitution and the practice of law.

**CITY OF NEW YORK**
**CIVIL SERVICE COMMISSION**

In the Matter of

D.S.,

Appellant,

v.

THE NEW YORK POLICE DEPARTMENT,

Appellee.

Index No.

Assigned:

**ORAL ARGUMENT REQUESTED**

Parties:

D.S.

*Appellant (Pro Se)*

The New York Police Department
One Police Plaza, Rm. 1406
New York, New York 10038
(646) 610-5400

Brian McCaffrey
Asya Abbas
Nicole Moccio

*Attorneys for Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

PARTIES ..... 1

JURISDICTIONAL STATEMENT ..... 1

ISSUES PRESENTED ..... 4

STATEMENT OF CASE ..... 5

STANDARD OF REVIEW ..... 7

STATEMENT OF FACTS ..... 7

*Procedural History* ..... 7

*Relevant Facts* ..... 8

ARGUMENT ..... 13

I. THE DECISION MUST BE OVERTURNED, BECAUSE A PARTY CANNOT BE FOUND MENTALLY INCOMPETENT AND REPRESENT HIM- OR HERSELF AT TRIAL ..... 13

II. THE TRIBUNAL ERRED ON NOT DISMISSING THE PETITION ON DUE PROCESS GROUNDS ..... 15

III. THE TRIBUNAL ERRONEOUSLY DETERMINED THAT THE DEPARTMENT MET ITS BURDEN OF PROOF, BECAUSE THE DECISION GOES AGAINST THE WEIGHT OF THE EVIDENCE, WHICH WAS INSUFFICIENT AND INCREDIBLE 20

*A. The Department Must Establish That Simone Had A Disability By A Preponderance Of The Evidence* ..... 21

*B. The Department's Psychologists Cannot Be Medical Officers For Section 72 Purposes And Are Not Authorized to Diagnose Employees* ..... 22

*C. The Department Failed to Prove Simone Suffers From A Disability Irrespective Of Its Psychologists' Statuses* ..... 25

*D. The Department Admitted Into Evidence Inconsistent Testimonies Regarding Simone's Time And Leave And Threat To Other Employees* ..... 28

*E. The Department Failed to Show Interference with Operations* .................................... 31

IV. THE DETERMINATION SHOULD BE VACATED, BECAUSE THE WEIGHT GIVEN TO HEARSAY EVIDENCE DENIED SIMONE A FAIR HEARING ................ 32

*A. The Weight Given the Hearsay Evidence Was Material and Prejudicial* ..................... 32

*B. The Tribunal Showed Bias* ........................................................................................... 35

V. THE TRIBUNAL COMMITTED REVERSIBLE ERROR BY DISREGARDING SIMONE'S FIRST AMENDMENT RIGHTS ........................................................................ 39

VI. THE DETERMINATION SHOULD BE VACATED AND SANCTIONS IMPOSED ON THE DEPARTMENT FOR SLANDER, CONSTRUCTIVE TERMINATION, TORTIOUS INTERFERENCE, EVIDENCE TAMPERING, AND VIOLATION OF *NLRB V. WEINGARTEN* ........................................................................................... 42

VII. CONCLUSION ........................................................................................................... 46

TABLE OF AUTHORITIES

**CASES**

Ahr v. Karolewski, 48 A.D.3d 719, 853 N.Y.S.2d 172 (2d Dep't 2008) ........................................ 7

Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty., 513 F. Supp.3d 593, 610 (W.D, Pa. 2021)........................................................................................................... 39

Arbuckle, *et al*. v. City of N.Y., 14-cv-10248, Docket No. 34 (S.D.N.Y. Sept. 30, 2016) .......... 46

Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001) ...................................................... 39

Barrett v. Miller, 179 Misc.2d 24, 30, 682 N.Y.S.2d 552, 557 (Sup. Ct., N.Y. Cty. 1998) ......... 15

Baum v. Cty. of Rockland, 337 F. Supp.2d 454 (2004) ............................................................... 23

Bowen v. Van Bamer, 205 A.D.3d. 674, 674 – 5, 2022 N.Y. Slip Op. 2975 (2d Dep't May 4, 2022)............................................................................................................................. 43

Brady v. Dammer, 573 F. Supp.2d 712 (2008)............................................................................. 23

Brown v. Murphy, 348 N.Y.S.2d 777, 43 A.D.2d 524 (1973) .......................................... 32, 33, 34

Caravalho, *et al*. v. City of N.Y., 13-cv-4174 (PKC) 2016 WL 1274575 (S.D.N.Y. Mar. 31, 2016)............................................................................................................................. 47

Curinga v. City of Clairton, 357 F.3d 305, 309 (3d Cir. 2004) ............................................. 40, 41

Erdman v. Ingraham, 28 A.D.2d 5, 280 N.Y.S.2d 865 (1st Dep't 1967) ......................... 32, 34, 35

Garcetti v. Ceballos, 547 U.S. 410 (2006)............................................................................ 39, 40, 41

Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011).................................................................................. 37

Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d 757, 765, 34 Misc.3d 161, 168 (Sup. Ct., N.Y. Cty. 2010)................................................................................................................... passim

Hegeman v. Bedford, 5 A.D.3d 632, 774 N.Y.S.2d 769 (2d Dep't 2004).................................. 18

Hersh, *et al*. v. Cohen, *et al*., 2024 N.Y. Slip Op. 03738 at 2 (N.Y. App. Ct., 2d Dep't Jul.10, 2024)............................................................................................................................. 44

Holland v. Gallagher, 11 A.D.2d 1027, 205 N.Y.S.2d 649 (2d Dep't 1960) .............................. 39

Houchins v. KQED, Inc., 438 U.S. 1 (1978) ................................................................................. 37

Joseph v. Fensterman, 204 A.D.3d 766, 771, N.Y. Slip Op. 02733 (3d Dep't Mar. 27, 2023).... 44

Katz v. U.S., 389 U.S. 347 (1967) ........................................................................................ 37

Laurido v. Simon, 489 F. Supp. 1169 (S.D.N.Y. 1980) ............................................... 13, 15, 17

Marom v. City of N.Y., 15-cv-2017 (PKC) 2016 WL 59000217 (S.D.N.Y. Jul. 26, 2016) ........ 47

Matter of Breen v. Gunn, 137 A.D.2d 685, 524 N.Y.S.2d 774 (2d Dep't 1988)......................... 15

Matter of Halperin v. City of New Rochelle, 24 A.D.3d 768, 770, 809 N.Y.S.2d 98 (2005) ...... 21

Matter of Williams v. Troiana, 129 A.D.3d 1601, 1603, 13 N.Y.S.3d 725 (4th Dep't 2015)...... 17

Miller v. Debuono, 90 N.Y.2d 783, 666 N.Y.S.2d 548, 689 N.E.2d 518 (1997) ............ 20, 21, 22

N.L.R.B. v. Weingarten, 420 U.S. 251 (1975) ............................................................... 44, 45

Nelson v. HSBC Bank USA, 41 A.D.3d. 445, 447 (N.Y. App. Div., 2d Dep't 2007) ................ 45

New York v. Hill, 528 U.S. 110, 115 (2000)........................................................... 16, 17, 18

Pastore v. City of Troy, 481 N.Y.S.2d 306, 126 Misc.2d 113 (Sup. Ct., Rensselaer Cty. 1984). 31

People v. Armlin, 37 N.Y.2d 167, 172 (1975)...................................................................... 14

People v. Garafolo, 44 A.D.2d 86, 88, 353 N.Y.S2d 500 (2d Dep't 1974)................................ 29

People v. Johnson, 176 A.D.3d 1392, 113 N.Y.S.3d 294 (3d Dep't 2019)................................ 21

People v. Stone, 22 N.Y.3d 520, 525, 6 N.E.3d 572, 575, 983 N.Y.S.2d 454, 457 (2014).......... 13

People v. Stroman, 83 A.D.2d 370, 372, 444 N.Y.S.2d 463, 465 (1st Dep't 1981).................... 29

People v. Wright, 418 N.Y.S.2d 586, 587, 71 A.D.2d 585, 586 (1st Dep't 1979) ........................ 7

People v. Zi, 178 A.D.3d 591, 592, 117 N.Y.S.3d 21, 24 (1st Dep't 2019).......................... 13, 14

Phillips v. N.Y.C. Admin. Servs., 173 A.D.3d 493, 103 N.Y.S.3d 62 (1st Dep't 2019)............. 24

Pickering v. Bd. of Ed. Of Tp. High Sch. Dist., 391 U.S. 563, fn. 2 (1968) ........................... 7, 40

Price v. City of N.Y., 172 A.D.3d 625, 103 N.Y.S.3d 31 (1st Dep't 2019) ............................... 21

Schenectady Police Benev. Ass'n v. N.Y.S. Pub. Empl. Rel. Bd., 85 N.Y.2d 480, 485, 626 N.Y.S.2d 715, 650 N.E.2d 373 (1995)........................................................................... 7

U.S. v. Olano, 507 U.S. 725 (1993)..................................................................................... 17

Urofsky v. Gilmore, 216 F.3d 401, 407 (2001) ...................................................................... 39

Weaver Hardware Co. v. Solomovitz, 235 N.Y. 321, 139 N.E. 353 (1923) ............................... 19

Whelan v. Cuomo, Index No. 607269/21, 2023 N.Y. Slip Op. D72551 (2d Dep't Oct. 25, 2023) ............................................................................................................................ 43

Zaborowski v. Roman Cath. Diocese of Brook., *et al.*, Index No. 18474/13, 2021 N.Y. Slip Op. 3866 (2d Dep' t Jun. 16, 2021).............................................................................................. 45

**STATUTES**

18 U.S.C. App. 2, Art. III (2025)................................................................................................ 18

N.Y. C.P.L.R. § 7803 (2023) ........................................................................................................ 20

N.Y. Civ. Serv. L. § 72 (2023)............................................................................................... passim

N.Y. Civ. Serv. L. § 72(1) (2023)........................................................................................... 20, 22

N.Y. Civ. Serv. L. § 72(5) (2023).................................................................................................. 20

N.Y. Ed. L. § 6512 (2023) ......................................................................................................... 5, 36

N.Y.S. Ed. L. § 7601 (2023) ......................................................................................................... 23

N.Y.S. Ed. L. § 7605 (2023) ......................................................................................................... 23

**OTHER AUTHORITIES**

45-A N.Y.C. Charter § 1048 (2023) ............................................................................................. 2

45-A N.Y.C. Charter § 1049(1)(b) (2023)...................................................................................... 2

45-A N.Y.C. Charter § 1049(2)(b) (2023)...................................................................................... 2

45-A N.Y.C. Charter § 1049(3) (2023)........................................................................................... 1

Admin. for Children's Servs. v. Anonymous, OATH Index No. 2619/11 at 7 (Dec. 30, 2011) ................................................................................................................... 26, 27

**RULES**

48 R.C.N.Y. § 1-02 (2023) .......... 1

48 R.C.N.Y. § 1-51 (2023) .......... 2

48 R.C.N.Y. § 6-02 (2023) .......... 1

48 R.C.N.Y. § 6-11(g) (2023) .......... 2

60 R.C.N.Y. § 3-03 (2024) .......... 45

N.Y.C. P.S.B. § 410-1R (2000) .......... 28

**TREATISES**

4 N.Y. Jur. 2d Appellate Review § 729 (2024) .......... 39

58A N.Y. Jur. 2d Evidence & Witnesses § 965 (2024) .......... 7

58A N.Y. Jur.2 Evidence & Witnesses § 968 (2024) .......... 21

## PARTIES

D.S. was an Associate Staff Analyst ("ASA") permanent in title with the New York Police Department since April 2019, hereinafter "Simone".

The New York Police Department is a law enforcement agency within the City of New York, hereinafter the "Department".

## JURISDICTIONAL STATEMENT

On or around August 23, 2023, the New York Police Department initiated a proceeding pursuant to Section 72 of the New York Civil Service Law alleging that Simone was unfit for duty. The petition was filed with the Office of Administrative Trials and Hearings ("OATH") as the designated hearing officer and assigned a hearing date in the Trials Division. Simone does not concede jurisdiction of this matter to OATH's Trials Division, which cites 48 R.C.N.Y. § 1-02 as the basis of its jurisdiction. Relying on Section 1049(3) of the New York City Charter, the provision states, in relevant part, that OATH has "authority to render any ruling or order necessary and appropriate under applicable law or agency rule for the just and efficient adjudication of cases." 48 R.C.N.Y. § 1-02 (2023). The language is overly-broad as if granting the Trials Division the authority to oversee any case. But Section 1049(3) of the New York City Charter does not explicitly grant OATH's Trials Division such authority; it merely delineates the powers of the administrative law judges. *See* 45-A N.Y.C. Charter § 1049(3) (2023) ("In the conduct of an adjudication, an administrative law judge may . . .").

On the other hand, 48 R.C.N.Y. § 6-02 establishes the practices for matters held before the Hearings Division of OATH and limits such matters to summonses issued within the City. *See* 48 R.C.N.Y. § 6-02 (2023) ("Pursuant to Section 1048 of the Charter, the Tribunal has jurisdiction to hear and determine summonses issued by a City agency or, when permitted by law,

an individual . . ..”). It relies on Section 1048 of the New York City Charter in imposing this limitation, but that provision states, “There shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings for all agencies of the city unless otherwise provided for by executive order, rule, law or pursuant to collective bargaining agreements.” 45-A N.Y.C. Charter § 1048 (2023).

It is important to note that the specific language used in NY Civil Service Law §72 (“Section 72”) is that a party is afforded the right of a “hearing”, and it continues to characterize the proceeding as an “administrative hearing”. *See*, generally, N.Y. Civ. Serv. L. § 72 (2023). OATH clearly distinguishes between trials and hearings and further between hearing officers and administrative law judges with the terms being used in both the conjunctive and disjunctive forms, thereby indicating that they are separate and distinct. *See, e.g.*, 45-A N.Y.C. Charter § 1049(1)(b) (2023) (“. . . qualifications shall not be mandatory with respect to any administrative law judge **or** hearing officer.”)(emphasis added); 45-A N.Y.C. Charter § 1049(2)(b) (2023) (“[T]he chief administrative law judge shall promulgate and may from time to time amend rules establishing a code or codes of professional conduct governing the activities of all administrative law judges **and** hearing officers in city tribunals.”)(emphasis added). These distinctions in effect impair Simone’s rights. Specifically, OATH denied her request for a copy of the original recording of the hearing based on the case being heard in the Trials Division in lieu of the Hearings Division. *See* 48 R.C.N.Y. § 6-11(g) (2023)(“Hearings will be mechanically, electronically or otherwise recorded by the Tribunal . . ., and the original recording will be . . . the sole official record of the hearing . . . A copy of the recording will be provided upon request to the Tribunal.”); *cf.* 48 R.C.N.Y. § 1-51 (2023) (“Trials will be stenographically or electronically recorded, and the recordings will be transcribed . . . Transcripts will be made part of the record, and will be made available upon request or as required by law.”).

The original recording would ensure the integrity of the transcript and decision. The Commission will notice that the copy of OATH's determination as provided to the Commission bears dark lines going across the pages as if to indicate a poorly executed cut and paste job. At any and all times, Simone has maintained that the petitioner has engaged in evidence tampering. Further, the moment at which opposing counsel attempted to change exhibits mid-trial can be heard in the recording but would be less evident from the transcript. In fact, it conveniently may be represented as inaudible.

Because the matter was heard in OATH, Simone appeals to the Commission after having contacted Department of Citywide Administrative Services on or around July 2, 2024 and January 29, 2025 regarding reinstatement and intentions to appeal the OATH determination. Simone also does not concede that the Commission is the proper authority to review any and all matters rooted in the state and federal constitutions or qualifies as the final authority in certain interpretations of state law. Consequently, she reserves the right to bring those matters, if any, before a court of proper jurisdiction.

**ISSUES PRESENTED**

1) Whether the Tribunal erred in denying due process by not dismissing the matter based on Simone not waiving the 30-day hearing.

2) Whether the Tribunal erred in characterizing Dr. Gille as a medical officer for purposes of Section 72 and further accepting her practice of medicine without a license by diagnosing an employee with a medical condition.

3) Whether the Tribunal erred in determining that the Department's evidence met the higher standard of preponderance of the evidence with inconsistent and incredible testimony from the Department's witnesses.

4) Whether the Tribunal erred in determining that the Department met its burden of proof in spite of the insufficient and incredible evidence, and thus shifting the burden of proof to Simone to rebut incredible evidence.

5) Whether the Tribunal denied Simone a fair hearing by assigning probative value to inadmissible hearsay.

6) Whether the Tribunal erred in disregarding Simone's protections under the First Amendment.

## STATEMENT OF CASE

It is a lie. All of it. It is not as evident from the emails that the Department admitted into evidence as much as it is in the inconsistent testimonies on which it heavily relies. The emails that the Department and the Tribunal use to assassinate Simone's character require close scrutiny and in-depth analysis. The sentence structure, word choice, and legal analysis are not indicative of someone who was delusional, but rather a reflection of the intelligent, self-assured person the Tribunal and both of the Department's psychologists determined her to be.

This proceeding is a test of whether the City can judge itself. Lies have been told. Under oath. By witnesses. By counsel. And the right facts have not been the focus of this matter. For example, setting aside her academic credentials, Dr. Christina Gille as the department's psychologist is not licensed to practice and identify herself as a psychologist in the State of New York. See N.Y. Ed. L. § 6512 (2023). If she cannot practice medicine, then she cannot diagnose someone with a medical condition. Additionally, even if the Commission disregarded the lack of licensing, her testimony undermines her diagnosis, thereby making it impossible to be true. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), the industry-accepted guideline for diagnosing mental health conditions, defines delusional disorder as having a false belief persisting longer than a specific time. The problem is that Dr. Gille testified that she did not know Simone's belief to be false. For that reason, she legitimately could not reach a determination that Simone suffered from delusional disorder.

The case should end there, because the plain language of Section 72 is that the employee is unable to perform his or her duties "by reason of a disability". N.Y. Civ. Serv. L. § 72 (2023). Consequently, the department failed to satisfy that element. We, nevertheless consider the outlandish notion that a 5'1, black, woman, and civilian in a questionably biased, uniformed organization was emboldened enough to physically threaten a white male with whom she did not

work or even personally know. And to do so without cause. No, she was not. However, the Department posits that Simone in fact threatened that man and others which resulted in operations stopping to a halt. It is laughable. On all days in question, police officers from the Department solved crime, which they were and are charged with doing, and the City that never sleeps still was awake.

And here we are, dragged into an all-out battle heaving one lie after the other. The problem with lies is that you cannot prove them to be true unless you submit more lies, either via modified records, false testimony, or other means. In order for the Commission to appreciate the gravity of those actions, I submit the following:

> As an attorney with a sworn oath to uphold the U.S. Constitution, I determined that opposing counsel Asya Abbas threatened each panel member of the Commission before their review of this matter. I saw her do it, and I will testify the same in court.

From that mere allegation and given my weight as an attorney with no disciplinary record, someone actually might presume her to be violent, and her character would be tainted, and career possibly jeopardized. Is it true? I do not know it to be true, but I know that I made it up. I never heard her threaten the panel, but I presented that example to demonstrate how easily a lie can escalate. We all know that the defense to slander is truth.

The truth is if the Tribunal deemed Dr. Gille, as the Department's psychologist, to be credible, then it means that Dr. Gille was practicing medicine without a license. And to uphold that diagnosis would not violate just state law but also the federal protections accorded to civil servants, thereby implicating the City and its personnel to actions for slander, tortious interference, and equal protection violations. This proceeding is the test on whether the City can overcome undue influence and judge itself. Let's hope that truth finally will prevail.

## STANDARD OF REVIEW

It is customary for a court to grant great deference to the trier of fact, because of its opportunity to hear and observe the witnesses.[1] Under such a review, the question would be whether the lower court made a plain error or if its interpretation of the facts were clearly erroneous. However, such deference is inapplicable when the matter involves statutory interpretation.[2] This case warrants *de novo* review, because of the questions of fact, evidentiary issues, questions of law, and substantive rights at issue.[3]

## STATEMENT OF FACTS

### *Procedural History*

Simone was sent for a mandatory fitness for duty evaluation on or around July 25, 2023. After such evaluation, she was immediately placed on involuntary leave of absence. A notice dated July 28, 2023 regarding such leave followed. The Department initially proposed August 25, 2023 for the pre-trial conference and August 28, 2023 for the hearing date. By August 23, 2023, the initial scheduling of the 30-day hearing was adjourned without Simone's consent. The first scheduled conference occurred on or around October 5, 2023.

Simone was represented by a union attorney from the Organization of Staff Analysts until on or around December 8, 2023. After such time, OSA assigned a private attorney

---

[1] 58A N.Y. Jur. 2d Evidence & Witnesses § 965 (2024) (citing Ahr v. Karolewski, 48 A.D.3d 719, 853 N.Y.S.2d 172 (2d Dep't 2008)); People v. Wright, 418 N.Y.S.2d 586, 587, 71 A.D.2d 585, 586 (1st Dep't 1979) (noting that the trier of facts has the "advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews the printed record.").
[2] Schenectady Police Benev. Ass'n v. N.Y.S. Pub. Empl. Rel. Bd., 85 N.Y.2d 480, 485, 626 N.Y.S.2d 715, 650 N.E.2d 373 (1995).
[3] "[W]here constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case." Pickering v. Bd. of Ed. Of Tp. High Sch. Dist., 391 U.S. 563, fn. 2 (1968); *see also*, Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d 757, 765, 34 Misc.3d 161, 168 (Sup. Ct., N.Y. Cty. 2010) ("Application of the preponderance of the evidence standard demands a de novo review of the record.").

who requested removal on or around January 9, 2024, and such request was granted. After numerous adjournments, the first hearing date occurred on May 21, 2024 with continuances on May 23, 2024 and May 31, 2024. The Department denied Simone's request for reinstatement submitted in or around October 2023. The Tribunal issued a recommendation on or around October 9, 2024 to uphold the leave of absence, and the Police Commissioner accepted the recommendation on or around October 17, 2024. Simone contacted The Civil Service Commission on or around October 16, 2024 and October 29, 2024 to appeal the agency determination, and she later contacted Department of Citywide Administrative Services on or around January 29, 2025 regarding her intent to appeal. The Department had a deadline of December 19, 2024 by which to submit a true and complete administrative record. A partial record was submitted. Brief deadlines were set and oral argument is requested.

*Relevant Facts*

Simone joined the Department on April 1, 2019. Tr. 522 – 99, 611 - 50. She was initially assigned to work as a compliance analyst with the Compliance Division of the Risk Management Bureau. . During her time with that unit, she created new data visualizations to present at meetings with different commands throughout the department. However, she experienced a hostile work environment and sought new opportunities with other commands instead of filing a complaint. She voluntarily transferred to the Project Management Office on or around July 28, 2021. While the plan was for a new start, she seemed to experience residual conflict from the previous command. She was assigned to lead the implementation of certain projects. However, she slowly was removed from those projects in favor of other project managers. After having completed certain assignments, she would return at a later time and her work would be undone. Her meeting appointment times in her email were changed without her knowledge. Additionally, she continued to have property taken from her purse while on department premises,

including keys and bank cards. Most notably, after her bank cards were taken, she continued to experience issues with her financial accounts. For example, transactions on her banking statements differed from her receipts for those same transactions.

Simone raised certain issues with her superiors regarding her concern with actions by certain co-workers. In an attempt to employ techniques for conflict resolution, she attempted to address these matters with co-workers directly, and in some instances, her supervisor would follow-up.

As Simone gradually was removed from leading projects, she sought to identify opportunities for improvement in the Department, thereby attempting to find new projects on which she could work. In doing so, she approached supervisors from several commands to learn their functions. That inquiry process resulted in her asking to attend a meeting, in which executives from different commands presented statistical information concerning their command operations as well as other key issues. She attended similar meetings in her previous assignment. She directly asked the highest ranking uniformed officer if she could sit in on the meeting, to which he gave his approval. However, a number of lower ranking persons blocked her attendance and later complained to her supervisor. After learning about her interest to attend the meeting, her supervisor reluctantly attended the same meeting virtually. Simone was later chastised for having tried to attend that meeting and issued specifications and charges on the basis of failing to obey orders in spite of not having been given the necessary order that would warrant those charges.

During that same time, Simone noted weird incidents in the Department. She noticed and documented smells that possibly could not be true considering her environment. She also noticed that her co-workers' demeanor differed from their standard behavior. When she asked one co-worker what he was doing, he said just a little "voo-doo", but Simone did not give his statement much weight at the time. He was not the person with whom she mostly spoke at the

office. However, she had a work acquaintance who she asked whether he experienced strange events at the office. He asked if she could smell different scents, and after she responded in the affirmative, he told her that they use dark arts. The events that followed got increasingly worse. The unexplainable scents and theft continued into 2022. At that time, Simone only discussed the incidents with two people – her work acquaintance and her husband until his passing. In fact, when she noticed that her husband was not acting like himself, she directly asked whether the department used a medium or hypnosis.

The employment of dark arts is hard to prove. In fact, it is designed to exist under the radar. For that reason, Simone attempted to document most occurrences. Those incidents included ailments that she could not explain or that could not possibly be hers. Those conditions started to affect her time and leave. She started to use more sick leave than she had during her first three years with the Department. She also collected any evidence, such as hair follicles, that showed up in places that no one could have been. In one such incident, she collected a hair follicle that was in her purse that she had in a private office with the door closed. She would also note the sudden appearance of a fly in cold, winter temperatures.

It was not until after February 2023, after having been involuntarily transferred, that she started to have discussions with executives about a witchcraft program. Prior to that time, she asked an executive about navigating the environment with incidents that could not be explained, to which he texted that it sounds like a problem with a witch. That text was later changed to "magician". When she directly asked an executive officer to discontinue its use, he responded that he could only affect it in the office but not outside of the command. She also witnessed that same executive call a particular command to have a sergeant turn "it" back on after I received prayer from a clergyman earlier that day. She heard chanting, which stopped after she threatened to

contact the imam. The implications of the existence of the practice of something unnatural worsened and was incessant.

Consequently, she requested a reasonable accommodation in or around March 2023 so that she could meet with clergy on a regular basis. It was denied. She asked about the practice originating from certain persons, and instead of assuming the information that she received was correct, she aimed to speak directly to the person(s) to address the issue. It would eliminate the perpetuation of any rumors. I was unable to speak to those persons directly. However, when she followed up about a certain persons' participation, an executive responded that it was not just that person. For that reason, she reached out to prospective participants, citing constitutional violations to dissuade the continuance of their actions.

In addition to the underlying tone of black magic and/or witchcraft, Simone was also addressing the Department's failure to promote her from the civil service list for the title of Administrative Staff Analyst. She was informed that the Department Advocate's Office was blocking her promotion due to the charges issued in or around December 2022. Those charges were issued shortly after she interviewed for the title but prior to the promotions being issued for the month of December 2022. In or around March 2023, she visited the Advocate's Office to ask about the status of the charges as well as the author of the document. She was informed that it was an executive counsel who happened to be white, female and two years ahead of her in bar admission. Simone was unable to speak to her about the charges.

At some point, Simone complained to another acquaintance, who was not an attorney, about the author's failure to establish a *prima facie* case and the discrepancy of the facts between the charges and the memorandum on which the charges was based. Simone strongly suspects that the drafting attorney learned about the conversation and was compelled to contact the Medical Division regarding a recommendation that she was unfit. Afterall, only a person with

mental incapacity would try to attend the primary meeting in which department matters are discussed in order to learn about the Department. R. at 135.

In or around April 2023, Simone filed a grievance as a result of the unfounded charges and specifications that might have been preventing my promotion. Shortly thereafter, she was sent for an involuntary fitness evaluation. After three visits, the psychologist determined that she was fit for duty. At that time of the initial visit, she complained to the union about her being required to undergo the evaluation. Within approximately two days of her asking the executive to discontinue the witchcraft, Simone was administratively transferred to another command.

At that time, Simone was assigned a private office. Several people asked her where she was sitting. Simone was reluctant to tell them. But once people learned about her new location, the theft and harassment resumed. On July 25, 2023, Simone's supervisor told her that she was going for a fitness evaluation at the Medical Division. He further instructed her to pack her belongings and not to leave any items. Simone met with Dr. Christina Gille at the Medical Division for the fitness evaluation. After the meeting, Dr. Adam Bloom and Dr. Gille met with Simone to explain that she was unfit for duty. While on a call with her union representative, Dr. Bloom informed Simone that the leave would be paid. Simone did not return to the office. Days later, the Department sent a notice informing Simone that her leave was unpaid.

Since that time, Simone continued to experience issues with her bank accounts as well as interference with her email and telephone communications. Because the behavior followed the same pattern as what she experienced while at the office, she continued to email her supervisor as well as internal affairs. The Department based its characterization of "delusional" on those communications.

## ARGUMENT

### I. THE DECISION MUST BE OVERTURNED, BECAUSE A PARTY CANNOT BE FOUND MENTALLY INCOMPETENT AND REPRESENT HIM- OR HERSELF AT TRIAL

New York courts have consistently held that when a party's mental competence is a known issue, then his or her right to self-representation is not waivable unless the court performs a search inquiry to establish that the party's waiver to counsel was knowingly, voluntarily, and intelligently given. *See, e.g.*, People v. Stone, 22 N.Y.3d 520, 525, 6 N.E.3d 572, 575, 983 N.Y.S.2d 454, 457 (2014) ("It is well-settled that an application to proceed pro se must be denied unless defendant effectuates a knowing, voluntary and intelligent waiver of the right to counsel."); People v. Zi, 178 A.D.3d 591, 592, 117 N.Y.S.3d 21, 24 (1st Dep't 2019) ("Where there are 'red flags' that a defendant may be suffering from a serious mental illness affecting his or her competency to waive counsel, the searching inquiry should include a particularized assessment of defendant's mental capacity.")(emphasis removed). Here, the Department initiated the proceeding challenging Simone's mental capacity to perform her duties as an ASA. In fact, it alleges that her inability to serve in that role is due to her disability. For that reason, it is clear that Simone's mental health was at the forefront of this matter. After a hearing of the evidence against Simone, the Tribunal determined that Simone was competent in trial practice but unable to perform her duties as ASA due to her alleged mental disability. The finding is contradictory.

While these cases often involve protections afforded to persons subject to criminal prosecution, the same reasoning applies when the case involves a substantial right. *See* Laurido v. Simon, 489 F. Supp. 1169 (S.D.N.Y. 1980)(noting that placing a civil service employee on involuntary leave implicates liberty and property interests). Additionally, these matters are not presented to the Commission particularly for the purpose of waiving counsel, but rather to highlight the contradiction of finding Simone mentally competent to represent herself in a trial and

show competence in performing that function but unable to perform the role of an ASA. *See, e.g.*, People v. Armlin, 37 N.Y.2d 167, 172 (1975) ("[T]here is an inherent contradiction in arguing that a [party] may be incompetent, and yet knowingly or intelligently waive [a fundamental right]."). "'Intelligent' as used in this context refers to cognitive capacity . . .." People v. Zi, 178 A.D.3d at 595, 117 N.Y.S.3d at 26 (dissenting). Thus, Simone's cognitive capacity was that she could give an opening statement, actively listen to the proceedings, cross-examine the Department's witnesses, challenge leading or irrelevant questions, defend her examination questions, testify, and complete a summation.[4] Additionally, she asked questions that demonstrated inconsistency in the Department's witness testimonies and further showed that they were impossible to be true (discussed *infra*). In fact, the Tribunal explicitly described her representation as competent. R. at 348 ("[Respondent] demonstrated competence with respect to trial practice and procedures."). But she was or is unable to perform "professional work" as required by the tasks and standards of an ASA. See R. at 0001 (An ASA "[p]erforms and administers difficult professional work in the preparation and conduct of administrative, procedural and operational studies and analyses concerning the agency's organization and operations . . .."). The two facts cannot coexist. Work as a trial attorney is professional work and, in some ways, more complex than the tasks of an ASA. Nevertheless, ASAs have wide latitude for independent judgment in the performance of their duties, which may include determining the need for contractual services. Id. For that reason, if she was mentally fit to perform trial work, then she was mentally fit to perform the duties of an ASA.

For the record, Simone's representation of herself was not voluntary. She opted for representation by her union. She was assigned counsel, who she deemed too friendly with opposing counsel. The union's attorney chose to remove within a week after Simone's health insurance

[4] This description pertains to Simone's acts that occurred during the hearing from May 21, 2024 – May 29, 2024, *but see*, People v. Crampe, 17 N.Y.3d 469, 484, 957 N.E.2d 255, 932 N.Y.S.2d 765 (2011) stating "'counsel' is required . . . adhere to the rules of procedure and evidence, comprehend the subtleties of voir dire, examine and cross-examine witnesses effectively . . . object to improper prosecution questions, and much more."

ended. She was assigned new counsel for whom she had to complete tasks to meet the deadline. She was unable to obtain new counsel as an out of pocket expense, especially with constant interference of her email communication. She told the Tribunal that her preference was for representation. Consequently, she was forced into the function and responded to the moment.

For the aforementioned reasons, the Tribunal's decision should be overturned, because Simone could not possess sufficient mental capacity to perform the duties of a trial attorney and represent herself at the proceeding but be mentally incompetent or unfit to perform the duties of an ASA.

## II. THE TRIBUNAL ERRED ON NOT DISMISSING THE PETITION ON DUE PROCESS GROUNDS

The Tribunal's determination violates Simone's due process rights, because the law requires that a civil service employee whose mental fitness is challenged must be afforded a hearing within a reasonable time of being placed on involuntary leave. Specifically, Section 72 requires that a hearing be held within 30 days of the employee being placed on leave. N.Y. Civ. Serv. L. § 72 (2023) ("The appointing authority will afford the employee a hearing within thirty days of the date of a request by the employee to be held by . . . a hearing officer employed by the office of administrative trials and hearings."). It is well-established that Section 72 concerns substantive rights of the employee, thereby requiring due process protections. *See* Laurido v. Simon, *supra*. For that reason, courts must strictly comply with the statute's procedural requirements. Barrett v. Miller, 179 Misc.2d 24, 30, 682 N.Y.S.2d 552, 557 (Sup. Ct., N.Y. Cty. 1998) (citing Matter of Breen v. Gunn, 137 A.D.2d 685, 524 N.Y.S.2d 774 (2d Dep't 1988)). "[E]xceptional circumstances requiring immediate action" must exist in order to place an employee with civil service protection on involuntary leave without a hearing,. Laurido v. Simon, at 1176.

Here, Simone was permanent in the title of ASA and on the promotional and open competitive lists for Administrative Staff Analyst. Her title is a competitive title and represented by a union. Thus, she opted for the union to represent her in connection with the Section 72 matter. She was placed on leave on or around July 25, 2023. Shortly after such time, she communicated with her union representation about a conference and hearing scheduled on August 25th and August 28th, respectively. R. at 639 – 41. Those dates were given to her by her union. However, on or around August 24th, she learned that union waived the 30-day hearing without consulting her. Id. After reviewing the Department's petition dated August 23, 2023, she discovered that the waiver to the 30-day hearing requirement had been given on that same date, which was prior to the union having any discussion with Simone about the hearing dates changing. The Tribunal referenced an email dated August 4, 2023 among the Tribunal, the Department, and Simone's counsel, and this email reflects the waiver of the 30-day hearing, but Simone is not copied on the email.[5] R. at 338 – 9.

The Tribunal cites New York v. Hill, 528 U.S. 110, 115 (2000) as precedent for upholding the waiver of the 30-day hearing from Simone's counsel irrespective of her not consenting. R. at 339. However, such reliance is reversible error. In New York v. Hill, New York lodged a detainer against an Ohio prisoner pursuant to the Interstate Agreement on Detainers (the "IAD").[6] The prisoner requested for disposition of the detainer as required by the IAD. The prisoner's counsel agreed to a trial date beyond the mandatory 180-day period. In spite of counsel's

[5] The record does not include an email dated August 4, 2023 among the aforementioned parties. Nevertheless, the tribunal notes that it relied on the union's written representation in scheduling the first pre-trial conference. R. at 338 – 9.

[6] The IAD memorializes an agreement among 48 states, the United States federal government, and the District of Columbia that aims to resolve one state's outstanding charges against a prisoner of another state. It states: Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever . . . there is pending in any other party State and untried indictment . . . on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after . . . his request for a final disposition to be made of the indictment . . . [provided that], for good cause shown in open court, the prisoner or his counsel being present, the court . . . may grant any necessary or reasonable continuance. 18 U.S.C. App. 2, Art. III (2025).

adjournment, the prisoner moved to dismiss the indictment based on the expiration of the time. The Supreme Court determined that the adjournment was a scheduling matter contemplated by the IAD, and thus the prisoner would be bound by the acts of his lawyer-agent. Id. However, the court noted that the underlying right affected by the waiver is crucial in determining whether the represented party must participate personally in the waiver, whether the required procedures are followed, and whether the party's choice was informed or voluntary. Id.; U.S. v. Olano, 507 U.S. 725 (1993). For certain fundamental rights, the represented party personally must make an informed waiver. N.Y. v. Hill, 528 U.S. at 115.

The Tribunal erred in claiming that the requirement for a 30-day hearing after being placed on involuntary leave was "unlike a fundamental right". R. at 339. The liberty and property interests attendant to civil service employment are well settled. *See* Laurido v. Simon, *supra*. Because of these rights, adherence to due process dictates that there must be strict compliance with statutory procedures. *See* Matter of Williams v. Troiana, 129 A.D.3d 1601, 1603, 13 N.Y.S.3d 725 (4th Dep't 2015) ("These procedures are necessary to 'afford tenured civil servant employees . . . procedural protections prior to involuntary separation from service'. . . 'Because of the significant due process implications of the statute, strict compliance with its procedures is required.'")(citations omitted). Thus, Simone's inability to continue pursuing life and liberty by and through her civil service employment after being placed on involuntary leave required her counsel to obtain a waiver of the 30-day hearing directly from Simone.

The statutory construction of Section 72 includes language preserving a party's right to obtain counsel. It specifically provides that the employee may be represented at a hearing by counsel or a representative of a recognized employee organization, and the employee "shall be entitled to a reasonable period of time to obtain such representation." *See* N.Y. Civ. Serv. L. § 72 (2023). "[W]hat constitutes a reasonable time is usually a question of fact, where the facts are

undisputed, what is a reasonable time becomes a question of law . . ..” Hegeman v. Bedford, 5 A.D.3d 632, 774 N.Y.S.2d 769 (2d Dep’t 2004). Arguably, this allowance of a reasonable time contemplates the need to adjourn the initial hearing beyond the statutory 30-day time period. However, the drafters of the IAD, on which New York v. Hill is based, explicitly provides for a continuance if good cause exists. 18 U.S.C. App. 2, Art. III (2025) (“[T]he court having jurisdiction of the matter may grant any necessary or reasonable continuance.”). The authors of Section 72 did not do the same. Section 72 does not explicitly reserve court discretion for a continuance or adjournment. Thus, it implies that 30 days could be a reasonable time for the employee to obtain representation in order to determine whether placing the employee on leave was justifiable.

Furthermore, Section 72 imposes an additional requirement that a determination of the appropriateness of the involuntary leave must be issued within 75 days of the employee’s request for review. *See* N.Y. Civ. Serv. L. § 72 (2023) (“In any event, a final determination of the notice of an employee’s contest of a notice of leave shall be rendered within seventy-five days of the receipt of the request for review.”). The mandate is prefaced with the phrase “[i]n any event”, thereby imposing a non-waivable mandate for the matter to be resolved within that finite time period. Id. (“[A] final determination . . . **shall** be rendered . . .”)(emphasis added).

The record is clear that Simone did not consent to a waiver as of August 4, 2023, which is the earliest date given as indicating that her right to a hearing within 30 days had been waived. On August 21, 2023, her union representative informed her that the Department proposed August 25, 2023 for the pre-trial conference and August 28, 2023 for the hearing date. R. at 640 (“NYPD is proposing an 8/25/23 conference date and an 8/28/23 hearing date to terminate your

employment.").[7] The subsequent communication between Simone and her representation show that Simone anticipated attending a hearing and resolving the matter by that time.

The only legitimate waiver between the parties was the Department's waiver to receive written notification of Simone's request for a hearing. While the statute imposed a requirement for the aggrieved party to notify the agency within ten (10) days of having received notice of the involuntary leave of absence,[8] the Department's notice dated July 28, 2023 informing Simone about the involuntary leave of absence (the "Notice of Leave") states that a hearing **will be** scheduled within 30 days of receipt of this letter. R. at 380 (emphasis added).[9] The only permissive language was in regards to Simon obtaining representation. This reasoning is supported by subsequent communication stating that the Department proposed August 28, 2023 for the hearing date. R. at 640.

Here, even if the Commission accepted that Simone's counsel waived the 30-day hearing requirement, it would be of no consequence given that the final determination was rendered more than a year after Simone's request for leave as opposed to the statutory 75-day wiondow. Thus, the proceeding should have been dismissed for the violation of Simone's right to due process. For the aforementioned reasons, we respectfully request that the determination be vacated.

---

[7] Please note that any and all communication between Simone and her representation included in the record does not waive attorney-client privilege. They were admitted into the record with limited scope and should not be used for any other purpose.

[8] N.Y. Civ. Serv. L. § 72 (2023) ("An employee shall be allowed ten working days from service of the notice to object to the imposition of the proposed leave of absence and to request a hearing. The request for such hearing shall be filed by the employee personally or by first class, certified or registered mail, return receipt requested.").

[9] The Notice of Leave bears the command "Human Resources Division" in the letterhead and the signatory's title is "Inspector". Simone asked the tribunal to take judicial notice that the Chief of Personnel was a representative of the department, to which the department refused, thereby indicating bias. Tr. at 478. The court may take judicial notice of "the usual custom as to a particular matter in a particular type of business." Weaver Hardware Co. v. Solomovitz, 235 N.Y. 321, 139 N.E. 353 (1923). The Chief of Personnel is a member of the department's executive staff and outranks an inspector who is assigned to that bureau. R. at 15 – 6.

## III. THE TRIBUNAL ERRONEOUSLY DETERMINED THAT THE DEPARTMENT MET ITS BURDEN OF PROOF, BECAUSE THE DECISION GOES AGAINST THE WEIGHT OF THE EVIDENCE, WHICH WAS INSUFFICIENT AND INCREDIBLE

The Tribunal committed a reversible error when it determined that the agency put forth credible evidence to establish that Simone suffered from a disability and was unable to perform those duties by reason of her disability, because the Department's evidence was incredible and thus insufficient. Section 72 imposes the burden of proving unfitness of a civil service employee on the party making the allegation. Consequently, the agency must demonstrate that the employee is "unable to perform the duties of his or her position by reason of a disability." N.Y. Civ. Serv. L. § 72(1) (2023). In doing so, the agency may direct the employee to submit to "a medical examination to be conducted by a medical officer" selected by the authority having proper jurisdiction. Id. After such examination, if it is determined that the employee is medically unfit, then the agency must notify the employee of its finding prior to the leave's effective date. Alternatively, if cause exists that "the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with operations, it may place such employee on involuntary leave of absence immediately." N.Y. Civ. Serv. L. § 72(5) (2023).

Generally, an agency's determination will be reviewed based on whether substantial evidence supported its finding. N.Y. C.P.L.R. § 7803 (2023) ("[W]hether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence."). However, when an employee's substantive rights are at issue, the agency must meet the higher burden of preponderance of the evidence. *See, e.g.*, Miller v. Debuono, 90 N.Y.2d 783, 666 N.Y.S.2d 548, 689 N.E.2d 518 (1997) (noting that due process requires by a preponderance of the evidence to

protect against erroneous deprivation of tangible liberty interest). This burden is not sustained by mere quantity of evidence, but the quality of such evidence has great import. *See*, Matter of Halperin v. City of New Rochelle, 24 A.D.3d 768, 770, 809 N.Y.S.2d 98 (2005) ("Substantial evidence . . . 'involves a weighing of the quality and quantity of proof."). In other words, if the evidence admitted into the record is "incredible and unbelievable . . . [then it] is to be disregarded as being without evidentiary value." 58A N.Y. Jur.2 Evidence & Witnesses § 968 (2024) (citing People v. Johnson, 176 A.D.3d 1392, 113 N.Y.S.3d 294 (3d Dep't 2019)); Price v. City of N.Y., 172 A.D.3d 625, 103 N.Y.S.3d 31 (1st Dep't 2019)).

Here, the Department did not meet its burden of proof, because it failed to show that Simone had been diagnosed with a disability by a medical practitioner, and thus any inability to perform her duties could not be attributed to such disability. It further failed to demonstrate that Simone's conduct endangered her or other employees or impeded the agency's operations.

*A. The Department Must Establish That Simone Had A Disability By A Preponderance Of The Evidence*

While courts generally review agency determinations to ensure that they are supported by substantial evidence, they impose the higher standard of a preponderance of the evidence when fundamental rights are at issue. *See,e.g.*, Miller v. Debuono, *supra*; Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d 757, 765, 34 Misc.3d 161, 168, 272 Ed. L. Rep. 606 (Sup. Ct., N.Y. Cty. 2010) ("Charges that potentially stigmatize a prospective employee . . . must be supported by a preponderance of the evidence, rather than substantial evidence."). "[T]he substantial evidence standard demands only that 'a given inference is reasonable and plausible, not necessarily the most probable.'" Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d at 765 (quoting Miller v. Debuono, 90 N.Y.2d at 793). It may include hearsay and support inconsistent findings, unlike the higher standard of preponderance of the evidence. *See* Miller v. Debuono, 90 N.Y.2d at

793. On the other hand, the preponderance of the evidence standard requires the burdened party to prove the existence of the fact is more probable than its non-existence.

Opposing counsel and the Tribunal conceded that the proper standard to apply in the instant case is preponderance of the evidence.[10] Tr. at 49 and R. at 348, respectively. For that reason, the Department accepted that it had to admit evidence into the record that demonstrated to the Tribunal that Simone more likely than not suffered from a disability, thereby requiring a medical diagnosis. Such evidence had to be more than inadmissible hearsay and could not be inconsistent so as to undermine the truth being asserted. *See, e.g.*, Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d at 766. Thus, reliance on hearsay statements, inconsistent testimony, and incredible evidence means that the Department failed to meet that stricter standard. As discussed below, two of the Department's witnesses gave statements that were incredible as a matter of law, and the other witness's testimony was inconsistent. Additionally, the Department put forth no credible medical evidence to establish that Simone had a disability.

### *B. The Department's Psychologists Cannot Be Medical Officers For Section 72 Purposes And Are Not Authorized To Diagnose Employees*

Section 72 permits an agency to direct an employee to submit to a medical examination performed by a designated medical officer if the employee is not performing his or her duties as a result of a disability. N.Y. Civ. Serv. L. § 72(1) (2023). The statute is constructed so that the disability precedes the mandatory examination. It plainly states that if an agency's representative suspects that an employee's failure to perform his or her duties is "by reason of a

[10] Even though the Department conceded the higher standard, its evidence also would fail substantial evidence scrutiny. It was not reasonable to infer that Simone suffered from delusional disorder based primarily on her having sent emails. The language of the emails (as opposed to the text messages) are well-drafted and exhibits her legal analysis. R. at 204 ("My privacy is sacred, and you (along with others from Legal) have overstepped in ways that are completely unconscionable."). Additionally, missing tangible property is not imagined. She mentioned certain property being taken, such as her NYU degree, R. at 204, and keys, R. at 194. And opposing counsel was quite defensive about discussing stolen property during the hearing, even though Simone was addressing her being instructed to pack her belongings prior to meeting with Dr. Gille. Tr. at 493.

disability", **then** the agency may require an examination to determine fitness. In other words, the agency must first know that the disability exists. Id. It is more than mere suspicion that the employee may have a disability. *See, e.g.*, Brady v. Dammer, 573 F. Supp.2d 712 (2008) (noting state's request for a medical examination appropriate where employee provided letters from personal physicians to support request for reasonable accommodation.); Baum v. Cty. of Rockland, 337 F. Supp.2d 454 (2004) (dismissing employee's action against college employer for requiring a Section 72 examination after she represented to the employer that she had dementia as a disability).

Here, Simone did not represent to the Department that she had a medical disability. She complained about being subjected to harassment in the office. R. at. 160. After her complaint, her supervisor sent her for a fitness for duty evaluation. R. at 159. After the meeting with the Department's psychologist, she was placed on involuntary leave of absence "due to a medical condition". R. at 380. The "medical condition" was delusional disorder, persecutory type as determined by Dr. Christina Gille, a psychologist within the Department.

The problem with Dr. Gille's diagnosis is that she is not permitted to practice medicine in the State of New York, and thus cannot diagnose anyone. Additionally, a doctor-patient relationship does not exist between Dr. Gille and Simone; she represents the Department. Tr. at 206. Pursuant to the laws governing the practice of psychology in the State of New York, a person must be licensed to practice psychology and/or use the title of "psychologist". N.Y.S. Ed. L. § 7601 (2023). Additionally, the exemption for which she could possibly qualify did not go into effect until June 2024, thereby being ineffective at the time of her meeting with Simone. N.Y.S. Ed. L. § 7605 (2023) (provision exempting persons assessing fitness on behalf of an agency). Lastly, she did not attend medical school. While she touts extensive experience in the area of

psychology, she cannot represent that she has a medical background versus a mental health one. R. at 332.

At the time that Dr. Gille met with Simone, she was not licensed. R. at 422; Tr. at 60 – 1.[11] In fact, she still was unlicensed on the day she appeared at the hearing and testified in regards to Simone's mental health. Without the licensing and medical background, she does not constitute a medical officer that can perform a medical examination. The law does not prescribe the process for selecting a medical officer, *see* Phillips v. N.Y.C. Admin. Servs., 173 A.D.3d 493, 103 N.Y.S.3d 62 (1st Dep't 2019) (noting that statute did not specify a method for the Department to use in selecting its medical officer), but we are not addressing process. We are speaking directly to the standard that the City applies when impairing a civil servant's fundamental right.

There is no official definition for medical officer under Section 72. However, a federal intelligence agency defines its medical officers as a person having "maintain[ed] current, active, full, and unrestricted licensure or registration as a physician from a State. . . , active board certification and . . . accreditation in an American Board of Medical Specialties . . . and . . . a minimum of 96 hours per year of clinical practice in an accredited clinic or hospital facility" as well as "provides direct care services to patients in connection with the official duties of the officer." 50 U.S.C.A. § 3528 (2025). Licensing and board certification establish that the person meets the industry standard. The adoption or application of this definition would strike a balance between facilitating the continuation of operations of the Department and ensuring the employee's rights are protected. In other words, it would be in furtherance of wellness of all parties.

If the Commission were to uphold Dr. Gille's diagnosis, then it would be facilitating the illegal practice of medicine in the State of New York. Physicians and doctors must have a

[11] Simone represents that Dr. Adam Bloom, another psychologist, was not licensed at the time of her meeting with Dr. Gille. R. at 501. Additionally, he did not perform a medical evaluation or ask any questions that could be construed as health-related. Tr. at [ ].

license from the New York State Department of Education to practice in New York. Even if she were licensed, she could not diagnose "delusional disorder", because it is outside of the conditions treated by psychologists. See R. at 623 – 4. It is also worth noting that Dr. Lokesh Reddy was a licensed psychiatrist employed by the Department, but he did not perform an examination of Simone. He did not even meet with her.

Because of the licensing issues and the laws governing the practice of psychology, Dr. Gille's testimony is incredible as a matter of law. "[T]estimony that is incredible and unbelievable . . . impossible of belief because it is . . . contrary to experience . . . is to be disregarded as being without evidentiary value." Her diagnosis is impossible to be true, because she must have been licensed at the time that she met with Simone. Her testimony is impossible to be true, because the diagnosis is outside of the list of disorders that she can diagnose and/or treat. R. at 623 – 4. Thus, the Department failed to establish that Simone has a disability or even that she was unfit based on a medical examination conducted by a medical officer.

*C. The Department Failed to Prove Simone Suffers From A Disability Irrespective Of Its Psychologists' Statuses*

The Department admitted into evidence testimony that undermined its position that Simone suffered from a disability. According to Dr. Gille, Simone suffered from delusional disorder, persecutory type. R. at 378. Based on this diagnosis, the Department placed Simone on involuntary leave of absence pursuant to Section 72. R at 380. Pursuant to the DSM-5, a delusion is a false belief, and thus a person must have a false belief persisting for an extended period of time to have delusional disorder. Tr. at 113. Dr. Gille testified that she did not know if Simone's belief was false. Id.

Along that same vein, Lt. Antonios Boctor testified that the Department employs approximately 45,000 employees. Tr. at 518. When these employees join the Department, they are not asked their religious affiliation. Tr. at 114, 517. For that reason, the Department cannot argue that not one of its employees practices a form of dark arts. In fact, the Department knew of at least

one (1) employee in the Department who practiced in demonology, albeit in 2014.[12] R. at 432. Consequently, the Department failed to meet its burden of proof.

Even if the Commission disregarded such an admission of lack of knowledge and focused on the emails as justification for placing Simone on leave, much like the Tribunal, the Department still fails. Simone regularly used language that reflected her uncertainty about the truth of the statement but a curiosity to explain certain incidents. For example, one email to a person who allegedly harassed her states, "When I noted that you were a party involved, the response was that you were not the only one." R. at 204. She further characterizes the statement as a possible rumor. Id. With respect to others in the Department and the methods of harassment being addressed, she states, "It has come to my attention that the Department quite possibly uses. . .," thereby leaving some room to deny its existence but also appreciating the occurrence of events that cannot be explained. R. at 212. Admittedly, there are points at which Simone insists on the veracity of her beliefs, but that tone forms after receiving information from higher ranking parties. R. at 204. Specifically, she notes that she was told by persons with titles of supervisor or higher. R. at 377; Tr. at 547.

In analogizing the instant case to previous OATH decisions, the Tribunal misrepresented the circumstances under which employees have been placed on involuntary leave by describing them as similar. The Tribunal cited Admin. for Children's Servs. v. Anonymous, in which the agency's board-certified psychologist determined that an employee was mentally unfit due to suffering from delusional disorder. OATH Index No. 2619/11 at 7 (Dec. 30, 2011). The only similarity in that case is the diagnosis "delusional disorder". The agency's medical officer was (1) board-certified and (2) a psychiatrist. Here, the Department's medical officer was (1)

---

[12] The record shows that the Department employed a sergeant who exorcised demons as off-duty employment. R. at 432. Off-duty employment must be approved by an employee's supervisor and other personnel within the Department before engaging in such activities. R. at 20 – 1.

unlicensed and (2) a psychologist for which she does not have a medical degree, unlike a psychiatrist.

In addition to those distinctions, the employee was receiving psychiatric treatment prior to his or her meeting with the agency's medical officer. As part of that treatment, (s)he was taking Abilify, a drug often used to treat schizophrenia, bipolar disorder, and even Tourette's syndrome.[13] The subject agency knew of the employee's medical condition before his or her fitness evaluation.

During cross-examination, Dr. Gille described the Department considering a uniformed person "sick" if the employee was under treatment and/or taking medication. Tr. at 197. The employee in Admin. for Children's Servs. v. Anonymous, No. 2619/11 would be considered "sick" by the Department's standards, but Simone was neither under psychiatric treatment nor taking medication, at least not to the knowledge of the Department. R. at 91. Upholding the determination of the Tribunal would be a deviation from previous OATH cases, including the case on which the Tribunal relied. Most importantly, it would be an affront to the fundamental rights afforded civil servant employees by lowering the bar for the requirements to terminate an employee's services and further circumventing civil service protections.

Based on her conversation with Lt. Boctor, Dr. Gille challenged Simone being told by higher ranking persons about the practices within the Department. Tr. at 181. However, Dr. Gille did not verify with every person of supervisory rank with whom Simone could have interacted whether they shared such information with Simone. Id. And thus, the failure to verify Simone's statement reiterated Dr. Gille not knowing whether the belief was false.

---

13 https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/021436s038,021713s030,021729s022,021866s023lbl.pdf (Federal Drug Administration) *last visited* February 8, 2025.

The Department conceded that it needed to prove that it was more likely than not Simone suffered from delusional disorder. Because Dr. Gille did not know whether the belief was false, then the Department failed to meet that burden.

*D. The Department Admitted Into Evidence Inconsistent Testimonies Regarding Simone's Time And Leave And Threat To Other Employees*

The Department cited Simone's time and leave as a basis for determining that she was unable to perform her duties as well as her threatening other employees. R. at 89 and 95. But the testimonies were inconsistent and/or impossible to be true. Specifically, Lt. Boctor testified that Simone was consistently late. Tr. at 397 – 8, 442. He recalled that civilians have a one-hour grace period. But when asked about Simone specifically, he said that she was considered late if she reported to work more than five (5) minutes after the start of tour of duty.

It is well-known throughout City employment that if an employee is late, that employee can be penalized pursuant to certain procedures. See N.Y.C. P.S.B. § 410-1R (2000) The policy dictates that an employee must notify his or her supervisor prior to the start of tour if there will be a delay in arrival time. The Department emulates this process by tracking lateness on a form called "Civilian Lateness/Warning Notification (PD449-122)". R. 43. The Department affords a supervisor discretion based on the needs of the command. Tr. at 443. Based on Simone's notification to Lt. Boctor and the needs of the command, he granted her tour changes. R. at 442 – 3. A tour change is not late. The three (3) instances of lateness on Simone's record since she started with the Department were excused and occurred after July 2021. Tr. at 522 – 99, 611 - 50.

Testimony from Kevin Mamakas was inconsistent and incredible as a matter of law. Mr. Mamakas testified that Simone threatened him and another employee in or around July 20, 2023. Tr. at [ ]. According to Mr. Mamakas, he noticed Simone walking in his direction as he was headed to the bathroom,[14] and as they were next to each other, he heard her mumble a threat.

[14] It is worth noting that the petition states that Simone threatened a co-worker **in** the bathroom with phrasing similar to what Mr. Mamakas states that he heard mumbled while he was on his way **to** the bathroom. R. at 366.

Tr. at 237 – 9. He described Simone as standing against the wall at the opposite end of the hallway and walking towards him as he was turning the bend at the elevators. Tr. at 237 – 8 and see R. at 396. While Simone maintains that his actual testimony was that they were next to each other, thereby rendering his having given testimony that is impossible to be true, she demonstrated to the Tribunal that his testimony was impossible to be true, because he would have outpaced Simone. Tr. at 331, 822. After having done so, the transcript was changed to Simone and Mr. Mamakas being within arm's length as opposed to next to each other.[15]

Nevertheless, the way the transcript reads now, Mr. Mamakas is turning the bend as she starts walking towards him from having stood against the wall, and thus, if he heard anything, it would have to have been louder than a mumble. Tr. at 237 – 9 and see R. at 396. But he continues to testify that he passed Simone on the way to the bathroom. Tr. at 239. For him to pass her, then he must have been behind her, in which case, she could not have been heading towards him as he was passing the bend, and further, she could not have been following him. Tr. at 238 – 9, 240 and see R. at 396. Mr. Mamakas later testified that when he saw Simone, he was not turning the bend but rather in the doorway of his office. Tr. at 256 – 7. When pressed on where each of the parties were located when he supposedly heard her mumble profanities, the distance was much longer than two (2) or a couple feet or even within arm's length. Tr. at 258 – 61. Additionally, he did not recall key details about Simone, such as race.[16]

"'In evaluating testimony, we should not discard common sense and common knowledge.'" <u>People v. Stroman</u>, 83 A.D.2d 370, 372, 444 N.Y.S.2d 463, 465 (1st Dep't 1981) (quoting <u>People v. Garafolo</u>, 44 A.D.2d 86, 88, 353 N.Y.S2d 500 (2d Dep't 1974)). Testimony

---

[15] Material changes to the transcript are addressed Section VI of the Argument.

[16] The transcript as submitted for appeal has been changed to address the absence of a racial description from Mr. Mamakas of Simone. He initially testified that he did not know her race. The transcript now reads to state that Lt. Boctor mentioned race during their conversation. Tr. at 293, but see Tr. at 824 ("He didn't describe my race; he didn't describe my height. Let's be honest, if someone is less than average height, you['d] probably notice them. You['d] probably notice what they are wearing. He didn't – especially if you felt threatened[.] [Y]ou'd probably notice if I had eyeglasses, any type of eyewear. He didn't. Especially if you felt threatened. But most importantly, you would notice that I was Black, especially if you felt threatened.").

that is physically impossible or self-contradictory has no evidentiary value. *See* id. Here, it is physically impossible for Simone to have been within a maximum of two feet of Mr. Mamakas as he was leaving the bathroom, because the hallway would have been too small to traverse easily or comfortably. His testimony continued to be improbable as he insisted that Simone was standing close to the elevator bend but also in front of the door to a stairwell, which would again create a hallway too narrow to accommodate more than one person passing through it. Tr. at 334 – 6. Nevertheless, Mr. Mamakas insisted that Simone threatened him after he passed her in the hallway.

The problem with Mr. Mamakas' testimony is that he claimed that Simone said that she would physically harm him if he continued to follow her. If that statement were true, then Mr. Mamakas would have had to approach Simone to be within two feet, thereby making him the initial aggressor. If he approached her, then his claim that Simone threatened to physically harm him if he did not stop following her makes more sense. His entering into her personal space without knowing her would have created apprehension, and her statement would have been a warning that if it continued, then she would have to defend herself.

At other times, evidence stemming from his alleged encounters lacked logic. For example, he testified that his superior officer, a captain, informed the team that a woman threatened one of their team members and further instructed them to speak with him if they had a similar incident. Tr. at 286. Approximately a couple of days later, he reports having a similar incident to his captain. Tr. 292 – 3. The captain directs him to Lt. Boctor, who was Simone's supervisor. Tr. at 293. Supposedly, Mr. Mamakas called Lt. Boctor after his alleged interaction with Simone on or around July 25, 2023, which was the same day of Simone's leave. He also testified that he exited his office to go to the bathroom around 12 noon on that day. Tr. at 235. Simone's arrival time at the Medical Division was reported at "1411 Hrs". Somehow between 12 noon and 2:11 PM, Simone threatened Mr. Mamakas on his way to the bathroom as well as when he returned to his office. He reported the incident to his captain and described nothing more than a woman wearing a headband; no description of race, height, or other clothing. Tr. at , and that information was

enough for his captain to know the exact supervisor to contact. Within that same window of time, Lt. Boctor arranged for a car to take Simone to the Medical Division and drive her to the office so that she would arrive by 2:11 PM. And for some reason, Mr. Mamakas still informed Lt. Boctor via email about the two incidents that he had not witnessed but was told by his captain, as if his captain had not previously discussed the matter with Lt. Boctor. Questionable.

Generally, his testimony was at times inconsistent but, more importantly, improbable. Thus, his testimony was not probative.

*E. The Department Failed to Show Interference with Operations*

The Tribunal noted that "the work stopped" when addressing the email communication with Simone's supervisor, and it deemed his testimony credible. R. at 343. Irrespective of legal training, we cannot abandon all common sense in pursuit of justice. The Department is a law enforcement agency with its primary function as solving crime. Crime happens everyday, and it gets solved everyday. The evidentiary standard is preponderance of the evidence, because a substantive right is at stake. [ ]. Consequently, it is not enough for a member to simply say that the "work stopped", the Department must show that the employee's continued presence on the job would "severely interfere with operations." Pastore v. City of Troy, 481 N.Y.S.2d 306, 126 Misc.2d 113 (Sup. Ct., Rensselaer Cty. 1984). It failed to meet that burden.

The record does not include any evidence that shows crime did not get solved at the time of the emails. The record does not include any evidence that the office building in which Simone's office was located closed for the day. The record does not even include any information that Simone worked with a team of people who were dependent on her work. The record does not include any evidence that Simone physically harmed another employee, and the testimonies regarding possible threats to the health of certain employees have no value. The only danger was to Simone's peace and property due to the theft. Lt. Boctor did not testify that he did not receive

his pay for that time period. In fact, just by virtue of his having received the emails, it is more probable that he still reported to work as usual.

Thus, the Department failed to meet its burden by showing that Simone's continued presence on the job severely affected operations, and to resolve such interference, she had to be placed on immediate leave.

## IV. THE DETERMINATION SHOULD BE VACATED, BECAUSE THE WEIGHT GIVEN TO HEARSAY EVIDENCE DENIED SIMONE A FAIR HEARING

The hearsay evidence admitted into the record was prejudicial to Simone's case, resulting in a hearing that was neither fair nor proper, and thus, the determination should be vacated. An administrative Tribunal is not bound by the technical rules of evidence that are commonplace in courts of law. *See, e.g.*, Erdman v. Ingraham, 28 A.D.2d 5, 280 N.Y.S.2d 865 (1st Dep't 1967). Consequently, the admission of hearsay evidence without exception is permissible as long as it is not used in a manner that deprives a party of the fair and proper hearing to which (s)he is entitled. Id. at 9.

The excessive weight applied to traditionally inadmissible hearsay could be a reflection of the Tribunal's bias, and bias alone can be a basis for vacating a determination. Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d at 771. Here, the Tribunal's reliance on hearsay significantly influenced its determination, evidencing its bias and denying Simon's right to a fair hearing.

### *A. The Weight Given the Hearsay Evidence Was Material and Prejudicial*

While compliance with technical rules of evidence is not required in administrative hearings, the admission and consideration of hearsay evidence could be so prejudicial as to deprive a party of a fair hearing. *See, e.g.*, Brown v. Murphy, 348 N.Y.S.2d 777, 43 A.D.2d 524 (1973). The instant case is replete with hearsay evidence, on which Dr. Gille and the Tribunal relied in reaching their determinations. Dr. Gille testified that she reviewed Dr. Janelle Rondeau's notes

from Simone's three (3) previous meetings, emails from Simone to other employees, and records maintained in the Central Personnel Index. R. at 376. She also had a telephone conversation with Lt. Boctor, who alleged that Simone had threatened other department employees according to Mr. Mamakas. Tr. at 64 – 5, 82, 84 – 5. Her only in-person interaction was an approximately one-hour meeting with Simone[17], during which she asked superficial questions, such as with whom do you live; do you drink alcohol; and are you taking medication? R. at 141. She did not speak directly with Mr. Mamakas to learn of his encounter, and she did not interview the other employees who supposedly were threatened.

Arguably the reports that Dr. Gille reviewed lacked substantial probative evidentiary value. In Brown v. Murphy, a police commissioner dismissed a patrolman after a urine analysis from the medical unit laboratory revealed the presence of cocaine residue. 348 N.Y.S.2d 777, 43 A.D.2d 524 (1973). The lab results were submitted without a proper foundation that demonstrated the nature of the tests, the procedures followed, or the reliability of the tests. Id. at 525. Consequently, the court determined that the reports were prejudicial, thereby denying the patrolman of a fair hearing.

Here, the Department failed to lay a proper foundation for the reports prepared by Dr. Rondeau and internal affairs. The Department did not describe the manner in which an employee would come to meet with the Department's psychologist or on what basis an employee would be sent for a fitness evaluation. Also, Dr. Rondeau was not available to testify regarding her notes. While Detective Vandross appeared solely for the purpose of laying a foundation, the opportunity was missed. Opposing counsel summarily asked if the documents were maintained in the ordinary course of business but failed to establish what the ordinary course of business was.

[17] Dr. Gille conceded that "nothing substitutes adequately for the combination of a thorough history (including collateral history), mental and physical examination, and adequate observation over a period of time." Tr. at 170 – 3 (quoting Munro, Alistair. *Delusional Disorder; Paranoia and Related Illnesses*, Cambridge Univ. Press, 1999.

Tr. at 373 – 5. Although Simone attempted to extract such information, the Department objected to the line of questioning. Id.

Applying the reasoning from Brown v. Murphy, *supra*, Dr. Gille's reliance on these reports influenced her determination of fitness by considering the allegations from other employees, irrespective of the results of the investigation. Additionally, the witnesses' failure to testify denied the Tribunal the opportunity to assess their credibility by observing demeanor and subjecting them to follow-up questions. And most importantly, Simone was prevented from cross-examining the witnesses. Thus, reliance on those reports denied Simone a fair hearing due to the prejudicial nature.

In Erdman v. Ingraham, the Commissioner of Health for the State of New York charged a physician with several violations in connection with prescriptions for narcotic drugs. 28 A.D.2d 5, 280 N.Y.S.2d 865 (1st Dep't 1967). The case against the physician rested primarily on a single investigator who relied on sworn third-party statements. None of the affiants were called as witnesses, and thus, the physician could not cross-examine those witnesses. "As hearsay, such statements standing alone, lack[ed] competency and sufficient probative force to sustain material findings." Id. at 868. The Commissioner was materially influenced by the third-party statement. Id. At 870. Without the opportunity to cross-examine the witnesses, that reliance effectively denied the physician a right to a fair hearing. Id.

Similarly, the Department's key witness was Dr. Gille, who relied on hearsay evidence, such as Dr. Rondeau's notes, IAB records, and reports from Lt. Boctor about events of which he had no personal knowledge. The Department had opportunity to make other witnesses available but failed to do so. For that reason, Simone was denied a fair hearing.

Admittedly the emails and text messages that Dr. Gille reviewed are overwhelming in comparison to Dr. Rondeau's notes, the information from internal affairs, and her meeting with Simone. They total more than 60 pages. And the subject matter would lead a common person to

characterize the author as crazy. Dr. Gille, however, purportedly is not a common person. As a health professional, her reasoning must be based on science, research, and proven theories in her area of expertise. See R. at 332. Science could not lead her to delusional disorder, because she cannot diagnose a department employee, and by her own admission, she does not know the belief to be false. Tr. at 113.

The Erdman v. Ingraham doctrine equally applies to hearsay perpetuated by Mr. Mamakas. We can set aside that his testimony that Simone threatened him was questionable. His statements regarding two of his co-workers also being threatened by Simone was prejudicial. By his own admission, he did not personally witness another incident. Tr. at 243. Rather, he was told by his supervisor that another employee had been threatened by a woman wearing a headband. Tr. at 283 – 6, 292 – 3. The Tribunal found the evidence that Simone "caus[ed] several colleagues to feel uncomfortable or fear for their safety" probative. R. at 350. Such evidence, however, was inadmissible hearsay. The Department did not produce for examination the other employees who reported Simone threatening them in the elevator and/or the bathroom. The Department did not produce the captain for examination. Yet, Mamakas' testimony is used to depict Simone as potentially violent. Thus, the Tribunal's reliance on those statements denied Simone a fair hearing.

*B. The Tribunal Showed Bias*

An independent review of the record will reveal the disparate treatment between Simone and opposing counsel, with the treatment being in the Department's favor. See, e.g., Tr. 97 – 217. A hearing officer exhibiting bias prejudices the rights of the accused party. *See* Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d at 771. In Gongora, a high school teacher was terminated for asking a student to go out with him, albeit jokingly. 930 N.Y.S.2d, *supra*. I He sought review of the school district's determination by the New York supreme court pursuant to Article 78. The court determined that the arbitrator was biased by the nature of the proceeding, thereby denying the teacher's right to due process.

A similar sensationalism exists in the instant case. In spite of it being inappropriate to discuss religion in social conversations, people are comfortable discussing God, but we tend to overlook His antithesis. Discussions about the devil, witchcraft, and all matters evil are often avoided, in spite of its inclusion in the world's most-read book, the Bible. If witchcraft was called "magic", it would be more palatable, even if it is rooted in the same system. The Tribunal improperly shifted the burden to Simone to prove that she was not delusional for discussing witchcraft, when the burden at any and all times should have been borne by the Department to prove that she in fact suffered from delusional disorder.

The goal is not to prove the existence of witchcraft or its effect. Focusing on that subject matter distracts from the true purpose of determining Simone's fitness to serve as an associate staff analyst. The Tribunal followed the pattern of the Department's psychologists, who consistently noted that Simone was coherent or logical at all times except for when discussing the Department. R. at 348; Tr. at [ ].

The disregard for statutes governing the practice of psychology showed the Tribunal's bias. Dr. Gille was not licensed in the State of New York, which is a requirement for any person who identifies as a psychologist. See N.Y. Ed. L. § 6512 (2023). There are certain exceptions, but they were inapplicable in the instant case. The importance of the licensing becomes crucial with respect to diagnosing an employee with a disability. It is more than merely determining fitness. That process of diagnosing a person with a disability constitutes the practice of medicine, for which a person needs to have the credentials, including certification. However, the Tribunal without hesitation characterized Dr. Gille and Dr. Bloom as medical officers who prepared medical reports and submitted medical evidence.

According to the National Library of Medicine, "medical records are used to track events and transactions between patients and health care providers."[18] By Dr. Gille's own

[18] https://www.nlm.nih.gov/oet/ed/stats/03-200.html *last visited* Feb. 9, 2025.

testimony, there is no patient-doctor relationship between her and the employee, and she does not treat anyone. The Tribunal determined the testimony and documentary evidence to be credible. R. at 350. According to the Tribunal, the evidence established that Simone "acted on [her] delusions by confronting colleagues, taking photographs of people without their consent, messaging her supervisor, and misusing department resources," none of which is supported by the record or constitutes any particular violation.

Dr. Gille testified that a delusion is a false belief, and further, that she did not know Simone's beliefs to be false. Tr. at 113. For that reason, "delusion" is non-existent. The pictures included in the record are taken in public places, but the Tribunal recites this fact as if a crime is being committed. The United States Supreme Court established that what a person knowingly exposes to the public is not a matter of privacy protections. *See* Katz v. U.S., 389 U.S. 347 (1967). The public's right of access to information is co-existent with that of the press. *See* Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011) (relying on Houchins v. KQED, Inc., 438 U.S. 1 (1978)). Those pictures were captured in public spaces and not used for commercial purposes or even posting on social media. They were sent solely for the purpose of possibly identifying the person(s) who was or were stealing and/or harassing Simone. Thus, no law was broken or violation committed.

Additionally, department policy requires an employee to report any harassment activity to any supervisor, including his or her supervisor. R. at 24 (stating employees strongly encouraged to report or discuss harassment to a supervisor at any level). Examples of such communication included in the record are (i) "Lt., is someone accessing my PC?", (ii) "And Lt., my card did not scan this morning. Can you add the time so that I won't have issues punching out?", and (iii) "Lt., who is the witch? He has to go. I don't know that he is mentally stable. And I'm being serious." R. at 183. The last question seems sensational and distracting. But we cannot ignore that these questions are coming from someone "intelligent and self-assured" and competent "with respect to trial practice and procedures" according to the Tribunal. R. at 348. These questions come from the same person who researched "[covert] hypnosis . . . Scientology, Kabbalah,

Masons . . . even Puja, astral projection[, etc.] . . . to get information to try to understand exactly what was going on." Tr. at 547. Someone simply attributing the incidents to dark arts was not enough for it to be true; the feasibility of its truth had to be established. Again, the goal is not to prove the truth of its existence. But we cannot set aside a person's intelligence simply because of that person's willingness to delve deeper.

Additionally, the idea that Simone had paranoia about being followed or being under surveillance, R. 341, is a blatant disregard for the records showing that the Department conducted internal investigations, of which Simone was the subject. R. 135 and 260 – 86. The record is silent on the Department's methods used for investigations. The record also supports the idea that persons from the Department were likely blocking her advancement. R. at 123, 135. Emily Collins was an executive agency counsel assigned to the Department Advocate's Office, which handles disciplinary matters. The record shows that she contacted the Medical Division by at least April 2023 asking for a letter that they in fact recommended counseling for Simone. R. at 123. Additionally, as per the psychologist's note, she characterized Simone's request to attend CompStat as "crazy" as opposed to a person showing initiative and interest in the Department. R. at 135. Simone worked in a corporate setting for years, and employees were expected to be self-motivated. How easily even the highly-educated can misunderstand a situation.

The record also shows that the involuntary leave of absence was in all likelihood pre-determined. If so, the inconsistent and incredible testimonies make sense. A handwritten note circulated within Personnel Bureau mentions an order for Lt. Boctor to have the employee clear out her desk. R. 431. The date is conveniently distorted. Notwithstanding, Simone had packed her personal property from the office prior to visiting the Medical Division based on instructions from Lt. Boctor. Tr. at 493, 613. She did not expect to return. The petition initiating this proceeding was not filed until on or after August 23, 2023, which was within a few days of the Department's proposed hearing dates. R. 639 – 40.

The Tribunal overlooked many of the facts in the record, and allocated very little weight to Simone's research and evidence. For example, it trivialized the screenshots of errors that Simone received as "computer malfunctions" as opposed to evidence of hacking. R. at 350. The inability to apply for a job through Employee Self-Service, even after the administrating agency confirmed that it did not have a system error, supports the notion of a targeted issue with Simone's application. R. 607 – 13. The messages allege a system error, but none existed. R. 612 – 3.

## V. THE TRIBUNAL COMMITTED REVERSIBLE ERROR BY DISREGARDING SIMONE'S FIRST AMENDMENT RIGHTS

A person does not abdicate his or her First Amendment right to free speech by virtue of his or her civil service employment, and thus, disregarding such rights would be a reversible error. When an error is prejudicial to a substantial right, it is reversible error. *See* 4 N.Y. Jur. 2d Appellate Review § 729 (2024) (citing Holland v. Gallagher, 11 A.D.2d 1027, 205 N.Y.S.2d 649 (2d Dep't 1960)). It is clear that termination of civil service employment concerns a substantial right, but basing that adverse action on an employee's speech raises questions under the First Amendment. It is well-settled that employees have a First Amendment right to speak on matters of public concern. Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty., 513 F. Supp.3d 593, 610 (W.D, Pa. 2021). A matter is of public concern if it "is fairly considered as relating to any matter of political, social[,] or other concern to the community." Id. at 610 (quoting Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001)). "Exposing government inefficiency and misconduct is a matter of considerable significance," and employees are afforded certain protections against unlawful or inappropriate actions by their supervisors in the event of such exposure. Garcetti v. Ceballos, 547 U.S. 410 (2006). It is of no consequence if this employee addresses the public concern in a private setting or while on duty. "An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace." Amalgamated Transit Union Local 85, *supra* at 612 (quoting Urofsky v. Gilmore, 216 F.3d 401, 407 (2001)). Irrespective of the place where the employee publishes the speech, it

cannot disrupt the efficient operation of the workplace. Curinga v. City of Clairton, 357 F.3d 305, 309 (3d Cir. 2004) (citing Pickering at 568)).

Here, the Department cited Simone's sending of emails and text messages to her supervisor and other employees about the abuse of a witchcraft program within the Department. R. at 377 – 8, 340 – 2. Specifically, she complained that it was being used to harass her and steal her personal property. Id. The emails and text messages are sent to persons who have either managerial authority to address the issue or allegedly were involved. See, e.g., R. at 219, 204, respectively. While there is a presumption of truth of the existence of such a practice, the overarching theme is that Simone was in all probability being harassed by someone on the job, and the matter needed addressing. In any event, the harassment constituted misconduct, and such behavior occurring on or off public premises by government employees would be of public concern pursuant to Garcetti v. Ceballos, *supra*. See, R. at 12.

In Pickering, a teacher published complaints about the mishandling of proposals to raise revenue by the school district that employed him. The school terminated him for publicizing his letter and insisted that his information was false. The court determined that absent any proof that the teacher knowingly or recklessly made false statements, then his speech could not be the basis of his termination. Here, the Department provided no evidence that Simone knew her statements were not true. If such statements were false, neither Simone nor the Department's psychologist knew them to be false at the time. R. at 113.

While the Department is quite protective of its image, see R. at 20, its implementation of policy does not outweigh the public interest in addressing official wrongdoing. The Department insisted that Simone was not performing duties assigned to her as an ASA. It would be partially right. The tasks and standards for an ASA do not instruct employees to email their supervisors or other personnel in the office about a witchcraft program. R. 384 – 6. But the Department encourages employees to report harassment. R. at 25.

In Garcetti, a deputy district attorney filed a cause of action alleging retaliation from his employer for recommending via memorandum that a case be dismissed due to serious misrepresentations in an affidavit that police used to obtain a warrant. The Supreme Court concluded that the memorandum was not protected speech, because he drafted the memorandum in furtherance of his duties.[19] The emails that Simone sent were not in connection with specific functions of an ASA, see R. 391 – 2, but rather simply as a public employee with the right to work in a hostile-free environment.

Additionally, Simone was not a high ranking official whose comments would affect public opinion. In Curinga, an appointed municipal manager spoke out against a city council incumbent during a primary election. After the incumbent won the election, he terminated the manager. The manager challenged his termination on the basis that his speech was protected. The Third Circuit did not share in his reasoning. Because of his position as a high ranking official with the power to appoint, suspend, or remove all city employees, the government's interest in ensuring that his interests aligned with the elected official outweighed his personal interest in his speech. We do not have that here.

Simone was not in an appointed position. She was in a civil service title that requires an examination to qualify for the position. She, like thousands of other City employees, was selected from a list. She was not in control of any department operations. She did not have the power to terminate anyone. Her comments would not have the impact on public opinion in the same way as the Curinga manager. While the Department takes the position that its employees' images affect how the public perceives the Department, R. at 20, Simone was not a uniformed member who could be readily identified as being employed with the Department. Mostly importantly, the communications were internal.

[19] The deputy district attorney in Garcetti was also a high-ranking attorney within the organization. Simone was not.

## VI. THE DETERMINATION SHOULD BE VACATED AND SANCTIONS IMPOSED ON THE DEPARTMENT FOR SLANDER, CONSTRUCTIVE TERMINATION, TORTIOUS INTERFERENCE, EVIDENCE TAMPERING, AND VIOLATION OF *NLRB V. WEINGARTEN*

At the onset, this proceeding was described as one full of lies. It is clear that Simone does not have a disability. It is also clear that she is not mentally unfit to be an ASA. The Department's motivation for putting forth these false narratives is unknown but also immaterial. The reason does not matter as much as the fact that it happened. The Department's intentional false testimonies before the Tribunal constitute slander, for which sanctions should be imposed.

An action for defamation requires "(a) a false statement that tends to expose a person to public contempt . . . or disgrace, (b) published without privilege or authorization to a third-party, (c) amounting to fault as judged by . . . a negligence standard, and (d) either causing special harm or causing defamation *per se*." Whelan v. Cuomo, Index No. 607269/21, 2023 N.Y. Slip Op. D72551 (2d Dep't Oct. 25, 2023) (quoting Bowen v. Van Bamer, 205 A.D.3d. 674, 674 – 5, 2022 N.Y. Slip Op. 2975 (2d Dep't May 4, 2022)). Here, the diagnosis of delusional disorder is false and could jeopardize future employment opportunities in addition to any plans that Simone has or would have to practice law. It is simply not damning to her civil service status as an ASA, but it also sabotages her promotional opportunities to administrative staff analyst, for which she has been on the promotional and open competitive lists. When transferring to another agency, the personnel file from the previous agency will be transferred, and thus, any false information included in the file will be made known to the receiving agency. Additionally, other employers who conduct background investigations have the potential of discovering these fake allegations and could rescind offers. In fact, Simone was offered and accepted an opportunity with another agency in or around April 2023, while this matter was pending. She was supposed to start in her new, higher title in May 2023. However, after Simone had to reschedule the processing, the opportunity disappeared. Her follow-up communication with the agency was ignored. Arguably, the decision is published under anonymity; however, in order for Simone to get reinstatement

and/or back pay, she must continue to escalate the matter with different adjudicating bodies, thereby further exposing her.

For these same reasons, Simone requests sanctions be imposed for tortious interference. An action based on tortious interference requires a party to (i) have a business relationship with a third-party, (ii) the accused party knew of that relationship and intentionally interfered, (iii) the accused acted solely out of malice or used illegal means, and (iv) the accused interference caused injury to the other party. *See, e.g.*, Hersh, *et al.* v. Cohen, *et al.*, 2024 N.Y. Slip Op. 03738 at 2 (N.Y. App. Ct., 2d Dep't Jul.10, 2024) (quoting Joseph v. Fensterman, 204 A.D.3d 766, 771, N.Y. Slip Op. 02733 (3d Dep't Mar. 27, 2023))). The business relationship could be with a prospective employer, and as Simone demonstrated, an employee within the Department has been hacking her personal equipment, including electronic communication. R. at 420, 607 – 13. Such hacking resulted in her inability to apply for other opportunities, even within the Department. Id. By and through this interception of electronic communication, the person would have learned of Simone's pursuit of employment opportunities as well as the specific companies and interfered with communicating with them. Even if, the Commission accepted the Department's authority by way of having conducted investigations, R. at 260 – 86, such investigations should not impair Simone's ability to advance her career. The Department would have nothing to gain by preventing my working elsewhere. Opposing counsel made clear that the Department was not interested in settling with her and further denied her requests for reinstatement, as evidenced by the contentious nature taken with this matter as well as basing the matter on falsehoods. For that reason, the Commission should impose sanctions on the Department for such interference.

Pursuant to N.L.R.B. v. Weingarten, an employee has the right to union representation during an investigatory interview. 420 U.S. 251 (1975). This right is often asserted during matters that could result in disciplinary action. During the hearing, opposing counsel asked whether Simone in fact committed an act for which the Department, by and through the Department Advocate's Office, issued charges and specifications alleging violations of certain

department policies. Simone immediately stopped the hearing and asserted her rights to union representation, but opposing counsel persisted to circumvent the disciplinary process by and through the Section 72. Tr. 760 – 5.

The Department argued that Simone waived her rights under the Weingarten doctrine, but Simone's language was clear when she replied that she did not waive those rights. Tr. at 762. Consequently, opposing counsel's persistence subjected the Department to the liability attendant to violating that doctrine and sanctions should be imposed on those grounds.

A cause of action for constructive discharge in New York exists when an "employer deliberately made working conditions so intolerable that he or she was forced into involuntary resignation." Zaborowski v. Roman Cath. Diocese of Brook., *et al.*, Index No. 18474/13, 2021 N.Y. Slip Op. 3866 (2d Dep' t Jun. 16, 2021) (quoting Nelson v. HSBC Bank USA, 41 A.D.3d. 445, 447 (N.Y. App. Div., 2d Dep't 2007)). Although, Simone has yet to resign, the Department has kept her out of work for more than one year. According to its representative, leave that exceeds that time period will end in termination. R. at 380 ("Be advised that if your leave of absence exceeds a period of one year, you will be terminated from employment."). Simone documented her incidents of harassment that she experienced in the Department, but it responded with the issuance of charges and specifications, R. at 447 – 51, and ignored her grievance regarding the legitimacy of those charges. R. at 460 – 1. And upon information and belief, she has consistently been under internal investigation, which rises to the level of harassment and invasion of privacy by exceeding a reasonable time. R. at 135, 260 – 86. Lastly, the Department concocted a fake Section 72 proceeding to force Simone out of the Department, thereby causing her to lose income, years of service, and time towards her pension. For a paramilitary organization to stress the importance of following the rules, it should do the same. Because of its failure to do so, the Commission should impose sanctions on the Department.

A party is guilty of tampering with evidence, if (s)he knowingly creates evidence that (s)he expects to be used in an official proceedings knowing that such evidence false. Here, the

inconsistent testimonies raise questions of credibility. But the material adjustments to the transcript exceed unethical conduct. The law mandates that Simone receive a copy of the original record. A transcript of the hearing can satisfy that requirement, assuming it accurately captures the events and testimony from the courtroom. Here, the Department provided an amended transcript with material alterations, thereby undermining Simone's defenses. Specifically, its witness testified that Simone was not more than two (2) feet away from him except for the instance in which he was inside of the men's bathroom. The testimony of the two-feet maximum makes his testimony impossible to be true, because the two of them could not be next to each other in a two-foot wide hallway.

The Commission cannot appreciate that in summation, Simone pulled out measuring tape to demonstrate what two (2) feet would look like, especially in comparison to her person. For the record, it could be described as approximately an adult arm's length. The transcript submitted for appeal reads "couple" instead of "two", thereby leaving room for interpretation. But there was no need to interpret two feet. Evidence that the transcript was altered can be seen on pages 236, 306, and 823. The transcript reads as if the Tribunal permitted Mr. Mamakas to diagram the floor where his office was located over Simone's objection, but then after significant testimony, a diagram is suddenly available. Tr. at 231 – 342.

Pursuant to 60 R.C.N.Y. § 3-03 (2024), the agency must submit the complete record to the Commission. Although the provision speaks to a disciplinary proceeding, the obligation to submit the record in connection with this matter remains with the Department. Because the submission shows a willful misrepresentation of the true events, sanctions against the Department should be imposed. Characterizing the Department's submission of an inaccurate record as willful is not outlandish. In fact, a number of cases before the United States District Court for the Southern District of New York allege that attorneys from the Department advised police officers to create false paperwork for processing arrests. *See, e.g.*, Arbuckle, *et al*. v. City of N.Y., 14-cv-10248, Docket No. 34 (S.D.N.Y. Sept. 30, 2016), Marom v. City of N.Y., 15-cv-2017 (PKC) 2016 WL

59000217 (S.D.N.Y. Jul. 26, 2016), Caravalho, *et al*. v. City of N.Y., 13-cv-4174 (PKC) 2016 WL 1274575 (S.D.N.Y. Mar. 31, 2016). Here, a false record was submitted, and courtesy for the Department to correct the record was extended but ignored.

## VII. CONCLUSION

This case follows a pattern of "by any means necessary" tactics employed by the Department. The Department's motivation for putting forth these false narratives can be rooted in a number of constitutional violations as well as simply wanting to discourage other employees from engaging in certain protective behavior. Nevertheless, the facts remain that the Department failed to meet its burden of by a preponderance of the evidence or even by the lower substantial evidence standard.

It did not demonstrate that Simone's emails concerning harassment in the workplace and the manner by which she was being harassed were false, that Simone knew her statements to be false, and operations were disrupted by her emails. Dr. Gille's testimony undermined her diagnosis. But even without her admission, the statute should be interpreted to require the Department's medical professionals to meet the industry standard.

Lastly, the testimony about Simone's alleged threats to other employees amounted to prejudicial hearsay and should be discredited. Mr. Mamakas' testimony was both inconsistent and impossible to be true. Lt. Boctor's testimony was inconsistent and unsupported by the record. It is clear that the initiation of the proceeding was malicious in both intent and effect. For that reason, sanctions should be imposed on the Department for slander, constructive termination, tortious interference, evidence tampering and the violation of Simone's right to union representation pursuant to NLRB v. Weingarten.

With the underwhelming evidence against Simone and the sensationalism of the subject matter, the Tribunal's determination made its bias apparent. And the bias alone is sufficient grounds to vacate its finding.

WHEREFORE, Simone requests reinstatement to her permanent title of ASA along with back pay since her first day of unpaid leave as well as damages flowing from the Department's aforementioned violations. She further requests any and further relief that the Commission deems just and proper.

Dated: February 10, 2025
New York, New York

By: /s/ D.S. ____________________________
D.S.

POLICE DEPARTMENT
Legal Bureau
One Police Plaza, Room 1406
New York, NY 10038
(646) 610-5400

**RESPONDENT'S RESPONSE**

**TO:** New York City Civil Service Commission **DATE:** March 12, 2025

**RE:** Demia Shymansky

**TITLE:** Associate Staff Analyst **CCSC CASE NO.** 2024-0057

**APPOINTING AUTHORITY ACTION:** Placed on Involuntary leave after OATH hearing pursuant to Civil Service Law § 72.

---

## INTRODUCTION AND PROCEDURAL SUMMARY

On or about April 1, 2019, Demia Shymansky ("Appellant" or "Respondent") was appointed to the position of Associate Staff Analyst ("ASA") with the New York City Police Department ("NYPD" or "Department"). On or about July 24, 2023, Respondent's supervisor requested that Appellant be submitted for a fitness for duty evaluation due to concerns about Respondent's ability to perform her duties. The request was based on Respondent's work performance, excessive absences, disruptive behavior in the work environment and threatening co-workers verbally and through emails and texts wherein Appellant alleged, among other things, that the NYPD was practicing witchcraft against her.[1]

On July 25, 2023, Respondent was evaluated by NYPD Psychologist Christina Gille, Psy.D assigned to the NYPD's Psychological Evaluation Section ("PES"). Dr. Gille reviewed

[1] See Civilian Request for Evaluation of Fitness for Duty dated July 25, 2023, NYPD Exhibit "4."

Respondent's history, which included a previous referral on April 13, 2023, for similar conduct by a prior supervisor at the Transportation Bureau. Due to the prior referral, Respondent was temporarily transferred to her most recent position at the Human Resources Division, where her conduct persisted.[2]

Dr. Gille reported that Respondent, "exhibits acute psychiatric symptoms indicative of psychosis. Respondent endorses paranoia, delusions of persecution and demonstrates a tangential and circumstantial thought process. She has been calling out sick with no time to use, coming in late, being confrontational, threatening, and disruptive to co-workers, and taking pictures and videos of others without their consent. The current symptoms exhibited by (Appellant) create a disruptive and hostile work environment and Appellant is a potential threat to herself and others." Dr. Gille found that she is currently unfit to work in the position of associate staff analyst. Dr. Gille recommended that Appellant be placed on a leave of absence pursuant to Sec. 72 of the Civil Service laws.

On July 28, 2023, the NYPD Personnel Division notified Respondent of her placement on Involuntary Emergency Leave pursuant to Civil Service Law Section 72.[3] The notice advised

---

[2] See NYPD Exhibit "6."

[3] See NY CLS Civ S § 72 (5) which provides that "notwithstanding any other provisions of this section, if the appointing authority determines that there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with operations, it may place such employee on involuntary leave of absence immediately; provided, however, that the employee shall be entitled to draw all accumulated unused sick leave, vacation, overtime and other time allowances standing to his or her credit. If such an employee is finally determined not to be physically or mentally unfit to perform the duties of his or her position, he or she shall be restored to his or her position and shall have any leave credits or salary that he or she may have lost because of such involuntary leave of absence restored to him or her less any compensation he or she may have earned in other employment or occupation and any unemployment benefits he or she may have received during such period."

Respondent of her rights and included a copy of the referral by her supervisor and Dr. Gille's findings.[4]

The NYPD filed its petition to place Appellant on a one year involuntary leave pursuant to New York Civil Service Law § 72 with the NYC Office of Trials and Hearings (OATH) on August 23, 2023, in order to give the Appellant the opportunity to contest the NYPD's placement of her on involuntary leave.[5]

On December 29, 2023, Appellant filed her answer to NYPD's petition.[6]

After the conclusion of discovery and multiple adjournments, the matter was tried before OATH Administrative Law Judge Tiffany Hamilton on May 21, 23, and 29, 2024.

On October 8, 2024, Judge Hamilton issued her report and recommendation. Judge Hamilton found that the NYPD established that Appellant suffers from a disability that prevented her from performing her job duties as an Associate Staff Analyst and recommended that Respondent be placed on a leave of absence pursuant to §72 of the Civil Service Law.[7]

On October 15, 2024, the Interim Police Commissioner notified OATH that he agreed with the finding that Appellant was presently unfit to perform the duties of her current position of Associate Staff Analyst and the recommendation to place her on a leave of absence.[8]

Subsequent to correspondence sent to the Civil Service Commission by Appellant that she wished to appeal the ALJ's findings of fact and recommendations the Department of Citywide

---

[4] See NYPD Notice of Emergency Involuntary Leave of Absence, dated July 28, 2023, NYPD Exhibit "8."

[5] See NYPD Civil Service Law Section 72 Petition, later assigned OATH Index number 582/24, dated August 23, 2023, OATH ALJ Exhibit "1."

[6] See Shymansky Answer, OATH Index number 582/24, dated December 29, 2023.

[7] See Report and Recommendation, Police Dept't v. Anonymous OATH Index No. 582/24, dated October 8, 2024 in its entirety; see also "Findings and Conclusions" and "Recommendation" at page 16.

[8] See Thomas L. Donlan, Interim Police Commissioner, letter dated October 15, 2024, a copy of which was previously submitted to the Commission.

Administrative Services ("DCAS") designated the Commission to hear the appeal on November 8, 2024, and the Commission issued a Notice Of Appeal on November 12, 2024, and directed the parties to provide the record, exhibits and transcripts.

On or about January 6, 2025, the NYPD issued its Notice of Final Agency Determination, and provided the Appellant and the Commission with a copy.[9]

On or about February 12, 2025, Appellant submitted her brief to the CCSC wherein she now refers to herself as "Simone."

Appellant's submission to the CCSC does show that the NYPD's decision to place Appellant on a one year voluntary leave of absence was arbitrary and capricious or not supported by the factual record. As such, the NYPD avers that ALJ Hamilton did not err in her finding that that Appellant was unfit to perform her duties as an ASA and her recommendation that Appellant to place on an involuntary leave. Accordingly, the CCSC should affirm the decision to place Appellant on an involuntary leave.

## STATEMENT OF FACTS

NYPD placed Appellant on involuntary emergency leave on July 28, 2023, after a series of disturbing incidents which escalated. NYPD thereafter filed its petition with OATH on August 23, 2023, pursuant to § 72 of New York Civil Service Law, arguing that Appellant should be placed on involuntary leave of absence because she was mentally unfit to perform the duties of her position and for being a threat to herself and others [10]

---

[9] See Notice of Final Agency Determination, dated January 6, 2025, a copy of which was previously emailed to the Commission.
[10] See NYPD Section 72 Petition, ALJ Exhibit "1."

Trial was held before ALJ Tiffany Hamilton on May 21, 23, and 29, 2024. Appellant appeared without counsel. We note that Appellant is an attorney admitted to practice before the courts of New York State and Appellant informed the court of such.[11]

Pursuant to rule 103(A)(8) of Appendix A to title 48 of the Rules of the City of New York, the Court advised Appellant of her right to be represented by an attorney. The Court also explained the nature and procedural aspects of the hearing. Appellant elected to proceed *pro se* and without further adjournment of the trial.

Respondent NYPD presented documentary evidence and the testimony of four witnesses: Dr.Christine Gille, Senior Police Administrative Aide Kevin Mamakas, Detective Rashad Vandross, and Lieutenant Gasser Antonios Boctor. Appellant presented documentary evidence and testified on her own behalf.

The NYPD submitted evidence that in April 2023, while Appellant was assigned to the Transportation Bureau, her supervisors grew concerned about her mental fitness and ability to perform her job duties. Her attendance was poor, she engaged in verbal disputes with colleagues, and her work performance was below standard. The Court cited for example, she displayed disruptive behavior on August 25, 2022, when she attempted to gain access to the Department's weekly CompStat meeting through a back door, even though her supervisor had specifically told her that she did not have permission to attend. The Court noted that Appellant's colleagues also reported that she frequently spoke of "intelligence gathering" and witchcraft. The Court also noted that Appellant's supervisors reported her behavior to the Department's

[11] See ALJ Report and Recommendation at page 1.

Internal Affairs Bureau ("IAB") for further investigation, and the incidents were logged in her personnel file.[12]

After learning of Appellant's behavior, the Chief of Transportation referred her for a fitness for duty evaluation. The first of three visits with Dr. Janelle Rondeau, a Department psychologist, took place on April 13, 2023. Dr. Rondeau noted that Appellant's "thought process was logical and coherent at times" but "illogical when discussing the Department".[13] On April 24, 2023, respondent was transferred to the Department's Personnel Bureau.

The NYPD also presented evidence that that after the transfer, Dr. Rondeau met with Appellant on April 25, 2023, and May 31, 2023. Respondent's new supervisors initially reported that she performed well in her new work assignment.[14] Based in part on this feedback, in a report dated May 31, 2023. Dr. Rondeau deemed respondent psychologically fit to work in the Personnel Bureau and closed her case with no recommended follow-up.[15]

On May 31, 2023, Dr. Rondeau deemed Appellant psychologically fit to work in the Personnel Bureau and closed her case with no recommended follow-up.[16]

Around June 2023, Appellant's supervisors and colleagues in the Personnel Bureau noticed that she had begun engaging in the same disruptive conduct reported by her supervisors in the Transportation Bureau, i.e., excessive absences, disputes with colleagues, and a failure to perform her job duties.[17] Appellant sent her supervisor, Lieutenant Gasser Antonios Boctor,

---

[12] Id.
[13] See NYPD Exhibit "7."
[14] Id.
[15] Id.
[16] Id.
[17] See NYPD Exhibit "5"; Tr. 386, 397-98.

emails and text messages almost daily about a theory on which she seemed fixated: the Department was practicing witchcraft against her.[18] In July 2023, Lieutenant Boctor referred Appellants for a fitness for duty examination[19] Dr. Gille evaluated respondent on July 25, 2023, and in a report dated August 11, 2023, found her unfit for duty.[20] The Department then filed the subject petition and placed respondent on emergency leave.[21]

Lieutenant Antonios Boctor testified that he served as Appellant's supervisor in the Personnel Bureau between April 2023 and July 2023.[22] He initially found her work above standard.[23] However, toward the end of May 2023, he noticed changes in Appellant's behavior.[24] She had begun sending him and other staff members "disturbing" and "unstable" text messages and emails, claiming to be under surveillance as part of the Department's "witchcraft program."[25] She sent these messages almost daily, sometimes multiple times per day, and most of them did not relate to the substance of her work as an associate staff analyst.[26] The messages sometimes included photographs of people on the street, in the subway, or inside One Police Plaza.[27]

Lieutenant Boctor testified that Appellant would inquire about these individuals, asking Lieutenant Boctor if they were "witches," or under the Department's control.[28]

---

[18] See NYPD Exhibits "9" and "10."
[19] See ALJ Exhibit. "1."
[20] See NYPD Exhibit "6."
[21] See ALJ Exhibit "1"; NYPD Exhibit "5."
[22] See Tr. 385.
[23] See Tr. 421.
[24] See Tr. 386.
[25] See NYPD. Exhibits. "9," "10," and "11"; Tr. 386, 399-400.
[26] See Tr. 407.
[27] See NYPD Exhibits. "9," "10," and "11"; Tr. 387,
[28] See NYPD Exhibits "10"; Tr. 390, 405.

Senior Police Administrative Aide Kevin Mamakas testified that on n July 25, 2023, he was on the 6th floor of One Police Plaza when he observed Appellant walking in his direction as he was headed to the bathroom.[29] As Appellant drew closer, he heard her say, "What the fuck are you looking at? Get the fuck away from me."[30] He turned left to continue toward the bathroom, and Appellant walked in the same direction.[31] SPAA Mamakas entered the bathroom and remained there for a few minutes.[32] When he exited the bathroom, he saw Appellant again and heard her say, "Stop fucking fo1lowing me ... or I'm going to beat the shit out of you."[33] SPAA Mamakas testified that he was shocked at what he heard, particularly given that he had not approached Appellant and had never interacted with her.[34]

After learning of the incident with SPAA Mamakas, Lieutenant Boctor referred Appellant for a fitness for duty evaluation.[35] Dr. Gille performed the evaluation on July 25, 2023, and in a report dated August 11, 2023 deemed Appellant unfit for duty.[36] She found Appellant "exhibits acute psychiatric symptoms indicative of psychosis" and "endorses paranoia [and] delusions of persecution." She also found that Appellant's current symptoms "create a disruptive and hostile work environment and [that] she is a potential threat to herself and others."[37] She concluded her report with a diagnostic impression of "delusional disorder, persecutory type," which she

[29] See Tr. 232-33, 238.
[30] See Tr. 239.
[31] See NYPD Exhibit "23"; Tr. 240.
[32] See Tr. 240.
[33] See Tr. 241.
[34] See NYPD Exhibit. "12"; Tr. 242, 251-52.
[35] See Tr. 450-51; NYPD Exhibit "6."
[36] See NYPD Exhibit "6."
[37] See NYPD Exhibit "6."

explained is "a psychiatric disorder where someone holds a false belief that's... strongly held despite contrary evidence."[38]

In preparing her report, Dr. Gille relied on her interview with Appellant, a review of the emails and text messages NYPD sent to Lieutenant Boctor and others, a review of Appellant's personnel profile, a telephone interview with Lieutenant Boctor, and a review of Dr. Rondeau's three evaluations.[39] Dr. Gille's report was endorsed by Dr. Adam Bloom, Director of the Department's Psychological Evaluation Section and a licensed psychologist, and Lokesh Reddy, MD, the Department's Deputy Chief Surgeon and a licensed psychiatrist.[40] Dr. Bloom not only reviewed the report but also met with Appellant and determined that she was "psychologically unfit for the title of Associate Staff Analyst," reinforcing Dr. Gille's conclusion.[41]

Appellant never submitted any medical evidence to rebut the finding that she was unfit to perform her duties. Rather she merely attempted to challenge the qualifications of the NYPD's medical experts.

## ARGUMENT

### I. The appeal is not a *de novo* hearing and the appeal should be limited to limited to the record of the hearing below.

The appeal is permitted by Civil Service Law section 72(3) which states that an employee who is placed on leave of absence may appeal from the determination of unfitness to the municipal Civil Service Commission This appeal is not a *de novo* proceeding on the underlying

[38] See Tr. 70-71; NYPD. Exhibit 6. ;
[39] See NYPD Exhibit. "6"
[40] See NYPD Exhibit. "6."
[41] See NYPD Exhibit "6"; Tr. 110.

issues; the presiding individual at the tribunal should focus on the record generated at the due process hearing.[42] This is especially the case whereas here Appellant has submitted absolutely no medical evidence that she is fit for duty or that the NYPD's decision to place her on an involuntary leave was arbitrary and capricious.

## II. NYPD proved that Appellant is unfit

To prevail under section 72 of the Civil Service Law, petitioner must prove by a preponderance of the evidence that respondent suffers from a disability, she is currently unable to perform her job duties, and her inability to perform those duties is caused by her disability.

As the Court noted in its decision, the NYPD provided credible evidence from multiple medical officers to support its claim that respondent suffers from a delusional disorder that prevents her from performing her job duties as an ASA[43] Respondent submitted no medical evidence to rebut NYPD's claim. Instead, she offered a foundationless self-assessment of her mental health and challenged the credentials and evaluation methods of the medical officers who deemed her unfit.[44]

Most of Appellant's testimony, and much of her documentary evidence, centered on her belief that the Department is practicing witchcraft against her and harassing her. Her trial exhibits included: a "Prayer of Release for Freemasons and their Descendants" (Shymansky Ex. AE); a June 20, 2014 *New York Times* article about a former NYPD officer who claims to exorcise demons (Shymansky Ex. I); screenshots of various alleged computer malfunctions (Shymansky Exhibit Ex. AH); psychology research (Shymansky Exs. B, C, M, AJ); and a business card respondent found

---

[42] See Richardson v. County of Suffolk, 151 Misc. 2d 378, 573 N.Y.S.2d 348 (Sup Suffolk 1991).
[43] See NYPD Exhibit"6"
[44] See ALJ Report and recommendation, supra at 14.

in her husband's garage, which belonged to a Department of Sanitation employee she had never met (Shymansky . Ex. AA).

The Court found that this evidence did not support Appellant's contention that she is able to perform the duties of an ASA. On the contrary, it tended to demonstrate an illogical thought process that further underscores NYPD's claims of unfitness.[45]

The Court found that in addition to unrefuted medical evidence, NYPD also presented credible witness testimony and documentary evidence to establish that Appellant repeatedly acted on her delusions, disrupting the workplace, decreasing her supervisor's productivity as well as her own, and causing several colleagues to feel uncomfortable or fear for their safety. The Court held that Appellant's actions are "probative of [her] present condition and future conduct." The Court further properly found that Appellant's delusions, which she denies she has, affect her ability to perform her job duties, and she presented no medical evidence reaching a different conclusion.[46]

**III. <u>Appellant's objections and defenses are unfounded.</u>**

Appellant has also reiterated her prior arguments that (1) she did not waive her right to a timely hearing, (2) that Dr. Gille was not qualified to find Appellant unfit, and that her First Amendment rights were violated. Each of these arguments were addressed at length by the Court in detail in its decision and recommendation.[47] In the interest of brevity the NYPD incorporates those findings of fact and all citations and the Court's reasoning in its Report and Recommendation as if fully put forth in NYPD's response to the appeal.

[45] <u>Id</u>. at 15.
[46] <u>Id</u>.
[47] <u>Id</u>. at 3.

However, the Commission should note Judge Hamilton's finding that although Appellant claims that she did not consent to her union representative and prior counsel's waiver and wanted a prompt trial, this assertion is at odds with her actions throughout the course of these proceedings, where she made or consented to seven adjournment requests.[48] While an adjournment request is not an explicit waiver, her repeated requests for a delay of the proceedings call into question her contention that she wanted a trial and decision within the prescribed timelines. The Court found that based on the entire record, including Appellant's request for multiple adjournments, it could not credit Appellant's claim that she did not consent to a waiver of the timelines.[49]

Likewise, the Court was correct in finding that Appellant's objection to Dr. Gilles testimony was meritless.

As Level 1 psychologist in the Department's Psychological Evaluation Section, Dr. Gille performs fitness for duty evaluations of NYPD members of the service.[50] She does not have a license, but Level 1 psychologists in the Department are not required to have one, as they work under licensed psychologists who review their recommendations.[51]

Dr. Gille holds a Ph.D. in clinical forensic psychology.[52] She has been employed as a Level I Psychologist for the NYPD since February 2021, performing fitness for duty evaluations for uniformed and civilian members of the service.[53] She completed her post-doctorate

---

48 See ALJ Exs. "4-11."
49 Id.
50 See Tr. 56, 60.
51 See Tr. 60-61.
52 See NYPD Exhibit "22"; Tr. 57.
53 See NYPD Exhibit "22"; Tr. 60.

fellowship at Herald Square Psychology, where, because she is not licensed, she applied for and obtained a limited permit to do clinical therapy work.[54] Prior to her fellowship, she served as an associate psychologist at Sing Sing Correctional Facility.[55]

Dr. Bloom and Dr. Reddy, who are New York State licensed psychologist and psychiatrist respectively, endorsed Dr. Gille's report, thus rectifying any perceived defect that her lack of a license might present[56] In response to an objection by Appellant, NYPD produced Dr. Bloom's psychology license information, which shows that he has been duly licensed since January 2, 1995.[57] The Court correctly determined that it was not persuaded by Appellant's challenges to the credibility and competence of Dr. Gille and Dr. Bloom.

Appellant's claims that the proceeding violated her First amendment rights are likewise meritless. NYPD did not allege that Appellant is unfit for duty because of her religious beliefs. NYPD's claim rather, is that she is unfit because she inappropriately acts on those beliefs, disrupting the workplace, neglecting her duties, and threatening to harm others.[58] Likewise Dr. Gille testified that Appellant is not unfit for duty because of her belief in witchcraft.[59] She stated "[T]his is not a case of discriminating against someone because of their religious beliefs," as Appellant is free to have "whatever religious beliefs [she] want[s]."[60]

---

[54] See NYPD Exhibit. "22"; Tr. 59.
[55] See NYPD Exhibit. "22"; Tr. 59.
[56] See NYPD. Exhibit. "6."
[57] See NYPD Exhibit. "24."
[58] See NYPD Exhibit "24."
[59] See Tr. 94.
[60] See Tr. 95; see also Baum v. County of Rockland, 337 F.Supp.2d 454 , (2004) amended 225 F.R.D. 470 , judgment vacated on reconsideration, affirmed 161 Fed.Appx. 62, 2005 WL 3527543 (no causal connection between free speech activity and unfitness finding).

## SCOPE OF REVIEW

The NYPD respectfully requests that the Commission limit its review to the record used by the NYPD and the due process hearing held by ALJ Hamilton to find that the decision to find Appellant unfit and to place her on a one year involuntary leave was rational, reasonable and supported by the underlying record and to determine that Appellant, in her testimony at trial and written submissions, has not met the heavy burden of demonstrating that the Department's determination was arbitrary and capricious or an abuse of discretion.[61]

## CONCLUSION

Based on these facts, the NYPD properly found Appellant unfit to perform her duties as an Associate Staff Analyst. That decision was lawful, proper, rationally based on the record, and within the Police Commissioner's discretionary authority. Appellant's delusions, work performance, and disruptive behavior directed towards her co-workers have a direct bearing on her ability to serve as a responsible and reliable member of the New York City Police Department. Therefore, the NYPD respectfully requests that its decision to place Appellant on involuntary leave after a three day trial and a finding of unfitness was rendered by the ALJ with a recommendation to place Appellant on involuntary leave be affirmed based on the record submitted to the Commission.

---

[61] See Richardson v. County of Suffolk, footnote 42 supra.

A copy of this report, with its attachments, was sent by electronic mail to Appellant at the following address provided by her for such communications: demia.wilburn@gmail.com.

Dated: March 12, 2025
New York, New York

MICHAEL GERBER
Deputy Commissioner, Legal Matters
New York City Police Department

By: Brian Mc Caffrey
Brian McCaffrey
Attorney for Respondent
New York City Police Department
One Police Plaza, Room 1406
New York, New York 10038
(646) 610-5400

D.S., hereinafter "Simone"
Associate Staff Analyst
NEW YORK POLICE DEPARTMENT
New York, New York 10038

March 25, 2025

**VIA EMAIL (submissions@nyccsc.nyc.gov)**

Reviewing Members of the Commission
NEW YORK CIVIL SERVICES COMMISSION
1 Centre Street, 2300N
New York, New York 10007

RE: Anonymous v. New York Police Department, 2024-0057

Dear Members of the Commission:

We are not at war with common sense. We yet are faced with a number of dilemmas that bring our application of civil service laws, protection of civil rights, and leadership skills under scrutiny. As you may be aware, I[1] am the named respondent in this this proceeding. The New York Police Department (the "Department"),[2] as my former employer, placed me on involuntary leave more than a year and a half ago, and I have not been able to commence work elsewhere since that time. According to the Department, I am mentally unfit to serve in the role of associate staff analyst. Just a blanketed statement with no actual evidence to support such a finding. All hearsay and lies. The Department professed to have medical evidence created by someone who does not possess a medical license. Consequently, the City of New York (the "City"), by and through the Department, infringed upon my fundamental right to civil service protections. And with every response, the falsehoods perpetuated by the Department only grow.

What is before you at this time is an opportunity to right a wrong on behalf of the City. Ever had a bad boss that just wanted to pull out the measuring stick to show his might? Ever had someone who lacks the ability to make sound decisions somehow sitting in a managerial position determined to exact revenge when you said "no" instead of "yes"? We are not at war with common sense. We are at war with abuse of discretion. We are at war with discrimination. In my email to internal affairs dated May 17, 2024, discussed *infra*, I asked that the culprit choose between being a lion or jackal. R. at 607.[3] It is the idea that lions are heralded as kings of the

[1] This letter serves as the Appellant's reply to the agency's response. The format intentionally deviates from the traditional brief form. It further disregards another rule of traditional legal writing by using the pronouns "I" and "me". Such use is also intentional to emphasize the tone of the reply.
[2] The author distinguishes between the use of "department" as a descriptor and a proper noun. As a description, it is used in lower case.
[3] "Who is hacking? I have work to do. . . Tell them to stay off of my computer. Lion or jackal? Pick one. Thank you for your help." R. at 607.

jungle, keepers of law and order. Jackals, on the other hand, are the antithesis of that order. A lion cannot run with the jackals. This case will show who the jackals are.

The Department's response did not change course from its unfitness determination in spite of the overwhelming contradictory law and facts. In fact, within fifteen (15) pages and 42 paragraphs, the response amounts to nothing more than (1) a demand for the Commission to rubber stamp the Tribunal's determination and (2) conclusory statements reiterating its position. Pursuant to the definition of "delusional" in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (the "DSM-5"), the Department would be delusional. Now, if we only had a licensed physician to assess it. We do not and neither does the Department.

I will attempt to reply succinctly. But I must state at the onset that I agree with one statement from the Department – my brief "does show that the [Department's] decision to place Appellant on a one year voluntary [sic] leave of absence was arbitrary and capricious or not supported by the factual record."

**Corrections**

On or around February 10, 2025 and the immediate following days, I informed the Commission that my computer had been hacked, which interfered with my ability to prepare my response. See Exhibit A, email to all parties dated February 10, 2025. I also noted at least two (2) material corrections. See Exhibit B, email to all parties dated February 11 and 17, 2025. On page 19 of my brief, the sentence should read "request for review" in lieu of "leave", and footnote 9 should read "the Tribunal refused" in lieu of "department". Also, page 26 should read "board-certified psychiatrist" and not "psychologist". On the day that my brief was submitted, I attempted to show interference by highlighting the difference from the email that was being drafted from my previous communications. In other words, I suddenly could not properly format my email or attach my brief at that moment. The delay afforded the benefitting party time to tamper with the document, create material as well as minor errors, and cause me to waste time repeating the same edits of the document. Nevertheless, the substance of my arguments should not have been lost, especially with the corroboration of law and the Department's discrepancy of facts.

**Simone**

The Department noted that I referred to myself as "Simone". The implication could be that I suffer from a multiple personality disorder or adopted other personas. Legal training teaches us that to protect an identity or shorten a lengthy name, we use "hereinafter" to rename the party.[4] "Simone" conceals my identity but makes me more than "Appellant". Simone is a civil servant who sat for the associate staff analyst's examination and passed, like thousands of other civil servants. Simone sat for the administrative staff analyst's examination, passed, and was

[4] *See also*, Gongora v. N.Y.C. Dep't of Ed., 930 N.Y.S.2d 757, 34 Misc.3d 161 (Sup. Ct., N.Y. Cty., 2010) (referring to witnesses at "Student A" and "Mother A" to conceal their identities).

placed on the promotional and open competitive lists. Simone worked for the City for years, like thousands of other civil servants. For those who have done the same, we are all Simone.

**HIPAA and Medical Information**

As you are aware, we are afforded privacy protection under the Health Insurance Portability and Accountability Act of 1996, commonly known as HIPAA and codified as 42 U.S.C. §§ 201 - 241. It governs the access, use, and disclosure of a person's medical information to ensure that it is safeguarded. I broached the issue of redaction of personal information with the Tribunal and was assured that such information would be protected by the use of "Anonymous" in the determination. In the Department's response, Agency Attorney Brian McCaffrey intentionally used my legal name and included my personal email address. In doing so, he revealed what the Department purports to be my medical information that customarily would not be disclosed due to privacy protections. If the Department insists that Dr. Christina Gille can diagnose me without a license to practice medicine in the State of New York and thus, create a medical record, then it also must appreciate its obligation to safeguard that information.

Mr. McCaffrey's breach of that duty subjected the Department to liability for negligence. In other documents, the Department exercised care in redacting the direct dial numbers for members of the Department, thereby demonstrating to adjudicating bodies that it appreciates the sensitivity of certain information. That same care, for which a legal obligation exists, was not extended to me. Thus, the Department should be required to remit monetary damages for its willful negligence. Such damages, if paid to a regulating authority, would be approximately $50,000 per violation, and the damages imposed for this offense should be no less.

**De Novo Review and the Record**

The Department argued that the Commission's review of this appeal is not *de novo* and that the Commission should use the record that it submitted. See Appellee's Response at p. 14 ("The NYPD respectfully requests that the Commission limit its review to the record used by the NYPD . . .. "). *De novo* review does not require a deviation from the actual record. In fact, the requirement is for the adjudicators to review the entire record and consider the laws governing the proceeding with a fresh perspective. It speaks solely to deference accorded to the initial factfinder. The Department, by its own admission, is wrong. By conceding that the standard of evidence was by a preponderance of the evidence, then it also conceded that the standard of review for the appellate body is *de novo*. The law is well-settled that *de novo* review is required in matters for which preponderance of the evidence is the standard. *See, e.g.*, Gongora, *supra* at 765 ("Application of the preponderance of evidence standard demands a *de novo* review of the record.") citing Matter of Alessandro, 13 N.Y.3d 238, 241, 249, 889 N.Y.S.2d 526, 918 N.E.2d 116 (2009). And such is the case here.

The concern with respect to the record is whether it accurately reflects what transpired during the trial. As previously noted, the transcript shows that the Department submitted

a false record. Specifically, page 236 of the transcript shows opposing counsel requesting that its witness diagram the floor plan and the path that he took on the day he alleged I threatened him, and the Tribunal questioned how the depiction of the events was working out at that moment. See Tr. at 236.[5] However, after the same witness completed direct and cross examinations, the Tribunal changed course and agreed to have the witness diagram the floor plan. See Tr. at 306.[6] Such a change would not have been warranted if the witness had already been diagramming during his testimony.

We are not at war with common sense. It is only logical that the witness had not been creating a visual prior to the time that the Tribunal stated that the opportunity to diagram should be reconsidered. The record is false, and the Department insists that the Commission rely on a record that the Department knows to be false.

Additionally, the Department outright claimed that my supervisors directed me not to attend the CompStat meeting on or around August 25, 2022. See Appellee's Response at p. 5. Another lie. The record does not show that any such instruction was given by any of my supervisors. R. at 447 – 451. In fact, it shows that none of my supervisors issued such a directive. Id. If such an instruction had been given, then the author of the Charges and Specifications dated December 16, 2022, after an investigation, failed to even mention my supervisors, thereby reiterating my position that the charges were baseless and existed solely as a tool to block my promotion.

The Department further characterized my behavior as "disruptive" which has a "direct bearing on [my] ability to serve as a responsible and reliable member of the New York City Police Department." Appellee's Response at p. 14. If only it were true. The record actually shows that opposing counsel lacked courtroom decorum. See, e.g., Tr. at 413. In fact, I asked the Tribunal to direct Mr. McCaffrey back to his team's table. Tr. at 268 and 413. It further shows his outbursts during my examination, such as asking if I were done while I completed cross-examination of their witness. Tr. at 297. The record has no such behavior from me.[7] When considering the testimonies

[5] "I'm not a 100 percent happy with this sketching situation . . . You can put it over there so everybody is – can -- can see it." Tr. at 236.

[6] "I'm jut going to ask, [sic] I know we had this discussion at the beginning of your examination, and after having heard both sides questioning, I feel that it would be helpful to me to have you do the diagram so that I can see what you're talking about a little bit better." Tr. at 306.

[7] During the trial, Mr. McCaffrey attempted to create a record that I was laughing during the trial, but the transcript does not reflect any audio of inappropriate laughter. Tr. at 413. ("Mr. McCaffrey: Your Honor, I just want to note. Your Honor may have heard, and I note for the record, that while the witness was reading that the Respondent started . . . what I perceived to be inappropriate laughter. I don't know if Your Honor heard it of if you didn't. ALJ Hamilton: I didn't. . . . [Simone]: Your Honor, I wasn't aware that we are assessing our Opposing Counsel's facial expressions; however, if that's the case, then I would probably feel more comfortable if Mr. McCaffrey remained closer to his desk as opposed to moving about and being behind [me]."). But, for the record, I hope that the Commission can appreciate the absurdity of watching an onslaught of character assassinations that were not even logical. For example, I asked Dr. Gille if she asked me whether I had evidence of my statements, and she did not recall prior to later insisting that I did not respond to many of her questions. Why would I not want to make it known whether I had evidence of my not being delusional? The answer was so illogical. It was more probable than not that she never asked me.

of the witnesses, Lt. Antonio Boctor-Gasser testified that he never witnessed any aggressive behavior from me, and his interactions with me were quite different. In fact, the examination was an amicable exchange in spite of the lies. See Tr. 423 – 518. Facts presented by the other witnesses were so inconsistent and improbable to be true that they were incredible as a matter of law.

We are not at war with common sense. I had a good relationship with my supervisor, but I supposedly went around threatening unknown persons in the bathroom and/or the elevator. Illogical.

**Rebuttable Medical Evidence**

When a party presents evidence supporting the truth of the matter being asserted, then it triggers the other party's obligation to rebut such evidence. However, New York Civil Service Law § 72 ("Section 72") establishes that "[t]he burden of proving mental or physical unfitness shall be upon the person alleging it." The keyword is "proving". It is not enough to merely say it. So yes, it matters that Dr. Gille is not licensed. It matters that Dr. Bloom was not licensed at the time of our meeting. It matters that I did not meet with Dr. Lokush Reddy, who is a board-certified psychiatrist and therefore subject to peer review for any ethical violations. In fact, it is convenient for Dr. Reddy that he did not meet with me so that he can disclaim having made such a diagnosis. It matters that the Department did not have a diagnosis from my private doctor prior to sending me for a fitness for duty evaluation. While Section 72 speaks to fitness, we cannot overlook the requirement that I must have a disability. The Department cannot diagnose me with a disability. The Department does not have a doctor-patient relationship with me.

The Department noted that I met with Dr. Bloom. The use of "met with" is quite loose in this context. The Department does not state and the record does not show that he conducted an evaluation. The record does not show that he asked me any medical questions. "Met with" leaves the encounter open for interpretation as to what was discussed, if anything.

In spite of my discontent with having been placed in this situation, I attempted to visit the doctor on a number of occasions. In fact, one day when I called to schedule an appointment with a private mental health professional using my personal phone, I was told by a person who identified herself as "Lady Diamond" that my co-pay would be $318 to $419. R. at 503. I emailed the Internal Affairs Bureau of the Department to inform them of the conversation, because those numbers reference provisions governing disciplinary matters in the Department. See id. I responded that "my co-pay looks more like 1 – 14", which were references to constitutional provisions. I also mentioned 1983, which is part of the statute giving rise to a cause of action for civil rights violations. As mentioned in my brief, the record shows that I was the subject of an internal investigation, R. at 135 and 260 – 86, and it is silent on the tools employed by the Department to conduct those investigations. In fact, when opposing counsel examined a Detective Rashad Vandross from IAB, it failed to take the opportunity for him to mention how the Department conducted the investigation to sustain any of the information presented in the records. Tr. at 361 and 374 – 8. And when I attempted to delve further, opposing counsel abruptly

interjected, preventing such information from being revealed. Tr. at 374 – 8. We are not at war with common sense, but we are at war with abuse of discretion and discrimination.

**Religious Beliefs vs. Religious Practices**

In its response, the Department insists that I was placed on leave for acting out my beliefs. Even that statement alone emphasizes the absence of a disability, which is necessary for leave pursuant to Section 72. Nevertheless, if we explore the basis of that claim, we cannot overlook my insistence of having been told and further questioning the validity of the sharing of that information.

For example, if we look at the emails on which the Department relies, they show my caution with quickly receiving that information as truth from persons with the ranks of supervisor or higher. The following are excerpts from emails sent to Lt. Boctor and Michael Gerber, the Deputy Commissioner of Legal Matters, respectively:

> **It is my understanding** that these methods are reserved for the facilitation of solving crimes and/or finding missing children. They have used it instead to harass and discriminate against me. They have made my experience at the office so uncomfortable. The same discomfort applies to/from work. I continue to emphasize that I do not employ black magic or any form of witchcraft. And it is also my understanding that people who participate in the harassment and discrimination are rewarded with promotions and/or overtime. **I do not know how true all of these statements are**, but I do know that [sic] I've been experiencing.
>
> The control and manipulation by persons who demonstrate signs of mental illness create a damning liability for the department, and even the City to the extent they invite participation from other agencies.
>
> The process is described as a game. But it is a violation of my person, my mind, and personal space. It is the primary reason that I have 1, 4, 13, and 14 Amendment claims against the department and Sanitation.

R. at 109 – 10, Email to Lt. Boctor dated July 20, 2023 at 9:42:13 EDT (emphasis added).

> **It is my understanding** that Legal Bureau has some control over the department's intelligence gathering program . . . It is designed to find missing persons or solve other crimes, but it has been perverted into violating employees' 1st, 4th, 13th, and 14th Amendment rights. The control, manipulation, and mining for

> secrets for the purpose of blackmail are unconscionable. No reasonable person would subject him- or herself to such an overstep. And access has been shared with other city agencies, including Sanitation, which has been hostile towards me. I find that deeply problematic.
>
> **While I can appreciate that this information that was shared with me has the potential of being erroneous**, I must inform you that **to the extent that it is true**, I do not participate in any form of witchcraft or consent to anyone "connecting" to my person. See Deuteronomy 18:9 – 13 (KJV).

R. at 111, Email to Commr. Gerber dated July 23, 2023 at 20:50:17 EDT (emphasis added).

The Commission will notice the use of "it is my understanding" and an appreciation for the possibility of having received erroneous information, thereby showing that I was cautious in arriving at a conclusion but still recognizing events were occurring that could not be explained by regular scientific methods. My language was not manic. My correspondence was structured to indicate a balance between the need for discretion and reigning in the misuse of intelligence resources. The dates of these emails are in 2023, which is at least two (2) years after I started noticing unexplainable incidents. Thus, there was opportunity for the issue to be addressed prior to the filing of this Section 72 proceeding, but it was missed and ignored. Again, common sense is not the enemy but rather abuse of discretion and discrimination.

We are not at war with common sense, but the Department would like for the Commission to believe otherwise. The state courts recognized the proclivity for abuse of the Section 72 provision. *See, e.g.*, Barret v. Miller, 582 N.Y.S.2d 552, 179 Misc.2d 24 (Sup. Ct., N.Y. Cty., 1998). A misguided leader would employ it as a tool to get rid of a "problematic employee" and "teach the employee a lesson" as the person suffers through leave without pay during a drawn-out process. Id. at 559.[8] While the Department highlighted my requests for adjournments, it conveniently excluded the reason for my asking was due to my equipment being hacked, irrespective of location. The inability to research case law and properly prepare my defense would have been detrimental to my case. And the record even shows the interference to visit a doctor to get a note stating that I do not suffer from delusional disorder. R. at 503.[9] All of these incidents of

[8] Barret v. Miller, 582 N.Y.S.2d 552, 179 Misc.2d 24 (Sup. Ct., N.Y. Cty., 1998) ("[A]n agency, tired on dealing with a 'problematic' employee, could decide to rid itself of the nuisance for some period of time and, perhaps, teach the employee a lesson, by placing that person on involuntary leave without pay, allowing the process to wend its way through the system towards a hearing, and then withdrawing the hearing, and reinstating the chastened employee, minus lost back pay and leave credits, at the point where the employee presents his or her case for reinstatement at the prehearing conference.").

[9] Email to IAB dated November 29, 2023: I just spoke with Lady Diamond on the phone. It was supposed to be the doctor's office. She claims that my out of pocket payment will need to be $318 - $419. I thought those numbers would be interesting for IAB. Is there any way to let her know that my out of pocket looks more like 1 – 14, including but not limited to the 4th and 13th? I wasn't born in 1983[,] but it looks like quite a promising year. Chat soon.

misconduct have been to the benefit of the Department. It is too coincidental to characterize them simply as malfunctions.

So what is the lesson? It is right before our eyes if we are willing to look. You will notice that in its response, the Department did not respond to my calling out its falsification of the record. It did not argue that Dr. Bloom was in fact actively licensed at the time of his meeting with me and that his license had not lapsed prior to that time. It did not challenge my arguing that the Tribunal showed bias.[10] It did not even show in the record that my actions interfered significantly with department operations. Instead, it deviated from the Tribunal's determination that the involuntary leave was warranted due to my alleged disability as opposed to the sensational emails. Appellee's Response at p. 13.[11] The law requires a disability. However, focusing on the emails and concocting a disability tells Simone not to mention witchcraft.

The Department's actions have been so egregious that any meaningful lesson would be lost. Again, when presented with the opportunity to elucidate on the methods used to investigate and/or the Department's process for handling complaints against members of service, opposing counsel failed to do so and objected repeatedly to my exploring that line of questioning. The Commission should ask "why". What about the internal emails that I sent had the powers that be so unnerved? For the record, Dr. Gille could not recall if she asked me for evidence of my claims. She described my responses as evasive. We are not at war with common sense. Why would I not want to clear my name and establish a reasonable basis for considering the veracity of what I was told? Maybe she never asked if I had proof, at least the record does not show that she did. After all, the belief had to be false to constitute delusional disorder and to prove otherwise would have undermined that diagnosis at the onset.

We are not at war with common sense. The Department has a Chaplain's unit that provides spiritual guidance. Tr. at 119 – 20 and R. at 439 – 40. Dr. Gille testified that the Medical Division works with that unit often, but I was not referred to that unit even after having sending her an email on or around July 26, 2023 informing Dr. Gille that I was religious. Tr. at 119 – 21. The truth is that the Department cannot with absolute certainty state that not one of its members employs witchcraft. In fact, in its response, it still missed the opportunity to establish it for the record. So that we are clear – I do not have to ever mention it again. The record speaks for itself.

---

R. at 503. The reference to 318 and 419 are department policies governing disciplinary actions. My rebut to those references were constitutional provisions that would be triggered by certain actions taken in reliance on those provisions and any circumvention of proper process. I also followed it with part of a statute authorizing a cause of action for federal civil rights violations. In other words, the Department would have violated certain of my rights enumerated in the First to Fourteenth Amendments with a particular emphasis on the Fourth and Thirteenth Amendments, thereby warranting a cause of action pursuant 42 U.S.C. § 1983.

[10] "I take Mr. McCaffrey's word . . .." Tr. at 363 – 4 (referring to accuracy of exhibits presented to Tribunal and Simone).

[11] "NYPD did not allege that Appellant is unfit for duty because of her religious beliefs. NYPD's claim rather, is that she is unfit because she inappropriately acts on those beliefs, disrupting the workplace, neglecting her duties, and threatening to harm others." Appellee's Response at p. 13.

**Stigma Plus Analysis**

As previously stated, the state courts acknowledged that Section 72 can be misused by agency leaders to teach an employee a lesson, which is not the spirit of the law. It exists to balance the interests of the governing bodies to ensure that they achieve their missions in the provision of services to the public and the rights of persons who suffer from a disability but have a right to work with the protection of civil service categorization. Upholding the determination of the agency and Tribunal should not be done haphazardly and without regard to the true purpose of Section 72. I respectfully urge the Commission to consider the precedent set by allowing an unlicensed practitioner of an agency to diagnose an employee as well as allowing an agency to circumvent due process and submit false records.

New York courts have consistently required that an agency abide by a higher standard when an employee's civil service protection is at issue and when the employee can be stigmatized by the adverse actions taken by the employer. *See, e.g.*, Gongora, *supra* at 765.[12] A diagnosis of delusional disorder and the inclusion of the determination in my personnel folder limits my employment prospects. Specifically, I have been forced out of my title as an associate staff analyst while awaiting appointment to the higher title of administrative staff analyst. This proceeding started in 2023, and we are now in 2025. Many opportunities for promotion have been missed.

Additionally, while applying to other employers, especially in the private sector, I am asked about having any type of disability. The completion of the disability questionnaire may be optional, but once an employer conducts a background investigation, the answer would be revealed, and the answer would be a lie. Security clearance for federal agencies can be denied due to mental disabilities, and those investigations are quite thorough. I reiterate that I am black. I am a woman. I do not need additional limitations added to my profile. Adding mentally incapacitated to my list of protected classes would be paralyzing to a career in legal, any type of law enforcement, or government office.

Again, this proceeding is an opportunity for the City to show that it can judge itself. Our leadership is under scrutiny. Nowhere in the record did Dr. Gille know my statements to be false, which is legally required to have a diagnosis of delusional disorder. Nowhere in the record did Dr. Bloom know the statements to be false, and nowhere in the record did Dr. Reddy know them to be false. And just as importantly, when presented with the opportunity to outright claim the impossibility that anyone in the Department would engage in such practices, the Department did not do so.

---

[12] "[T]ermination from employment, alone does not demand a higher standard . . . This increased stigma derives from such accompanying effects as . . . legal foreclosure from future employment, and accusations more serious than isolated poor judgment and serious enough to foreclose employment in petitioner's field as a natural consequence." Gongora, supra at 764 (citing Swinton v. Safir, 93 N.Y.2d 758, 764, 697 N.Y.S.2d 869, 720 N.E.2d 89 (1999)).

The Department simply did not carry its burden. It could have presented the witnesses who prepared the reports, but it failed to do so. Its failure denied the Tribunal the opportunity to assess the witnesses' candor though their appearance and testimony. Dr. Rondeau did not testify, but Dr. Gille relied on her reports. The detectives who investigated the claims against me did not testify, but Det. Vandross relied on their reports. Those who accused me of accosting them in the bathroom and/or elevator did not testify, but Mr Kevin Mamakas and Lt. Boctor relied on their reports. The Department provided no justification for failing to present these witnesses. When a witness to the alleged conduct does not appear in court to give testimony, the factfinder may draw the strongest inference against the party admitting the evidence into the record.[13] In other words, an adverse inference should have been made against the Department that the allegations in the hearsay statements were not true. But due to its bias, the Tribunal did not.

**<u>Conclusion</u>**

We are all Simone, and common sense is not our enemy. Simone's fundamental right to the protections afforded to civil servants is at stake. Maybe we are here due to the poor judgment of a boss who wanted to show his or her might. The courts have recognized the probability of that happening. Many of us have experienced it personally. But where that leadership has failed, the law exists to serve as a remedy and shield. Otherwise, the City should be subject to the liability caused by the actions of those who made the decision. Simone has suffered loss of income, including that attendant to having been promoted to administrative staff analyst, and loss of time towards her years of service and pension. She also has been unable to meet certain financial obligations, resulting in her incurring additional costs and expenses.

The Commission is presented with the opportunity to correct the errors and poor judgment of a few bad actors. My appeal to the Commission in this war against abuse of discretion and discrimination is for one thing - lead.

Respectfully,

Simone

SIMONE (D.S.)

[13] *See* <u>Gongora</u>, *supra* at 767.

# EXHIBIT A

Gmail

Demia [redacted]

# RE: [EXTERNAL] Re: Demia [redacted] v. NYPD - 2024-0680 - 2nd Appellant Extension and New Brief Deadlines

4 messages

**submissions (NYCCSC)** <submissions@nyccsc.nyc.gov> Mon, Feb 10, 2025 at 4:48 PM
To: Demia [redacted] m>
Cc: "ABBAS, ASYA" <ASYA.ABBAS@nypd.org>, "MOCCIO, NICOLE" <nicole.moccio@nypd.org>, "brian.mccaffrey" <Brian.mccaffrey@nypd.org>, "david.goldfarb@nypd.org" <David.Goldfarb@nypd.org>, "steven.drennen@nypd.org" <STEVEN.DRENNEN@nypd.org>

Dear Demia [redacted],

The Commission does not accept draft submissions. We have deemed your below email to be a request for an extension and your request is granted. Because you indicated that the document you submitted today is not final, that document will be disregarded.

Your final brief is now due **on or before March 12, 2025.** You may submit your final brief at any time between now and the end of the day on March 12, 2025. The NYPD will then have 30 days to submit its brief.

Thank you,

**NYC Civil Service Commission**

☎ **(212) 615-8915 | F: (212) 669-2727 | submissions@nyccsc.nyc.gov | www.nyc.gov/csc**

CONFIDENTIALITY NOTICE: This e-mail message is intended only for the person or entity to which it is addressed and may contain CONFIDENTIAL or PRIVILEGED material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

---

**From:** Demia [redacted]>
**Sent:** Monday, February 10, 2025 2:29 PM
**To:** submissions (NYCCSC) <submissions@nyccsc.nyc.gov>
**Cc:** ABBAS, ASYA <ASYA.ABBAS@nypd.org>; MOCCIO, NICOLE <nicole.moccio@nypd.org>; brian.mccaffrey <Brian.mccaffrey@nypd.org>; david.goldfarb@nypd.org; steven.drennen@nypd.org
**Subject:** Re: [EXTERNAL] Re: Demia Shymansky v. NYPD - 2024-0680 - Appeal Status

Good Afternoon:

Attached please find my draft brief. Someone is hacking, so my changes aren't saving for my TOA. If I send it now, the person can get over it. I will send another version, if possible. Please note that if I cannot, I am requesting back pay as well as other damages. Have a good day.

Best,

Demia

On Mon, Feb 10, 2025 at 8:22 AM Demia [redacted].com> wrote:

> Good Morning: Attached please find a draft of my brief. My PC is currently hacked. I am submitting a draft of the brief (as is) so that the party who is most concerned about my filing it by the deadline will have no more concerns, because the key information has been submitted. You will notice that the structure of this email is significantly different from my previous emails. With the brief, some of the arguments are out of place, because I no longer have formatting capabilities. Nevertheless, if I am able to make edits, then I will do so and submit a final version by today's end. Otherwise, please review. Actually, I can't attach the document either. I will deliver the document in person. See you soon.
>
> [redacted]
>
>> [redacted]
>>
>> [redacted]
>>
>> [redacted]
>>
>> [redacted]
>>
>> [redacted]
>>
>> [redacted]
>>
>>> [redacted]
>>>
>>> [redacted]
>>>
>>> [redacted]

# EXHIBIT B

**From:** submissions (NYCCSC) <submissions@nyccsc.nyc.gov>
**Sent:** Tuesday, February 18, 2025 11:28 AM
**To:** 'Demia [redacted]>
**Cc:** ABBAS, ASYA <ASYA.ABBAS@nypd.org>; MOCCIO, NICOLE <NICOLE.MOCCIO@nypd.org>; MCCAFFREY, BRIAN <BRIAN.MCCAFFREY@nypd.org>; GOLDFARB, DAVID <David.Goldfarb@nypd.org>; DRENNEN, STEVEN <STEVEN.DRENNEN@nypd.org>
**Subject:** RE: [EXTERNAL] Re: Demia [redacted] v. NYPD - 2024-0680 - Appellant Brief Received

Dear Demia [redacted],

The Commission refers to its February 11, 2025, correspondence for instructions about next steps in your appeal.

Thank you,

**NYC Civil Service Commission**

☎ **(212) 615-8915 | F: (212) 669-2727 | ✉ submissions@nyccsc.nyc.gov | www.nyc.gov/csc**

CONFIDENTIALITY NOTICE: This e-mail message is intended only for the person or entity to which it is addressed and may contain CONFIDENTIAL or PRIVILEGED material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

---

**From:** Demia [redacted]>
**Sent:** Monday, February 17, 2025 8:00 AM
**To:** submissions (NYCCSC) <submissions@nyccsc.nyc.gov>
**Cc:** ABBAS, ASYA <ASYA.ABBAS@nypd.org>; MOCCIO, NICOLE <nicole.moccio@nypd.org>; brian.mccaffrey <Brian.mccaffrey@nypd.org>; david.goldfarb@nypd.org; steven.drennen@nypd.org
**Subject:** Re: [EXTERNAL] Re: Demia [redacted] v. NYPD - 2024-0680 - Appellant Brief Received

Hello:

This email is solely for documenting the hacking. Page 26 of my brief now states “board-certified psychologist” in lieu of “psychiatrist”. However, the remaining paragraph uses psychiatrist, which is the description in the decision and the original language.

I’m not sure who the male in the hat with the protruding curls were, but I am flattered that he thought I was worth the energy.

Best,
Demia

On Tue, Feb 11, 2025 at 2:24 PM Demia [redacted]> wrote:

> Understood. Thank you.
>
> Best,
> Demia
>
> On Tue, Feb 11, 2025 at 2:04 PM submissions (NYCCSC) <submissions@nyccsc.nyc.gov> wrote:
>
>> Dear Demia [redacted],
>>
>> NYPD has been directed to respond to the brief you submitted on February 10, 2025. Therefore, no changes or corrections can be made until the submission of your reply brief.
>>
>> Thank you,
>>
>> **NYC Civil Service Commission**
>>
>> ☎ **(212) 615-8915 | F: (212) 669-2727 | ✉ submissions@nyccsc.nyc.gov | www.nyc.gov/csc**

CONFIDENTIALITY NOTICE: This e-mail message is intended only for the person or entity to which it is addressed and may contain CONFIDENTIAL or PRIVILEGED material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

---

**From:** Demia [redacted]>
**Sent:** Tuesday, February 11, 2025 11:05 AM
**To:** submissions (NYCCSC) <submissions@nyccsc.nyc.gov>
**Cc:** ABBAS, ASYA <ASYA.ABBAS@nypd.org>; MOCCIO, NICOLE <nicole.moccio@nypd.org>; brian.mccaffrey <Brian.mccaffrey@nypd.org>; david.goldfarb@nypd.org; steven.drennen@nypd.org
**Subject:** Re: [EXTERNAL] Re: Demia [redacted] v. NYPD - 2024-0680 - Appellant Brief Received

Good Morning:

Thank you for the confirmation. Please note that I documented evidence of the hacking while I was working. Hence, the existence of a number of errors. It was frustrating repeating the same tasks over again, but flattering that the hacker felt compelled to do it. Nevertheless, I respectfully request two substantive corrections on page 19. In para. 3, it should read “request for review” in lieu of “leave”. And footnote 9 on the same page should read “the Tribunal refused” in lieu of “the department”.

If the corrections would render the filing late, then I can wait to address them in the reply brief and submit evidence of the hacking (e.g. photo evidence) at that time. Thank you again.

Best,
Demia

CITY OF NEW YORK
# CIVIL SERVICE COMMISSION

NANCY G. CHAFFETZ, *CHAIR*
RUDY WASHINGTON, *VICE CHAIR*

LARRY DAIS
CHARLES D. MCFAUL
*COMMISSIONERS*

1 CENTRE STREET - ROOM 2300
NEW YORK, NY 10007

212-615-8915
www.nyc.gov/csc
appeals@nyccsc.nyc.gov

AMANDA M. WISMANS
*GENERAL COUNSEL*

JOAN RICHARDS
*DIRECTOR OF ADMINISTRATION*

## NOTICE OF CITY CIVIL SERVICE COMMISSION ACTION

**Nicole Moccio, Esq.**
Agency Attorney
NYPD Legal Bureau
NICOLE.MOCCIO@nypd.org

| | |
|---|---|
| **Case No.:** | 2024-0680 |
| **Appeal Type:** | Section 72 |
| **Appellant:** | Demia Shymansky |
| **Position/Title:** | Associate Staff Analyst |
| **Agency:** | NYPD |
| **Appeal Date:** | 10/17/2024 |

## INTERIM ORDER

The Civil Service Commission has issued an interim order in connection with this appeal. A copy of the order is attached. NYPD's response is due by **April 15, 2025.**

**NEW YORK CITY CIVIL SERVICE COMMISSION**

**c. Demia Shymansky**
Appellant
[redacted]

**Brian McCaffrey, Esq.**
Agency Attorney
NYPD Legal Bureau
Brian.MCCAFREY@nypd.org

**Steven Drennen, Esq.**
Agency Attorney
NYPD Legal Bureau
steven.drennen@nypd.org

**Asya Abbas, Esq.**
Agency Attorney
NYPD Legal Bureau
ASYA.ABBAS@nypd.org

**David Goldfarb, Esq.**
Assistant Commissioner
NYPD Legal Bureau
david.goldfarb@nypd.org

**Sgt. Yaudy Fernandez**
Civilian Investigation Unit
NYPD Personnel Bureau
yaudy.fernandez@nypd.org

**THE CITY OF NEW YORK**
**CITY CIVIL SERVICE COMMISSION**

---

*In the Matter of the Appeal of*

**DEMIA SHYMANSKY**
*Appellant*

*-against-*

**POLICE DEPARTMENT**
*Respondent*

*Pursuant to Section 72 of the New York State Civil Service Law*

CSC Index No: 2024-0680

---

# INTERIM ORDER

**DEMIA SHYMANSKY** ("Appellant") appealed from a determination by the Police Department ("NYPD") placing her on an involuntary leave of absence following proceedings conducted pursuant to Civil Service Law ("CSL") Section 72.

Appellant filed an appeal with the New York City Civil Service Commission ("CSC" or "the Commission") on October 17, 2024. NYPD submitted the underlying record with Appellant on copy on December 19, 2024.

After reviewing the previously submitted record, a few items were omitted in that submission and therefore:

**WE HEREBY DIRECT** NYPD to provide the Commission and Appellant with the following:

- A copy of Petitioner's Exhibit 13A from the underlying proceeding.
- A copy of the August 24, 2023, email sent by Adam Orgel to NYPD, on which the tribunal was copied, which was referenced on page 3 of the ALJ's Report and

Recommendation. The Commission was unable to locate this email in ALJ Exhibit 11.

All submissions to the Commission shall be within **7 days** of this Interim Order and must be copied to Appellant.

Dated: April 8, 2025

POLICE DEPARTMENT

Legal Bureau
One Police Plaza, Room 1406
New York, N.Y. 10038
Telephone: (646) 610-5400
Fax: (646) 610-8395

April 14, 2025

To: New York City Civil Service Commission

From: New York City Police Department Legal Bureau

SUBJECT: Respondent's Response to Interim Order, dated April 8, 2025

---

**Appellant:** Demia Shymansky

**TITLE:** Associate Staff Analyst **CCSC CASE NO.** 2024-0057

**APPOINTING AUTHORITY ACTION:** Placed on Involuntary leave after OATH hearing pursuant to Civil Service Law § 72.

---

This letter will serve as the New York City Police Department's ("NYPD") response to the New York City Civil Service Commission's ("Commission") Interim Order, dated April 8, 2025. The Interim Order directed the NYPD to produce: (1) a copy of Petitioner's (NYPD) Exhibit "13 A" from the underlying proceeding and (2) a copy of the August 24, 2023, email sent by Adam Orgel to NYPD, on which the tribunal was copied which referenced on page 3 of the ALJ's Report and Recommendation.[1]

[1] See Interim Order, dated April 8, 2025, a copy of which is annexed hereto as Exhibit "A."

Attached hereto, please find a copy of Petitioner's Exhibit "13 A."[2] It is an unredacted copy of the redacted IAB report that was marked and entered into evidence as Exhibit "13."

Further, it appears to the NYPD that the reference in ALJ Hamilton's Report and Recommendation to an email sent by Adam Orgel on August 24, 2023, may have been a typographical error. However, the NYPD does have an email sent by Adam Orgel dated August 23, 2023 at 10:55 a.m. A copy of same is annexed hereto as Exhibit "C."[3]

A copy of this response, with its attachments, was sent by electronic mail to Appellant at the following address provided by her for such communications: demia.wilburn@gmail.com.

By: Brian McCaffrey
Brian McCaffrey, Esq.
Attorney for Respondent
New York City Police Department
One Police Plaza, Room 1406
New York, New York 10038
(646) 610-5400

[2] See Petitioner's Exhibit "13 A," a copy of which is annexed hereto as Exhibit "B."

[3] See Email communication between Adam Orgel and the NYPD, dated August 23, 2023, a copy of which is annexed hereto as Exhibit "C." We note that this email was an ALJ Exhibit rather than an exhibit proferred by the NYPD.

EXHIBIT A

# CITY OF NEW YORK
# CIVIL SERVICE COMMISSION

NANCY G. CHAFFETZ, *CHAIR*
RUDY WASHINGTON, *VICE CHAIR*

LARRY DAIS
CHARLES D. MCFAUL
*COMMISSIONERS*

1 CENTRE STREET - ROOM 2300
NEW YORK, NY 10007

212-615-8915
www.nyc.gov/csc
appeals@nyccsc.nyc.gov

AMANDA M. WISMANS
*GENERAL COUNSEL*

JOAN RICHARDS
*DIRECTOR OF ADMINISTRATION*

## NOTICE OF CITY CIVIL SERVICE COMMISSION ACTION

**Nicole Moccio, Esq.**
Agency Attorney
NYPD Legal Bureau
NICOLE.MOCCIO@nypd.org

| | |
|---|---|
| **Case No.:** | 2024-0680 |
| **Appeal Type:** | Section 72 |
| **Appellant:** | Demia Shymansky |
| **Position/Title:** | Associate Staff Analyst |
| **Agency:** | NYPD |
| **Appeal Date:** | 10/17/2024 |

## INTERIM ORDER

The Civil Service Commission has issued an interim order in connection with this appeal. A copy of the order is attached. NYPD's response is due by **April 15, 2025.**

**NEW YORK CITY CIVIL SERVICE COMMISSION**

**c. Demia Shymansky**
Appellant
[redacted]

**Brian McCaffrey, Esq.**
Agency Attorney
NYPD Legal Bureau
Brian.MCCAFREY@nypd.org

**Steven Drennen, Esq.**
Agency Attorney
NYPD Legal Bureau
steven.drennen@nypd.org

**Asya Abbas, Esq.**
Agency Attorney
NYPD Legal Bureau
ASYA.ABBAS@nypd.org

**David Goldfarb, Esq.**
Assistant Commissioner
NYPD Legal Bureau
david.goldfarb@nypd.org

**Sgt. Yaudy Fernandez**
Civilian Investigation Unit
NYPD Personnel Bureau
yaudy.fernandez@nypd.org

**THE CITY OF NEW YORK**
**CITY CIVIL SERVICE COMMISSION**

---

*In the Matter of the Appeal of*

**DEMIA SHYMANSKY**
*Appellant*

*-against-*

**POLICE DEPARTMENT**
*Respondent*

*Pursuant to Section 72 of the New York State Civil Service Law*

CSC Index No: 2024-0680

---

# INTERIM ORDER

**DEMIA SHYMANSKY** ("Appellant") appealed from a determination by the Police Department ("NYPD") placing her on an involuntary leave of absence following proceedings conducted pursuant to Civil Service Law ("CSL") Section 72.

Appellant filed an appeal with the New York City Civil Service Commission ("CSC" or "the Commission") on October 17, 2024. NYPD submitted the underlying record with Appellant on copy on December 19, 2024.

After reviewing the previously submitted record, a few items were omitted in that submission and therefore:

**WE HEREBY DIRECT** NYPD to provide the Commission and Appellant with the following:

- A copy of Petitioner's Exhibit 13A from the underlying proceeding.
- A copy of the August 24, 2023, email sent by Adam Orgel to NYPD, on which the tribunal was copied, which was referenced on page 3 of the ALJ's Report and

Recommendation. The Commission was unable to locate this email in ALJ Exhibit 11.

All submissions to the Commission shall be within **7 days** of this Interim Order and must be copied to Appellant.

Dated: April 8, 2025

EXHIBIT C

**MCCAFFREY, BRIAN**

---

**From:** MCCAFFREY, BRIAN
**Sent:** Wednesday, August 23, 2023 10:55 AM
**To:** Adam Orgel
**Subject:** Re: OATH CSL Sec 72 Proceeding against NYPD OSA member _ WYNEIKA WILBURN n/k/a DEMIA SHYMANSKY CONFIDENTIAL

thank you

Sent from my iPhone

> On Aug 23, 2023, at 10:47, Adam Orgel <aorgel@osaunion.org> wrote:
>
>
>
> CAUTION! EXTERNAL SENDER
>
> STOP WHEN UNSURE. Never click on links or open attachments if sender is unknown, and never provide user ID or password. Suspicious? Please report to this email address: reportphishing@nypd.org
>
>
> Good morning. Yes, the union will be representing her at the Section
> 72. Once we receive the filing we plan to waive the 30 day requirment
> and request a postponement of both August dates. Thank you again.
>
>
>> On 08/22/2023 8:10 PM, MCCAFFREY, BRIAN wrote:
>> Good Evening, We will be filing the Section 72 tomorrow. Will you be
>> representing WYNEIKA WILBURN n/k/a DEMIA SHYMANSKY so I can serve you
>> with the Petition?
>>
>> Sincerely,
>>
>> Brian McCaffrey
>>
>> Agency Attorney
>>
>> New York City Police Department
>>
>> Legal Bureau - Suite 2-17
>>
>> 17th FL
>>
>> 375 Pearl Street
>>
>> New York, NY 10038
>>
>> Tel 646-610-4494
>>

To: Members of the Commission, New York Civil Service Commission

Cc: Legal Bureau, New York Police Department, Appellee

From: D.S., Appellant

Date: April 19, 2025

Re: Supplement to Reply Brief dated March 25, 2025
Case No.: 2024-0057

---

The purpose of this memorandum is to supplement the reply brief submitted by the appellant in the above-referenced proceeding on or around March 25, 2025. After a trial, the Office of Administrative Trials and Hearings (the "Tribunal") issued a Report and Recommendation dated October 8, 2024 (the "Determination"). The Tribunal submitted the Determination to Thomas Donlon, the interim police commissioner, "Anonymous", and Brian McCaffrey, counsel for the appellee. The interim police commissioner memorialized the appellee's concurrence with the Tribunal's finding in a reply letter to the Tribunal dated October 15, 2024. The appellant appealed to the New York City Civil Service Commission (the "Commission") pursuant to New York Civil Service Law § 72(1) ("Section 72"). At the direction of the Commission, the parties submitted briefs for consideration. The Commission later issued an interim order dated April 8, 2025, in which it directed the appellee to provide "[a] copy of the August 24, 2023[] email sent by Adam Orgel to NYPD, on which the tribunal was copied . . .", *inter alia* (the "Interim Order"). On or around April 14, 2025, the appellee emailed its response to the Interim Order. Its response constituted new evidence that the appellant had not had opportunity to consider and address in her previous brief submissions. The Commission granted the request for such an opportunity. This memorandum serves as the appellant's response.

In an appellate brief dated February 10, 2025, the appellant brought to the Commission's attention the appellee's falsification of the record, to which the appellee did not address in its response dated March 12, 2025. Revisiting the submission of a false record would be superfluous at this juncture. However, the issue of whether the appellant waived her right to due process cannot be ignored and is further highlighted by the new evidence.

In response to the Interim Order, the appellee characterized the Tribunal's reference to an email in which the appellant's representative waived the statutorily-required 30-day hearing as a typographical error. It claimed to have an email from that representative dated August 23, 2023 instead of August 24th. While the legitimacy of that email may be an issue, it still fails to demonstrate to the Commission that the appellant waived her right to the 30-day hearing that Section 72 requires.

The Determination has been altered several times, often to reflect a response to the appellant's analysis, thereby indicating the existence issues that the court failed to consider prior to issuing the Determination. It further reflects the appellee's insistence on winning a case that is wrong on both law and facts. However, even in its adoption of certain phrases or analyses, they are often misplaced.

For instance, in the latest version of the Determination, the Tribunal notes that Section 72 does not explicitly state that consent is required, but the analysis does not align with law and logic.[1]The requirement for a client's consent is often not preserved by statute but has life through the constitutional interpretations set forth by the U.S. Supreme Court.[2] Any deviation from

[1] R. at 330 ("Section 72(1) does not specifically require that a waiver of deadlines be communicated or ratified by a respondent.").
[2] *See, e.g.*, N.Y. v. Hill, 528 U.S. 110, 115 (2000).

its analysis would be an affront to our U.S. Constitution, but more importantly, restrict the rights afforded to a party by the U.S. Constitution, which is impermissible under the preemption doctrine.[3] The absence of the statutory reservation is not an invitation for courts to undermine fundamental rights so much as it is for state legislatures to ensure that their laws preserve them. Essentially, it is of no consequence that Section 72 does not explicitly state that a party's consent is required for waiver of the 30-day hearing. In fact, the statutory construction has no language that even discusses adjournments aside from permitting time for a party to retain counsel.[4] It is silent on how much time should be given to the party and further on the court's discretion to adjourn proceedings under certain circumstances. However, the Supreme Court has not been silent on preserving fundamental rights and a party's need to be informed in waiving any of those protected rights.[5]

The aim is not to attack the Tribunal's analysis for the purpose of this supplemental response, but rather to demonstrate the absurdity in reasoning that has been created by changing the record. Below are three (3) scenarios presented to the Commission in regards to the alleged waiver.

**August 4, 2023 Email from Appellant's Representative**

The Tribunal referenced an email dated August 4, 2023 sent to the Tribunal and opposing counsel.[6] In that email, appellant's representative confirmed "union representation and

---

[3] *See, e.g.*, Gibbons v. Ogden, 22 U.S. 1, 22 (1824) ("[I]f a law passed by a State, in the exercise of its acknowledged sovereignty, comes into conflict with a law passed by Congress in pursuance of the Constitution . . . the Constitution is the supreme law.")
[4] "The employee shall be entitled to a reasonable period of time to obtain such representation." N.Y. Civ. Svc. L. § 72 (2023).
[5] *See, generally*, N.Y. v. Hill, *supra*.
[6] R. at 338.

indicated that [appellant] was waiving her right to a hearing within 30 days of the notice and issuance of the final agency decision within 75 days of receipt of the request for review." R. at 338. This email was included in the record as an exhibit marked ALJ 11, but the record, as provided to the appellant, shows ALJ 11 as an email from the appellant to the Tribunal and opposing counsel dated March 14, 2024 requesting an adjournment so that she could attend a hiring pool.[7] If the appellant's representative emailed the parties with the language described in the Determination, then it probably would have superseded the scheduling of the initial hearings on August 25 and August 28, and the remaining analysis of the Tribunal would flow logically. It states that the first pre-trial conference was scheduled for October 3, 2023. R. at 338. It continues that appellant's representative requested an adjournment of that conference via an email dated October 5, 2023. Id. Consequently, under this scenario, the Tribunal did not schedule any dates in August 2023.

The Tribunal did not state that the first pre-trial conference was adjourned as was described in subsequent paragraphs. In fact, it counted each of the "adjournments" that appellant made. R. at 340 (noting that the appellant requested seven (7) adjournments and listing the dates). For that reason, it does not seem likely that the Tribunal made a typographical error in its reference of August 4, 2023 (or even August 24th, if applicable). If August 4, 2023 is in fact a typo, then the Tribunal's analysis is deeply flawed and it shows a misunderstanding of the facts. Thus, it committed a reversible error.

[7] "I have prepared my witness list and trial exhibits for submission. I will send all documents . . . once the interference with my equipment has ceased. I would like to bring to the court's attention that late yesterday evening, I received an email timestamped for 5:34 PM the same day. It is an invitation to a hiring pool occurring on 3/21. . . I [ ] have an obligation to pursue employment options to mitigate damages resulting from the petitioner's initiation of this proceeding. For that reason, I respectfully request that we adjourn the hearing until 3/26." R. at 419.

**August 23, 2023 Email from Appellant's Representative**

If the Tribunal made a typographical error and meant to reference August 23rd in lieu of August 4th or August 24th, then the evidence submitted by the appellee is insufficient and fails to rise to the level of the waiver described in the Determination. The appellee provided an email exchange between Brian McCaffrey and Adam Orgel dated from August 22, 2023 to August 23, 2023 (the "Email Chain"). No other parties are copied. The appellee's counsel initiated the contact with the appellant's representative. He only asked the union to confirm its representation in order to receive service of process. In response, the union representative confirmed representation and volunteered to waive the 30-day hearing. He did not mention waiving the issuance of a decision within 75 days of the request for review. However, the Commission must consider whether the language of the Email Chain actually waives the appellant's right to the 30-day hearing, or alternatively, whether the appellee was reasonable in determining that the appellant in fact waived the 30-day hearing.[8]

In order for a party to be justified in relying on another's expression of his intention, that party must be reasonable in his expectation that the other will carry out his intentions as expressed.[9] However, such reliance would be unjustifiable if the party knows facts that would render the execution of those intentions impossible.[10]

---

[8] The previous iteration represented that the appellant had waived the 30-day hearing, but it has since changed to the representative stating that he "will" waive the hearing requirement. In any event, the new language does not rise to the level of the appellee having received a waiver. "Will" is a term used for the future tense. Additionally, "plan", also a term implying future action, is less concrete than "will" and thus it fails to reflect the true message conveyed by the representative. R. at 365. It also includes a contingency clause, in which the plan would be triggered by the union receiving the filing.

[9] RESTATEMENT (SECOND) CONTRACTS & US UCC ART. 2 § 171 (Inst. of Int'l Banking L. & Prac. 2005)

[10] Id.

The appellant's representative explicitly stated that he "plan[s]" to waive the requirement and further request a "postponement of both August dates". He refrained from using more concrete language, such as simply stating that he waived the right. Additionally, the changed language of the appellee's petition states the union representative "will" waive the 30-day hearing, thereby deviating from its position that it in fact had a waiver as of August 23, 2023. It further means that the Tribunal was wrong in stating that it received such communication. Both terms, "will" and "plan" indicate an action to occur in the future, but plans change. The appellee's counsel did not provide a communication showing that it followed up with the appellant's representative after having filed the petition to ensure that it received the filing and was in fact waiving the hearing. Based on the Email Chain, such a communication should have occurred on August 24, 2023. That exchange would have been the necessary waiver.

Additionally, the union representative still had to submit a request to the Tribunal in order to postpone the previously-scheduled August dates. Arguably, the appellee did not know that the Tribunal would deny the request, but it knew or should have known that the Tribunal would have been obligated to consider certain factors prior to granting the request to adjourn. One of those factors would have been the Tribunal's opportunity to ask the union representative directly whether the appellant consented to the adjournment or for a legitimate reason for the need to adjourn.

The communication necessary to waive the statutorily-required 30-day hearing as well as the issuance of a decision within 75 days of the request for review is notably absent from the record. The Email Chain amounts to nothing more than a potential expression of intent. But it begs the question – why the delay? The union representative could have taken the opportunity to give the waiver at that moment on August 23, 2023. But he did not. Probably because the appellant

submitted a brief and documentary evidence showing the Commission that she had not communicated with her counsel regarding a waiver prior to August 24, 2023. For that reason, the email has to be dated no earlier than August 24, 2023. But it is not.

Lastly, it is worth noting to the Commission that approximately 31 calendar days passed before the appellee communicated with the appellant's representative regarding the Section 72 proceeding. Based on the appellee's response, representation was not confirmed until August 23, 2023 in spite of the statutory requirement that the hearing already should have been scheduled for dates around the time of that email. It is inconsistent with other documentary evidence, in which the union relayed the appellee's intention for the pre-trial conference and hearing to occur in August 2023. Thus, it is even more unlikely that the Tribunal made a typographical error.

**August 24, 2023 Email from Appellant's Representative**

The Interim Order directed the appellee to produce the email dated August 24, 2023 described in the record submitted by the appellee. It did not. Instead, it characterized the Tribunal's reference as a typographical error, thereby implying that the union representative did not communicate with the Tribunal or opposing counsel before securing a waiver from the appellant. However, if such were true, then the appellee misrepresented its communication with the union representative in its petition dated August 23, 2023. Further, it could not have been true that the first pre-trial conference was scheduled for October 3, 2023, or else the representative would not have had a need to request a "postponement of both August dates". From first glance, using the August 24th date seemingly fixes the union's liability for waiving a fundamental right without having first communicated with its client and shields the appellee from liability for representing in an official document that the appellant waived her right to due process. However, it depicts the

Tribunal as reckless in drafting the Determination, negligent in reaching such a conclusion without being familiar with the facts, and beyond unethical in representing that the email explicitly stated that the union received the necessary waivers. Still just a typo?

**Collusion**

In ALJ 11, the appellant expressed to the Tribunal that her *pro se* representation was not voluntary.[11] She also expressed her lack of interest in self-representation.[12] However, her need to represent herself resulted from her complaints to her union representation that the parties were too friendly with each other. The parties included, but were not limited to, the union representatives and opposing counsel. An answer to the petition was not filed with the Tribunal prior to the appellant's submission of that document on her own behalf on or around December 27, 2023.[13] And now, the facts of the record continue to change. The union's volunteering of a waiver of the 30-day hearing requirement without a direct request from the appellee, even if it is only an intent to do so, is quite suspicious. The legal strategy in abdicating a due process defense is not readily apparent, and further compromised the strength of the appellant's case. And the response to the Interim Order seemingly protects the union for its lack of representation and the appellee for its blatant disregard of legal process. But in this mire, the appellant is the one getting hurt while the union and the appellee are working in tandem to protect themselves.

New York law affords a person relief if two parties, especially counsel, collude to deceive the court or the injured party.[14] The appellant deserves such relief. The appellee's response

---

[11] R. at 419 ("I must proceed *pro se*.")
[12] ALJ 7, email dated Dec. 18, 2023 from the appellant to the Tribunal and opposing counsel, R. at 415 ("I have no desire to represent myself in this matter.")
[13] See R. at 415.
[14] N.Y. Jud. L. § 487 (2025).

to the Interim Order only solidifies the appellant's concern that her representatives were not assertive enough in their advocacy of her interests, which permitted the appellee to present a false case unbridled.

WHEREFORE, the appellant respectfully requests the Commission for an order reinstating her to the title of Associate Staff Analyst, directing the appellee to pay back salary consistent with the contract terms as of the time of the issuance of the Commission's decision, imposing sanctions on the appellee based on the relief requested in the appellant's briefs dated February 10, 2025 and March 25, 2025, awarding expectation damages to the appellant for the effect this proceeding had on her not being promoted to the title of Administrative Staff Analyst as of April 2024, and granting such other and further relief that the Commission deems just and proper.

Dated: April 19, 2025
New York, New York

By: ______________________
D.S.