citeUNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMIA SHYMANSKY f/k/a WYNEIKA WILBURN,<br><br>Plaintiff,<br><br>-vs-<br><br>STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES, JOSHUA VINCIGUERRA, in his official capacity as Deputy Commissioner and General Counsel, -NEW YORK STATE UNIFIED COURT SYSTEM, SARENITY GIBBS, CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, THOMAS DONLON, in his official capacity as police commissioner, and JESSICA TISCH, in her official capacity as police commissioner, MICHAEL GERBER, BRIAN MCCAFFREY, ASYA ABBAS, NICOLE MOCCIO, DR. CHRISTINA GILLE, DR. ADAM BLOOM, DR. LOKUSH REDDY, KEVIN ANDRADE, OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS, ASIM~~F~~ REHMAN, in his official capacity as chief administrative law judge, TIFFANY HAMILTON, in her official capacity as Administrative Law Judge, NEW YORK CITY OFFICE OF LABOR RELATIONS, CHERYL GRIFFIN, NEW YORK CITY CIVIL SERVICE COMMISSION, NANCY G. CHAFFETZ, in her official capacity as deputy commissioner, DRAFTERS OF THE CSC FINAL DETERMINATION DATED MAY 14, 2025, the ORGANIZATION OF STAFF ANALYSTS, LEONARD SHRIER, STEPHEN PARKER, DEPARTMENT OF SANITATION OF NEW YORK, JAVIER LOJAN, in his official capacity as Commissioner, UNKNOWN AGENCIES OF THE CITY OF NEW YORK and THEIR RESPECTIVE EMPLOYEES (2021 – 2025), fictitious and/or unknown to the plaintiff, and UNKNOWN TRANSIT AUTHORITIES and THEIR RESPECTIVE | Case No. 1:25-cv-10850 (PAE) (KHP)<br><br>FIRST AMENDED **COMPLAINT**<br><br>Jury Demand/Oral Argument Requested |

EMPLOYEES (2021 – 2025), fictitious and/or unknown to the plaintiff,.

Defendants.

DEMIA SHYMANSKY f/k/a WYNEIKA WILBURN ("Demia"), the plaintiff in the above-captioned proceeding, brings this suit against the STATE OF NEW YORK (the "State"), the NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES ("DMV"), JOSHUA VINCIGUERRA, in his official capacity as Deputy Commissioner and General Counsel, NEW YORK STATE UNIFIED COURT SYSTEM, SARENITY GIBBS, the CITY OF NEW YORK (the "City"), the NEW YORK CITY POLICE DEPARTMENT (the "Department" or "NYPD"), THOMAS DONLON, in his official capacity as the former police commissioner, and JESSICA TISCH, in her official capacity as the police commissioner, MICHAEL GERBER, in his official capacity as Deputy Commissioner of Legal Matters, BRIAN MCCAFFREY, ASYA ABBAS, NICOLE MOCCIO, DR. CHRISTINA GILLE, DR. ADAM BLOOM, DR. LOKUSH REDDY, KEVIN ANDRADE, the OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS ("OATH"), ASIMF REHMAN, in his official capacity as commissioner and Chief Administrative Law Judge, TIFFANY HAMILTON, in her official capacity as Administrative Law Judge, NEW YORK CITY OFFICE OF LABOR RELATIONS, CHERYL GRIFFIN, the NEW YORK CITY CIVIL SERVICE COMMISSION (the "CSC"), NANCY G. CHAFFETZ, in her official capacity as chair and commissioner, DRAFTERS OF THE CSC FINAL DETERMINATION DATED MAY 14, 2025, the ORGANIZATION OF STAFF ANALYSTS ("OSA"), LEONARD SHRIER, STEPHEN PARKER, DEPARTMENT OF SANITATION OF NEW YORK ("DSNY"), JAVIER LOJAN, in his official capacity as Commissioner, UNKNOWN AGENCIES OF THE CITY OF

NEW YORK and THEIR RESPECTIVE EMPLOYEES (2021 – 2025), fictitious and/or unknown to the plaintiff, and UNKNOWN TRANSIT AUTHORITIES and THEIR RESPECTIVE EMPLOYEES (2021 – 2025), fictitious and/or unknown to the plaintiff alleges as follows:

**NATURE OF ACTION**

1. This action seeks declaratory judgment as well as injunctive and monetary reliefs pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 29 U.S.C. § 157, N.Y. Lab. L. §§ 704 and 740, N. Y. Civ. Servs. L. § 203, as amended ("Taylor Law"), N.Y. C.P.L.R. § 214-a (medical malpractice), and N.Y.C. Admin. Code § 20-1204. Demia seeks a declaration that (i) New York Civil Service Law § 72 ("Section 72") is facially unconstitutional under the Fourteenth Amendment to the United States Constitution (the "Constitution"); (ii) the statutory standard for judicial review pursuant to New York Civil Practice Law and Rules (the "CPLR") § 7803(4) is constitutionally insufficient for an evidentiary standard with respect to actions, in which civil servants' substantive rights are at issue; (iii) Section 72 as applied to Demia violated the First, Fourth, Thirteenth, and Fourteenth Amendments of the Constitution, and it was employed as a tool to deter her from and punish her for engaging in protected activity, thereby causing additional constitutional violations of the Third, Fourth, and Eighth Amendments. It further requests an injunction prohibiting enforcement of these provisions as currently enacted by the New York Attorney General and the City and award monetary damages resulting from such violations. Section 72 is deficient in ensuring that civil servants placed on involuntary leave are accorded due process and other fundamental rights as required by the Constitution.

2. An opening statement is a powerful tool that sets the tone for the remainder of the proceeding. It gives insight into how the presenter will lead the audience. The same theory

applies to Section 72 in that its opening words demand very little expertise from the authority who determines the fate of a civil servant's fundamental protections attendant to his or her employment. Specifically, judgment regarding an employee's fitness to perform his or her duties rests with an appointing authority usually employed by the government employer. However, the statute fails to impose a standard for this authority who is charged with making a judgment.

3. The statutory construction of Section 72[1] continues with that deficiency to the point of denying civil servants adequate due process. While an appointing authority can be a supervisor responsible for overseeing the work of the employee, the statute fails to impose a standard for the medical officer who is required to certify the employees' inability to perform his or her duties by reason of a disability. For this reason, Section 72 is not only unconstitutional as applied to Demia but also facially.

4. The plain language of Section 72 requires that the civil servant has a disability before being adjudged unfit to perform his or her duties. When the appointing authority forms his or her opinion or conducts an evaluation of the employee to determine fitness, it must be "due to a disability". Thus, it follows that the diagnosis of the disability must precede the appointing authority's judgment of the employee's fitness. In other words, the employee's disability must be a pre-existing condition before the employee is subjected to a medical examination by a medical officer.

[1] Subsection 1 of Section 72 begins:

> When in the judgment of an appointing authority an employee is unable to perform the duties of such employee's position by reason of a disability, other than a disability resulting from occupational injury or disease as defined in the workers' compensation law, the appointing authority may require such employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department or municipal commission having jurisdiction.

N.Y. Civ. Servs. L. § 72(1) (2023).

5. Section 72 has no official definition for medical officer. It lacks an educational requirement. It lacks a mandate for board certification. And yet, the medical officer is empowered to certify as to the civil servant's fitness. The courts recognize that the appointing authority and the medical officer need not be the same person. And they should not be. However, at some point, the statute must impose a standard for one of these individuals who are authorized to deprive a civil servant of his or her substantive rights without due process.

6. It is worth noting that the employee can be placed on immediate leave prior to a hearing. A hearing can take as long as 30 days. For that reason, it is 30 days possibly without pay and/or health benefits. The spirit of Section 72 is intended to strike a balance between an employer's need to ensure continuity of operations and an employee's pursuit of life and liberty. However, as applied to Demia, the scale was not balanced, but rather it weighed heavily in favor of an employer misusing Section 72 to circumvent other civil service protections.

7. Here, Demia had not been diagnosed with a disability prior to an appointing authority directing her to undergo a medical examination. Demia had not engaged in violent conduct. However, her supervisor sent her for a medical examination, and the City's unlicensed practitioner diagnosed her with a disability and determined that she was unfit. Laws in the State require licensing for a person simply to identify as a psychologist within the State. N.Y.S Educ. L. § 7601 (2023). It is clear that a physician must be licensed to practice in order to diagnose a person with a medical condition. N.Y.S. Educ. L. § 6512 (2023). However, Section 72 fails to make clear what the necessary qualifications should be for a medical officer charged with certifying fitness for duty and therefore able to deprive a civil servant of his or her fundamental rights.

8. In spite of this blatant illegality, Demia appealed to two (2) administrative adjudicating bodies, both with managerial personnel appointed by the mayor of the City, either directly or indirectly. She is statutorily required to appeal to the New York Supreme Court; however, the complaint was removed. *See* NYSCEF Notification dated Aug. 18, 2025, Ex. K. The focus is not on the removal of the matter seeking judicial review, but rather the substantial evidence standard required by statute.

9. Courts consistently apply the preponderance of the evidence standard when substantive rights are at issue. *See, e.g.*, Miller v. Debuono, 90 N.Y.2d 783, 666 N.Y.S.2d 548, 689 N.E.2d 518 (1997) (noting that due process requires by a preponderance of the evidence to protect against erroneous deprivation of tangible liberty interest). The standard of proof must correlate with the rights at risk. Thus, the liberty and property interests at risk in a Section 72 hearing require a greater burden of proof shouldered by the party alleging unfitness.

10. Pursuant to C.P.L.R. § 7803(4), a reviewing court will determine whether an employer was justified in reaching its determination based on substantial evidence. Substantial evidence is an insufficient evidentiary standard to apply when a person's fundamental right is at stake. *See, e.g.*, Gongora v. N.Y.C. Dep't of Educ., 930 N.Y.S.2d 757, 765, 34 Misc.3d 161, 168 (Sup. Ct., N.Y. Cty. 2010) ("Charges that potentially stigmatize a prospective employee . . . must be supported by a preponderance of the evidence, rather than substantial evidence.").

11. The constitutional challenges pursuant to the First, Third, Fourth, Eighth, and Thirteenth Amendments are less apparent. These issues arise due to the underlying premise of Demia's leave. She complained about the abuse of intelligence resources to harass and discriminate against her. The forcible leave equating to constructive termination was retaliatory and a control

mechanism to deter Demia from discussing matters that the culpable parties did not want mentioned. Subsequent actions in furtherance of the retaliation and discrimination were so unconscionable that a reasonable person could not withstand such harassment. They were damning to Demia's reputation as a professional and attorney as well as damaging to her well-being. Essentially, the practices do not relate to Section 72, but the defendants employed Section 72 as a tool to do their bidding. Consequently, its abuse triggers a constitutional review of how it applied to Demia.

## PARTIES

12. Demia is a resident of the State. She returned to employment with the City in or around August 2017. After working at other agencies, her tenure at the Department commenced on April 1, 2019 in the civil service title of Associate Staff Analyst. In or around December 2021, she was listed as a candidate for promotion to Administrative Staff Analyst. On or around July 25, 2023, the Department required that she undergo a mandatory medical examination, at which time she was diagnosed with a mental disorder by one of its unlicensed psychologists. She had not been diagnosed with any mental disability prior to this time. She has been on involuntary leave since that examination.

13. The State is a member state of the United States of America. It is named as a defending party due to the misconduct of persons employed at a few of its agencies, but primarily, its presence is necessary to address the constitutionality of a statute.

14. The DMV is an agency in the State charged with the administration and maintenance of the State's residents' identification and driving profiles. It is a defendant, because

it issued multiple suspensions against Demia to prevent her ability to travel as well as other impropriety.

15. JOSHUA VINCIGUERRA is a deputy commissioner of the DMV and its General Counsel. He received communication from Demia in or around July 2025 regarding the status of her license, vehicle registration, and a demand for payment.

16. NEW YORK STATE UNIFIED COURT SYSTEMS ("UCS") is a body of courts within the State established to issue just, fair, and timely resolutions of cases before its courts. It is named as a defendant, because Demia's case against the City seeking reinstatement was removed, preventing her from filing to the case.

~~12.~~17. SARENITY GIBBS is an employee of UCS who removed Demia's case against the City from UCS' system. She cited guidelines specific to New York County but inconsistent with the New York Civil Practice Rules § 1101(d).

~~13.~~18. The City~~CITY~~ is a municipality within the State. It consists of approximately 50 agencies and employs over 306,000 employees. The final determination regarding Demia's involuntary leave represents a decision on behalf of the City.

~~14.~~19. ~~NEW YORK POLICE DEPARTMENT ("NYPD" or the "Department")~~NYPD is a law enforcement agency within the City. It is charged with enforcing the laws governing the City, investigating the violations of those laws, and other activities necessary to facilitate and/or support the public safety efforts of the City. It employs approximately 36,000 uniformed members of service along with 19,000 civilians. It initiated the Section 72 proceeding against Demia and refused reinstatement.

~~15.~~20. THOMAS DONLON served as ~~–~~the P~~p~~olice ~~c~~Commissioner of the Department from September 13, 2024 – November 24, 2024. He issued a letter to OATH in which he agreed with the finding of its report and accepted its recommendation. He further stated that he reviewed Demia's comments in response to the report, but her email dated October 9, 2024 and addressed to him was rejected. He is named as a defendant solely in his official capacity.

21. JESSICA TISCH has been serving as the P~~p~~olice C~~c~~ommissioner of the Department since November 25, 2024. She is named as a defendant solely in her official capacity.

~~16.~~22. MICHAEL GERBER is the Deputy Commissioner of Legal Matters for NYPD. He advises the Police Commissioner and executive staff on major legal developments impacting the Department and further provides legal guidance on the Department's operations.

~~17.~~23. BRIAN MCCAFFREY, ESQ. is an agency attorney employed with NYPD. He represented the Department during the Section 72 process. Upon information and belief. Mr. McCaffrey prosecuted this case knowing that the information was false, including testimony by certain witnesses. It is further suspected that he used the resources of the Department to access the plaintiff's personal devices without authorization to conduct a legitimate investigation but rather to falsify and destroy evidence, including but not limited to the original petition dated August 23, 2023.[2]

[2] On or around November 12, 2025 c. 1:14 PM, a draft of this complaint was shared with a select number of attorneys from non-profit organizations as a solicitation for feedback from constitutional scholars. Within a day, the plaintiff lost the ability to send documents via email on her personal computer. Additionally, as she prepared the exhibits to accompany this filing, the exhibits could not be downloaded. The plaintiff did not regain access to the email feature until after November 28, 2025. During that time, the plaintiff documented numerous instances of hacking and probable interference via the Department's intelligence resources, especially involving attorneys from the City. As of December 3, 2025, the plaintiff noticed a change in the language of the document identified herein as the Section 72 Petition. It was authored by Brian McCaffrey. The author also noticed that one of the filings, previously signed by agency attorney Nicole Moccio, also employed with the Department, was changed to Brian McCaffrey. Because these documents were changed after the plaintiff started to prepare them as exhibits to this complaint, the plaintiff was denied opportunity to respond to the documents in real time. It also is believed that the changes were done to undermine the discrepancies pinpointed by the plaintiff. The plaintiff's filings were also modified to create errors that did not exist prior to the

~~18.~~24. ASYA ABBAS, ESQ. is an agency attorney employed with NYPD. She represented the Department during the Section 72 process. Upon information and belief, Ms. Abbas misappropriated the Department's intelligence resources during the process to hack the plaintiff's personal equipment, destroy evidence, and defraud the tribunal.

25. NICOLE MOCCIO, ESQ. is an agency attorney employed with NYPD. She represented the Department during the Section 72 process. She initially drafted and filed the response to the CSC's interim order dated April 8, 2025 requesting the email in which Demia's counsel waived due process. Upon information and belief, the response was changed during the preparation of this complaint to show that Mr. McCaffrey drafted and filed the response.

26. DR. CHRISTINA GILLE is an unlicensed psychologist employed by the NYPD. She received her doctorate degree in psychology in California before moving her practice to the State. She works in the Department's Medical Division and assesses employees for fitness of their titles.

27. DR. ADAM BLOOM is a psychologist employed by the NYPD. He serves as the supervisor of Dr. Gille. He is licensed to practice in the State. However, his license lapsed at the time that Demia was placed on leave.

28. DR. LOKUSH REDDY is a licensed psychiatrist employed by the NYPD. He is named as defendant, because he endorsed a diagnosis made by Dr. Gille without having met with Demia.

drafting of this complaint. While it is flattering that Mr. McCaffrey recognizes the litigation ability of the plaintiff in comparison to his own, the plaintiff cannot submit exhibits that she knows to be false without bringing to the court's attention the nature of the documents.

~~19.~~29. KEVIN ANDRADE is an agency attorney formerly employed by the NYPD. He is named as a defendant, because he is known to use the Department's intelligence resources frequently, and he threatened the security guards of Demia's law school in November 2024 so that she would be unable to return to the school. Through the use of the Department's resources, he gained access to her school profile and changed her access privileges on her school ID.

~~20.~~30. CIVIL SERVICE COMMISSION (the "CSC") is an adjudicating body for the City pursuant to New York City Charter § 813 and charged with hearing appeals from city employees aggrieved by determinations of other city agencies. It issued the final determination for the City on or around May 14, 2025.

~~21.~~31. NANCY G. CHAFFETZ serves as the chair and a commissioner of the CSC. She was appointed as a commissioner in or around May 2009 and has served as the Chair since May 2011. She is named as a defendant solely in her official capacity.

~~22.~~32. OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS ("OATH") is an independent agency within the City that adjudicates a wide range of matters referred to it by any city agency. It consists of a division for trials and one for hearings. Cases before the Trials Division of OATH are overseen by an administrative law judge. Whereas, those cases assigned to the Hearings Division are determined by hearing officers. Demia's Section 72 hearing was held before administrative law judge Tiffany Hamilton, and she issued the report and recommendation dated October 8, 2024 (the "Report") on behalf of OATH.

33. ASIMF REHMAN serves as the commissioner and Chief Administrative Law Judge for OATH. He was appointed March 2022. He is named as a defendant solely in his official capacity.

34. TIFFANY HAMILTON is an administrative law judge in OATH. She was the factfinder in Demia'a hearing against the City and the author of the Report and Recommendation issued in October 2024.

35. NEW YORK CITY OFFICE OF LABOR RELATIONS ("OLR") represents the Mayor of the City in the conduct of all labor relations between the City of New York and labor unions representing employees of the City.

23.36. CHERYL GRIFFIN is the Chief Review Officer at OLR. She oversees the decisions issued in connection with Step III grievances.

37. DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES ("DCAS") is an agency within the City responsible for providing administrative support for other city agencies, including, but not limited to, promulgating rules and regulations governing the hiring, promotion, and training of the City's employees. It further facilitates the acquisition and management of various assets of the City. Demia emailed DCAS on two occasions regarding reinstatement to her position. She received a response requesting a note from a medical doctor even though she had not seen a doctor to be ousted from her job. It is not being named as a defendant at this time.

24.

38. DEPARTMENT OF SANITATION OF NEW YORK ("DSNY") collects and manages the waste material of the City. Upon information and belief, personnel from DSNY

blackballed Demia so that other agencies within the City would not hire her. It is also believed that the Chiefs' Association leveraged its relationship with her union to prevent OSA's representation of her in any administrative action in which she would assert her rights in connection with her title. By and through the intelligence resources, Demia received a message that if she did not work for DSNY, then she could not work for the City. Demia presumed that she was being informed that she was blocked from other opportunities in the City. That information seemed untrustworthy until she received an offer of employment from another agency, but the opportunity never came to fruition. While updating her personnel data, Demia changed her business email from a DSNY account to an NYPD account. The email address was changed back to a DSNY account. Demia encountered a hostile work environment while at DSNY and suspects its members' involvement with her husband's admission into the intensive care unit in December 2018. It is not being named as a defendant at this time, but she reserves the right to name the agency as a defendant in the event it is discovered that any of its members, current or former, contributed to the causes of action stated herein.

~~25.~~39. JAVIER LOJAN was the First Deputy Commissioner of DSNY.

40. ORGANIZATION OF STAFF ANALYSTS ("OSA") is the official collective bargaining union for civil servants with titles in the analyst series as well as other titles. It represents approximately 5,100 municipal workers. It was Demia's union during her tenure with the City. It assigned counsel during her Section 72 hearing. Upon information and belief, the counsel made a deal with the Department and failed to advocate for her interests.

41. LEONARD SHRIER served as OSA's outside counsel during the City's hearing against Demia. He assumed representation of Demia from October to December 2023.

During that time, Demia described his representation as too friendly with NYPD's counsel's hearing against the City.

26.42. STEPHEN PARKER is a representative of OSA. He was assigned to handle Demia's matters involving the City.

27.43. UNKNOWN AGENCIES OF THE CITY OF NEW YORK and THEIR RESPECTIVE EMPLOYEES (2021 – 2025) and UNKNOWN TRANSIT AUTHORITIES and THEIR RESPECTIVE EMPLOYEES (2021 – 2025): Upon information and belief, persons employed by certain transit systems participated, knowingly or unknowingly, in activities in furtherance of the misconduct described herein. All parties are not known to the plaintiff at the time of this filing. However, her right to name additional, proper defendants is being preserved. fictitious and/or unknown to the plaintiff

## JURISDICTIONAL STATEMENT

28.44. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the First, Third, Fourth, Eighth, Thirteenth, and Fourteenth Amendments to the Constitution and under 42 U.S.C. § 1983. The retaliation and unfair labor practices claims made pursuant to N.Y. Lab. L. §§ 704 and 740 and N.Y.C. Admin. Code § 20-1204 are consistent with protections accorded to persons under the Equal Protection Clause of the Fourteenth Amendment and federal labor statutes, and jurisdiction over those matters are not exclusive to state courts. Thus, this Court, having general jurisdiction over such matters, is one of competent jurisdiction to adjudicate those retaliation claims.

29.45. This Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

~~30.~~46. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in this district, the State and City maintain offices in this district and are subject to personal jurisdiction in this district, and the individually-named defendants have substantial contact with this district.

## FACTUAL ALLEGATIONS

*Section 72 Process*

~~31.~~47. On or around July 25, 2023, Demia's supervisor entered her office and informed her that she was going to another mandatory medical examination administered by a member of the Department's Medical Division. He ordered her to pack all of her belongings so that she would not have a reason to return. She would be evaluated for fitness to perform her duties as an Associate Staff Analyst. The Department provided transportation to the session.

~~32.~~48. Demia arrived at the Medical Division c. 14:11 hours and departed c. 15:25 hours. Within approximately one (1) hour and fifteen (15) minutes, Demia signed in, waited for the psychologist to become available, met with Dr. Christina Gille and later her supervisor Dr. Adam Bloom, and called OSA's representative Mr. Stephen Parker. During her meeting with Dr. Gille, Demia complained that she was experiencing harassment in the office, and it had become overwhelming. She withheld confidential medical information but responded to general background questions, such as marital status and state of origin. Demia recorded the session to document her demeanor. That evidence has since been deleted but not by Demia. At the end of their session, Dr. Gille met with Dr. Bloom before calling Demia in for her final sit down.

~~33.~~49. Dr. Bloom, the supervising psychologist, did not discuss any health-related matters with Demia. He only informed her that she was determined mentally unfit to serve in her

current role and would be placed on leave. In spite of the determination, the Medical Division's representative gave her a notice stating that she was not sick, and her duty status was "TBD". *See* Clinic Visit Report dated Jul. 25, 2023, Ex. F. Demia called the OSA before leaving the office, and the health professionals informed Mr. Parker, OSA's representative, that the leave would be paid. Demia has not returned to work since that day.

~~34.~~50. At the time of their meeting, Demia was unaware that Dr. Gille and Dr. Bloom were unlicensed psychologists[3]. That fact would come to light in the following months while she prepared for the Section 72 hearing.

~~35.~~51. Within days of being on leave, Demia received a notice from the personnel Department dated July 28, 2023. The notice informed her that she was on involuntary leave pursuant to New York Civil Service Law § 72, and a hearing would be forthcoming (the "Notice of Leave"). *See* Notice of Emergency Leave of Absence dated July 28, 2023, Ex. I. Demia continued communication with OSA, and its representative informed her that a conference and hearing were scheduled for August 25 and August 28, respectively.

~~36.~~52. On or around August 24, Demia contacted OSA to confirm the scheduling for the conference on August 25. She had emailed OSA the note issued by the Department stating that she was "not sick". *See* Ex. D. Oddly, Mr. Parker insisted that Demia was on unpaid sick leave. Someone deleted her communication with OSA that showed the pre-existing dates for the conference and the hearing as well as the email showing that as of August 24, she was unaware of an adjournment of the 30-day Hearing. *See* Ex. D.

[3] At the Section 72 hearing, the Department admitted evidence into the Record that Dr. Bloom was licensed before and after the sit down with Demia. Demia admitted evidence into the Record that Dr. Bloom was not licensed as of December 12, 2023.

~~37.~~53. Demia later learned that the petition pursuant to Section 72 is dated August 23, 2023 (the "Section 72 Petition"), and it includes a footnote stating that the general counsel for OSA "will waive the 30-day hearing and the OATH decision time requirement." As it relates to the due process protections embedded in Section 72, the Record is not clear.

~~38.~~54. OATH and the Department mentioned waivers of a hearing that must be afforded to the employee within 30 days of requesting a review of the agency's determination (the "30-day Hearing") and the issuance of a determination within 75 days of receipt of the request for review (the "75-day Determination") via an email from OSA's counsel. OATH specifically noted email communications on August 4, 2023, August 24, and October 5, 2023, in which Demia's representative from OSA affirmatively waived the due process requirements. *See* the Report, Ex. C. In April 2025, the Department produced an email dated August 23, 2023 which the Department described as proof that Demia's representative waived the 30-day Hearing. *See* Email dated August 23, 2023 (the "Waiver Email"), Ex. E.

~~39.~~55. The Waiver Email is an email exchange occurring between Adam Orgel and Brian McCaffrey. McCaffrey requests confirmation from Orgel whether OSA was representing Demia in the Section 72 proceeding. Orgel responded that once the petition was received, then he "plan[ned] to waive the 30 day requirment [sic] and request a postponement of both August dates." The Waiver Email, Ex. E. The Department produced no other evidence of a waiver, and OSA's representative did not discuss waiving the 30-day Hearing until August 24, 2023. *See* Email from Demia to OSA dated Aug. 24, 2024, Ex. D. During that discussion, OSA failed to mention the implications of adjourning the hearing beyond the initial 30 days. In fact, Mr. Parker took a

defensive position and attempted to assign fault to Demia for its failure in preparing a defense in spite of her having sent the Department's notice that she was not sick.

~~40.~~56. The initial conference was adjourned from August 25, 2023 to on or around October 3, 2023. It would not be the only adjournment. Several more adjournments followed over Demia's objections. *See* Email from Demia to OSA dated Oct. 10, 2023, Ex. D. However, on or around December 18, 2023, Demia had to request an adjournment of the hearing scheduled for the next day. Trial exhibits were due on or around December 14, 2023, but her newly-assigned counsel did not submit them. He relied on Demia to prepare the exhibits and formulate the arguments. Demia was relying on him.

~~41.~~57. By December 18, 2023, no answer had been submitted on Demia's behalf, and no motion to dismiss had been filed. When Demia asked about dismissing the case, she was told that OATH does not grant motions to dismiss, but Demia forwarded a number of cases demonstrating quite the contrary.

~~42.~~58. Pursuant to Section 72, a final determination regarding the legitimacy of the involuntary leave must be issued within 75 days from the request for hearing. The Department's notice informing Demia that a hearing would be scheduled is dated July 28, 2023. According to OATH, OSA's counsel communicated with the Department regarding the Section 72 hearing by August 4, 2023.[4] By October 11, 2023 or shortly thereafter, OATH should have issued a determination; it did not. OSA's counsel should have insisted on a dismissal; it did not.

[4] Upon information and belief, the original version of the Report stated that initial contact with OSA's counsel was on or around August 4, 2023. The information has since been changed as evidenced by the tribunal's subsequent reference to August 4, 2023, which the Defendant characterized as a typo.

~~43.~~59. Demia's health insurance ended on or around December 3, 2023. Prior to that time, personnel employed by the City, either directly or indirectly, used intelligence resources to prevent Demia from meeting with a licensed health professional to get a doctor's note. After one such incident on or around November 29, 2023, she emailed the NYPD's Internal Affairs Bureau to inform its members that she suspected personnel from the Department were involved. The person who was supposed to be from the doctor's office identified herself as "Lady Diamond" and cited recognizable policy provisions from the Department's administrative guide as the co-pay amounts.

~~44.~~60. What a person says can actually differ from what others hear. Within a week after Demia's health insurance coverage ended, Len Shrier, who identified himself as OSA's external general counsel, left the case. Mr. Parker informed Demia that if she were displeased with the new counsel, then she would have to hire her own private attorney. What Demia heard was the new attorney hired by OSA was going to botch the case. She immediately emailed the new attorney and asked that he not throw the case and instead be a zealous advocate. He was not.

~~45.~~61. By January 24, 2024, the new attorney had been removed from the case, and Demia was forced to represent herself. During the time that Demia prepared for the Section 72 hearing, her personal electronic devices were hacked. Her work was sabotaged. She was denied access to conduct legal research, and the websites that she accessed resulted in fake cases.

~~46.~~62. While on leave, Demia also had an obligation to mitigate the damages with respect to her not working. For that reason, she had to adjourn hearings to attend hiring pools for her promotion. Coincidentally, a hiring pool notice would arrive after the scheduling of the hearing date. For example, the Section 72 hearing was adjourned to March 21 and 26, 2024. However, on

or around March 13, 2024, Demia received an invitation to a hiring pool occurring on March 21, 2024. *See* Email to OATH dated Mar. 14, 2024, Ex. D.

~~47.~~63. Delays due to hiring pools were only part of the problem. Demia continued to experience issues with hacking, which she documented and submitted into evidence. Her system was hacked on or around August 11, 2023 when she attempted to apply for an agency attorney position with the Department. *See* Emails dated August 11 and 12, 2023, Ex. J. The hacking, which was not an error with the City's servers, prevented her submission through the City's application system. Coincidentally, the determination by Dr. Gille, an unlicensed psychologist, that Demia suffered from a mental disorder is dated August 11, 2023. *See* Psychological Evaluation of Associate Staff Analyst [ ] Human Resources Division dated Aug. 11, 2023, Exs. B and F.

~~48.~~64. Demia was also the target for hacking while she prepared for the Section 72 hearing. Demia did not experience technical issues with all of computer usage; only the documents related to trial. The hacking undermined Demia's ability to prepare a proper defense, and thus, she requested additional adjournments. *See* Emails dated Mar. 26, 2024, Ex. D.

~~49.~~65. In May 2024, when Demia arrived at the tribunal for the Section 72 hearing, nothing was what it appeared to be. The attorneys representing the Department were not the same ones who attended the conferences even though the names were the same. Dr. Gille, an unlicensed psychologist, was not the same one with whom Demia met even though her name was the same. The detective from internal affairs testified under a name that differed from the name given when they were initially introduced. It was a theatrical experience with substantive rights as issue. But the case opened under false pretenses. It should have been no surprise that it proceeded along the same vein. The tribunal was a stage, not a room for justice.

~~50.~~66. The key players in the roles of a lifetime were inconsistent testimony, incredible testimony, false testimony, insufficient evidence, and cronyism. The justice system was defrauded, and Demia was deprived of due process and other constitutional rights.

~~51.~~67. The Section 72 hearing occurred over a course of three (3) days. The Department presented four (4) witnesses – (i) Dr. Gille, an unlicensed psychologist, (ii) Demia's supervisor who ordered her examination, (iii) a detective from internal affairs, and (iv) the alleged victim of Demia's alleged tirade. The Department's primary witness, Dr Gille, an unlicensed psychologist, relied on records prepared by other parties, including other unlicensed practitioners, and failed to recall the details of her meeting with Demia. She further testified that she did not know Demia's belief to be false, thereby contradicting her illegal diagnosis. *See* Excerpts of Gille Testimony, Ex. F.

~~52.~~68. Demia's former supervisor testified that Demia suffered from time and leave issues, but he never considered her late as defined by the Department's policy. He claimed that the Department did not follow the City's policy. He also established as an executive assigned to human resources that the Department does not track a person's religion, and therefore, has no record of a person's religious beliefs.

~~53.~~69. The Department presented the detective solely to submit records maintained by internal affairs but failed to establish a proper foundation for admitting them into the Record. The counsel characterized them as records maintained in the ordinary course of business without demonstrating to the tribunal the actual ordinary course of business. The detective further revealed on cross-examination that he neither created nor maintained the records.

~~54.~~70. The Department's last witness changed testimony during examination, because his statements were illogical and improbable. During one iteration, he testified that he was next to Demia when he heard her mumble a threat, but when their being side-by-side was improbable, he testified that Demia was following him. However, he could not describe Demia, even her race. He also testified that he was told that Demia had threatened someone else, but after personally witnessing that person in distress, he did not directly ask the cause of her unrest. Finally, his email to Demia's supervisor was after she had the medical examination.

~~55.~~71. Demia submitted testimony through narration. The Department cross-examined her. During the cross-examination, Demia had to object to questions and preserve certain rights, including her Weingarten rights. Demia's representation of herself was not voluntary. She warned the judge that self-representation would entitle her to a favorable decision. The warning was ignored. And the Department attempted to circumvent the disciplinary process by asking Demia questions regarding the charges and specifications that the Department issued. They also tried to change out exhibits presented to the tribunal versus those provided to the witness for recollection.

~~56.~~72. The true events of the hearing may never be known. Supposedly, the tribunal recorded the hearing and provided a transcript of the hearing to Demia. However, the Record was changed prior to submitting it on appeal. The Department did not deny that allegation on multiple occasions.

~~57.~~73. Several months later, while Demia was preparing a Notice of Claim to file with the City, OATH issued a determination affirming the Department's decision. OATH's decision

was and is facially contradictory even with it having been changed on more than one occasion, especially in response to comments that Demia made in private settings.[5]

~~58.~~74. Thomas Donlon issued a letter dated October 15, 2024, in which he accepted OATH's recommendation after reviewing Demia's response. Donlon Letter dated Oct. 15, 2024, Ex. C. Demia's email to Commr. Donlon resulted in a bounce back reply. *See* Email dated Oct. 9, 2024, Ex. C.

~~59.~~75. Demia then appealed to the CSC which is required by statute. In the same month that the briefing schedule was established, Demia was denied access to her law school. She relied on its resources to conduct legal research. She then arranged to use the law library of her other alma mater. She invested days researching cases, and upon information and belief, towards the end of her research sessions, City employees used the intelligence resources to access the law library and interfere with Demia's printing necessary case law. Additionally, they returned during her subsequent visits to create errors in her work while she drafted her brief. *See* Email dated February 11, 2025, Ex. E. In fact, Demia had to make the same corrections more than once. During the Section 72 hearing, McCaffrey announced that Demia should expect such interference at this point.

~~60.~~76. Demia submitted a brief and a reply. The Department submitted a response. The documents have changed from their original filings, especially after the Department of Justice

[5] The author will later discuss how the City's personnel abused its intelligence resources. Those resources allow the City to modify an email, including its attachment, so that it appears as the original. The original Report included approximately three (3) citations. Demia retrieved each case and reviewed it for analysis. Those cases are cited in her brief. After sharing with a friend the flaws in the report's analysis, Demia received a different version in or around January 2025. On or around September 30, 2025, Demia attempted to download the decision from public records, but the link would not open. *See* Email dated Sept. 30, 2025, Ex. C. It appeared to be inoperable due to interference. A couple of weeks later, Demia opened the document from her email, and it was different than what was originally submitted. Nevertheless, each iteration upheld the Department's decision.

("DOJ") became a party to another proceeding. The CSC requested certain emails that would undermine Demia's arguments as they pertained to due process. *See* Interim Order dated Apr. 8, 2025, Ex. E. The Department provided emails as requested but failed to establish that her counsel at the time waived the 30-day hearing requirement before consulting Demia. In any event, Demia believes those emails to be false.

~~61.~~77. On or around May 14 2025, the CSC issued a determination affirming the "penalty" imposed and characterizing its decision as representing the City. *See* Notice of Civil Service Commission Action dated May 14, 205, Ex. E.

~~62.~~78. Demia began drafting her petition pursuant to New York Civil Practice Law and Rules § 7804 (the "Article 78") on or around August 6, 2025. The petition requested reinstatement, declaratory relief, and back pay. Due to the necessary discussion revealing the Department's abuse of intelligence resources and privacy concerns, she further requested that the case be sealed.

~~63.~~79. On or around August 12, 2025, Demia finalized her documents in a public library in the City. During that time, she experienced significant interference with filing her documents, including being overcharged for printing on her bank card so that she would not be able to print all of her documents. The printer also rejected her cash.

~~64.~~80. She was unable to commence the Article 78 proceeding until she reached her home. Even then, personnel from the City continued to use the intelligence resources. Demia could not submit the documents for filing until she announced in the privacy of her home that the DOJ directed her to contact the agency if she had any issue filing. Suddenly, the documents were submitted, but the attempts to deprive Demia of her civil service status persists.

~~65.~~81. Demia's Article 78 proceeding seeking reinstatement, *inter alia*, was filed August 13, 2025 at 1:34 AM. *See* ~~Ex.~~ Confirmation Notice dated Aug. 13, 2025, Ex. K. On or around August 18, 2025 c. 4:46 PM, she received a notification from the court that the case had been removed. As per the notification, the state court in New York county prohibits the commencement of a proceeding with the filing of an application to waive court costs, fees, and expenses. She communicated back and forth with the court regarding its removal of the case without judicial review. Demia mailed working copies of the petition to the court, which were treated as the original filing. The commencement date of the Article 78 in the court's system is September 10, 2025 in lieu of August 13, 2025, which exceeds the statute of limitations. *See* Court Email, 2025, Ex. K.

~~66.~~82. Upon information and belief, the documents were deleted to block Demia's reinstatement and prevent review of the subject matter by members of the public. The documents are not even accessible from Demia's online attorney account.

~~67.~~83. The order denying Demia's application for a fee waiver is dated September 12, 2025. *See* Ex. K. Demia did not become aware of the court's determination until September 30, 2025. *See* Ex. K. The basis of the denial was Demia's failure to submit proof of income; however, the absence of that evidence is easy to remedy. Demia could have filed such proof through the court's e-filing system that was used to commence the cause of action, but the deletion of the case makes such a simple feat nearly impossible. Most importantly, it makes Demia's lack of income an obstacle to judicial review of the Section 72 hearing, and consequently, due process.

~~68.~~84. The court's denial fails to inform the litigant of the status of the case or remind her that she has 120 days to remedy. *See* C.P.L.R. § 1101(d). The copy of the order, as

received from the court, notes that it is one (1) out of four (4) pages, but the remaining pages were missing. Additionally, the judge asked the source of Demia's fixed income, ending her statement with a question mark, as if a response is expected. However, the deletion of the case prevents Demia's filing of a response.

~~69.~~85. As of October 20, 2025, Demia has yet to be reinstated, and the Article 78 cannot proceed without a proper order from the court.

~~70.~~86. As of November 18, 2025, by notification received on or around November 22, 2025 and bearing two (2) different postmark dates, Demia was dismissed from employment with the City. *See* Notice of Dismissal dated Nov. 18, 2025, Ex. I. She was ordered to submit a medical examination for reinstatement. In other words, if she wants to return to work, then she must stay silent about the practices that she experienced and witnessed in the workplace.

*Intelligence Resources – Harassment, Discrimination, and Abuse of Discretion*

~~71.~~87. In early March 2022, Demia received a phone call from a person who sounded like an old friend. During the call, he warned that the witch trials would start on March 28. That day, her husband had a doctor's appointment for an in-home visit. He met with a nurse named Wendy Rodriguez. She issued him prescription medication and left. Later that week, he received a letter dated March 29, 2022 stating that he no longer needed medical attention.

~~72.~~88. Upon information and belief, the call that Demia received was not from her friend, but rather an employee of the City with access to resources that enable someone to spoof a number and mask his or her voice. With those abilities, an unsuspecting person is disarmed and proceeds to converse with the disguised caller as if (s)he is who (s)he pretends to be. But those resources are not the only mechanisms at their disposal.

~~73.~~89. The Department had an expert who taught different religions and occultic practices to members of service. John Annese, *Retired NYPD Cult, Occult Expert Dies Of Sept. 11 Cancer*, N.Y. Daily News, Feb. 12, 2021. He was detective Marcos Quinones. After interviewing him, the New York Daily News reported that he suspected that an occult attempted to infiltrate the Department. There was no update on its success.

~~74.~~90. Demia was unaware of the Department's use of such resources until a colleague revealed its use of "dark arts". She approached him questioning unexplainable events in the workplace. His response did not alarm her but set the stage for her journey of proving the impossible.

~~75.~~91. Demia also would learn that the Department's hacking capabilities were limitless. In fact, during a discussion with a sergeant, he informed her that "we can get into any system." With great power comes great responsibility, but the power was being shared haphazardly and with persons who had malicious intent.

~~76.~~92. Since at least Spring 2021, Demia was harassed daily, in the workplace and the privacy of her home. In her home, she witnessed her husband being mentally tormented. He spoke into a telephone even though no one called. He verbalized comments as if he were responding to questions. And just as he hit the side button of the telephone, he went to sleep instantly.

~~77.~~93. His demeanor changed like the wind, as if he were different people within moments. He was not Demia's husband. Because of his curious demeanor, Demia asked her husband if the Department was using a medium or hypnosis. He responded with strange enthusiasm, "I hypnotized him like I hypnotized you." His response confused Demia, because her

husband told her years ago that he could not be hypnotized. For that reason, she thought it was physically impossible for him to be hypnotized. After witnessing incidents possibly attributed to covert hypnosis, she realized that his restriction against hypnosis was not physical but rather due to his possession of classified information.

~~78.~~94. Upon information and belief, these resources were used against Demia's husband and father-in-law who both possessed classified information. Such information was not to be shared without the necessary mission-specific clearance. Consequently, persons within the Department and other City agencies accessed this information by way of their illegitimate use of those resources.

~~79.~~95. After Demia mentioned the illegality of having collected such information while she was at the Department, a member responded, "Destroy everything!"

~~80.~~96. Between the end of 2021 and February 2022, Demia called to her husband while sitting in the privacy of their home, and he responded, "he's never coming back."

~~81.~~97. On or around April 2, 2022, Demia's husband suffered a stroke. Around 7:30 AM that morning, Demia heard a voice ordering her husband to direct her to rub his forehead. "Tell her to rub like this." He did not want her to call an ambulance. But an alarming fact from that call was the dispatcher's focus on someone else having lived at that address before Demia's father-in-law. His concern was not her husband's medical condition.

~~82.~~98. The days between April 2 and 8, 2022 seem like the pieces of an Anne Rice novel, but they are the events resulting in Demia's husband not returning. He was taken to the closest hospital for emergency care. At that time, Demia recognized one of the EMT's faces. His body and hair color were different. He resembled the grinch. She had seen him a couple of times

before that day. The other time that she had seen him, he wore a t-shirt announcing affiliation with the Department, specifically the 32 precinct. She suspects that he was the same man that she saw a couple years prior using one of the intelligence devices issued by the Department and driving a white rental car.

~~83.~~99. Demia's husband was transported to another hospital facility to treat his traumatic injury. At the time, she had not seen the doctor charged with neurological care. Since that time, Demia has seen that "doctor" on the 10th Fl of the Department's headquarters. She was not the only person whose likeness Demia would see in the subsequent months. In fact, Demia recognized some of the voices from the hospital as City employees. The intelligence resources would permit such concealment.

~~84.~~100. On the morning of April 8, 2022, Demia received a phone call that her husband passed. She expected that he would have recovered and completed at least a month of rehabilitation. After the tragic news, Demia met a friend at a café the next day. Her friend focused on Demia's banking practices and accounts. A group of blonde women sat in a corner, primarily on their phones. Some of their faces, Demia would see again later. One of them, Demia had seen just days before in the hospital. After the dining experience, a man dressed as a lieutenant with the Department appeared out of nowhere and passed by Demia. She would see his mannerisms again during an interview with internal affairs.

~~85.~~101. In the subsequent months, the intrusion into Demia's home would appear in other ways. Her personal computer was hacked to prevent her filing an Article 78 to claim the pension funds owed to her in connection with her husband's account as well as to prevent her applying for an agency attorney, level two (2) position through the City's employment

database. When she visited the public libraries, errors were created in her work or the pages would suddenly go blank as if someone hacked the system and replaced the pages. The list continues.

~~86.~~102. When Demia would awake some mornings, she suffered excruciating pains that were not possible. In fact, one morning, she felt as though her spine was in pieces. It seemed to move separate and apart from the rest of her body.

~~87.~~103. That was home. In the workplace, Demia's co-workers harassed her daily. She documented a pattern of the property's video notifying her of motion at the door and then smelling the trash bin from her bathroom. She would be sitting at her desk when such incidents occurred. She also documented persons visiting her office in the Department at those times. Most importantly, she observed the behavior of her co-workers.

~~88.~~104. While sitting at her office desk, Demia's bank cards, USBs with confidential information, keys to her house and car, and ID were taken from her desk and/or purse. Eventually, these items were returned to her. The USB storing her business records was broken, and the data has been unretrievable. That same information was deleted from her personal laptop.

~~89.~~105. In or around June 2022, Demia's cellphone was stolen. She expected that it would be returned as other items had been. The culprit even ordered Chick-Fil-A using Demia's phone and account. Demia filed a police report that her phone along with two bank cards were stolen. She has yet to receive her cellphone.

~~90.~~106. Upon information and belief, Demia suspects that her co-workers facilitated the theft of her phone using the Department's intelligence resources, especially given that Ewelina Piekut, with whom Demia had an issue, confessed to taking it. Demia, however, did not see her co-worker at the time that her phone was stolen.

~~91.~~107. In fact, she only personally witnessed an item being stolen only once. It happened while she was in a virtual meeting sitting at her desk. Since then, her work property continued to be removed from her purse even while traveling. Other items were taken as well.

~~92.~~108. Her work ID was removed from her locker while she worked out in the Department's gym. A woman walked into the locker room and looked at Demia. When Demia looked down, her ID suddenly was sitting on top of her bag.

~~93.~~109. Her car keys were taken on more than one occasion. On a day when it was six (6) degrees outside, Demia's keys were taken. The taking of her keys occurred even after being assigned a private office at the Department and working with the door closed. On a day when a large fly appeared out of nowhere, Demia's keys disappeared from her gym bag. When she informed her supervisor, he asked what he was doing at the time that the keys were taken. Her keys were returned weeks later, and her car seemingly had an extra 1,000 miles on it.

~~94.~~110. Demia discussed the taking of her property with that particular supervisor regularly. Often times, the items would be returned, thereby building trust in the confidence of their discussions. However, even he was subject to influence, because one day he described himself as Muslim in the same tone that Demia's previous manager did. The next day, the same supervisor said that he was Catholic and exhibited a completely different demeanor.

~~95.~~111. Demia experienced physiological symptoms that she could not explain. For example, in or around November 2021, Demia had to take sick leave for a week. She felt numbness on the left side of her body as if she had a stroke. She thought that it was a symptom of COVID, but she tested negative.

~~96.~~112. Her mannerisms were inconsistent with her usual behavior. The change correlated with her passwords and pin numbers being revealed as evidenced by certain social media posts in her feed. She smelled different scents emanating from her body that were impossible to be true. For example, she would smell as though she worked out in the gym after stepping out of the shower or breathing a man's breath with implications of foods that she had not eaten.

~~97.~~113. Demia raised her concerns to her supervisors. During those conversations, she was chastised for leaving written notes that could indicate the existence of the intelligence resources, and she further was discouraged from discussing the intelligence resources with other co-workers. "Stop talking about it," was her warning. However, the egregiousness of the harassment and violations continued to escalate.

~~98.~~114. Specifically, Demia's husband's pension was not finalized until after his death. A check in the amount of approximately $13,000 accompanied the letter stating that it had been finalized. Demia never cashed the check, and it has been missing since the time that it arrived. The calculation of the pension amount did not include credit for his military service. After the re-calculation, Demia received a check in the amount of roughly $13,000 at the end of October 2022. The check that she received was a payment for the pension checks owed after April 8, 2022 until September 30, 2022. The amounts of the two different checks were similar in number, but Demia could deposit only one of the checks.

~~99.~~115. Interestingly, when Demia deposited the check on or around November 3, 2022, the bank credited her approximately $100 of the check. She stopped into a 7-Eleven convenient store that evening and purchased some items for less than $10. During that transaction, two people entered the store. One of them stood next to Demia while using an electronic device.

The next day, Demia's account had a negative balance. The bank put a hold on the entire check. She spoke with two different managers, and they were unhelpful. While Demia was at the bank trying to address the negative balance with the managers, a man entered the bank and looked at Demia. He said, "You got your money. What's the problem?"

~~100.~~116. Demia recognized the voices in the bank as persons employed by the City. One of the voices belonged to her supervisor. She proceeded to walk to the Federal Bureau of Investigation's headquarters in New York City, but she saw a man who looked like a detective with NYPD run to the security guard ahead of her. When Demia approached the building for entry, she was re-directed. Deciding that the perpetrators preceded her, Demia returned to the office and spoke with a supervisor in her command. Gaslighting. Demia told her that she thought Alfredo Melian was involved in the bank holding the entire check. While Demia and the supervisor still were discussing the matter, Mr. Melian called to speak with a co-worker in the office. She did not see him again that day.

~~101.~~117. Demia had a vacation scheduled for the week of November 7, 2022. She submitted the request at the beginning of the year. On November 6, 2022, a social media post showed up in her feed from a person who she did not follow. The post read, "You shouldn't be BROKE and on VACATION at the same time. That doesn't add up." *See* Social Media Post dated Nov. 6, 2022, Ex. M.

~~102.~~118. Demia visited her banking institution at a different location on or around November 7, 2022 to determine the issues with processing a check. The bank representative explained issues with presenting the check for payment and provided other excuses as to the reason for the pension check not clearing. The check did not clear until days later.

~~103.~~119. Upon information and belief, the intelligence resources had been shared with representatives from the bank. That suspicion was corroborated when Demia spoke with a bank manager and the manager questioned why Demia did not cook rice and beans with her salmon, which was information that someone would know only if that person had been in the privacy of Demia's home.

~~104.~~120. On November 7, 2022, the representative's one charge was to ensure that Demia was unable to access those funds. She succeeded.

~~105.~~121. Mr. Melian, the supervisor who Demia suspected of being involved in the bank fraud with her account, left the Department in or around December 2022. Earlier that month, Demia was being considered for promotion. On or around December 6, he and Ms. Piekut walked past Demia on multiple occasions. As each one looked at Demia, her earbuds popped out of her ear. By the time Mr. Melian departed, Demia had not been promoted in spite of the promotion list having been released for a year.

~~106.~~122. Their actions also aligned with the timing of certain notifications on Demia's phone. A new update from MarketWatch would send Ms. Piekut into motion with a frenzied countenance and eyes locked on Demia for only a moment. Moments later, Mr. Melian would follow with a quick glaze before stepping into his office.

~~107.~~123. In or around April 2023, it seemed as though Demia would finally be promoted. However, she heard her new supervisor's phone ringing. When he answered the phone, he exclaimed, "Alfredo!" Apparently, Mr. Melian still had access to the intelligence resources. Another month passed, and Demia was not promoted.

~~108.~~124. Also in December 2022, the Department issued Demia specifications and charges (the "Charges"), which are allegations of her having violated department policies. Specifically, Demia asked the Chief of Department if she could attend CompStat on or around August 25, 2022. CompStat is a regular meeting within the Department, during which executives discuss the status of operations and areas to improve. The Chief of Department granted her request. However, a lower ranking chief and detective thwarted her efforts.

~~109.~~125. Based on the chief's disheveled appearance, Demia suspects that it was a member of service from her command impersonating that chief. More importantly, the Charges against Demia accused her of disobeying orders, which required a supervisor to order Demia not to attend or ask to attend CompStat. When Demia pointed out the discrepancy between the facts reported in the department memo versus the facts recited in the actual Charges, the document changed in an attempt to correct the error and save the face of the executive counsel who drafted the charges. While the failure to establish a *prima facie* case remains a point of contention for Demia, the most critical component is the misuse of the Department's intelligence resources to falsify records.

~~110.~~126. The use of those resources enabled entry into Demia's home to change her copies as well as access other databases within the Department to modify its records. The modification of records within the Department is best evidenced by communication in October 2025 regarding Demia's leave stating she had been on leave since October 15, 2024, but the Notice of Leave placed Demia on leave as of July 25, 2023. *See* Notice of Dismissal dated Nov. 18, 2025, Ex. I.

~~111.~~127. In or around December 2024, the Department had to submit the record of events that occurred up to and during the hearing administered by OATH in May 2024 (the "Record"). The Record includes an unsigned evaluation of Demia's health and a signed evaluation. Both documents are dated August 11, 2023 by the same practitioner. The evaluation accompanied the Section 72 Petition. When Demia received the document, it was unsigned. The copy submitted into the Record by the Department was signed.

~~112.~~128. Spoliation of evidence is not the extent of the use of those resources. The abuse of those resources have been 24/7 under the guise of an investigation. The equipment also was shared with neighbors and other persons within the community. In fact, the distribution of the application has been so ubiquitous that it would be impossible to control all aspects of its use. In fact, when Demia outright told an executive that she was tired of the use of witchcraft, he denied its use but continued to explain that he could only make it stop in the office, not outside of the office. He further assured Demia that people just wanted to get to know her, but she never consented.

~~113.~~129. Demia discussed the abuse with another supervisor and informed him that she suspected a particular attorney of using the intelligence resources to harass her in the mornings. He responded that attorney was not the only one. His voice was higher in pitch than usual as if it were someone else.

~~114.~~130. In an attempt to explore another recourse to end the harassment, she requested a reasonable accommodation for religious reasons in or around April 2023. *See* Reasonable Accommodation Request for Employees dated April 24, 2023, Ex. H. By that time, she realized that the harassment ended with prayer. She wanted to visit a clergyman during the day

so that she could get prayer. Her request was denied. *See* Department Email dated June 27, 2023, Ex. H.

~~115.~~131. After several months, Demia emailed persons who she suspected were involved or the source of the harassment. When she received no response, she emailed the heads of their commands. She filed a grievance on or around April 6, 2023 challenging the Charges, which stood as an obstacle to her promotion. She was sent for a mandatory medical examination shortly thereafter. On her third visit, she was determined "not sick". *See* Clinic Visit Report dated May 31, 2023, Ex. F.

~~116.~~132. On or around July 23, 2023, Demia sent another email to the head of Legal Matters citing constitutional violations by members of his team due to the misuse of department intelligence resources. Her goal was to afford him the opportunity to reel in their misconduct. She was again referred for a mandatory medical examination and determined unfit for duty after the one (1) visit with that practitioner.

~~117.~~133. By and through these resources, Demia has been forced out of her job for sending emails to possible culpable parties and certain executives complaining about the abuse of those resources. Her real and personal properties were damaged and/or stolen by persons using those resources. Her interviews with potential employers were disrupted by persons using those resources. Her communication has been intercepted by persons using those resources, including her mail. Her identity possibly was stolen by persons using those resources. Other persons used Demia to secure better employment by using those resources, and therefore, depend on its access to perform their work. She was forced out of her alma maters by persons using those resources. Her vehicle was stolen by persons using those resources. Her husband's pension money

probably was stolen by persons using those resources. Her husband's and her vehicles were disabled while driving by persons using those resources. Her house suspiciously caught fire by persons using those resources. Demia was denied access to her bank account by persons using those resources. Demia's money on deposit at the bank was made unavailable to her by persons using those resources and using her money on deposit. Her electricity was disconnected for over ten (10) months by persons using those resources. Her tax refunds were stolen by persons using those resources. Her dog was injured by persons using those resources. And with each injury, money demanded.

## ~~CAUSES OF ACTION~~LEGAL DISCUSSION

*Fourteenth Amendment*

A. The statutory exclusion of a definition for "medical officer" violates due process

~~118.~~134. This Court previously reviewed Section 72 to test its constitutionality as it related to an employer placing a permanent civil service employee on involuntary leave without notice of the circumstances and opportunity to challenge the decision. *See generally* Laurido v. Simon, 489 F. Supp. 1169 (S.D.N.Y. 1980). In doing so, this Court established seven (7) procedural steps for the State to implement to ensure protection of civil servants' due process rights. Id. at 1178. The State modified the law since that time to afford an employee a hearing within 30 days of being placed on involuntary leave. This Court has not had the opportunity to ensure the State's compliance. Specifically, it mandated that the statute provide "written notice of the Employee Health Services Unit physician's findings." Id. The statute fails to incorporate that mandate.

~~119.~~135. Section 72, as written, identifies at least two (2) parties in reaching the decision to place the civil servant on involuntary leave prior to a hearing – (i) an appointing authority and (ii) medical officer. State courts established that these two (2) parties do not have to be the same, and they should not be. However, where Section 72 fails and is inconsistent with the Laurido procedure is with respect to its use of "medical officer".

~~120.~~136. The Laurido court specifically used the term "physician" as opposed to "medical officer". The common definition for a physician is "a health care professional . . . who has earned a medical degree, is clinically experienced, and is licensed to practice medicine."[6] No such common definition for "medical officer" is easily identifiable.

~~121.~~137. The common understanding of medical officer could be a person licensed to practice medicine, but the failure to define this term leaves room for deviation from requiring a physician. In fact, a state court established that there is no process for selecting a medical officer. Phillips v. N.Y.C. Admin. Servs., 173 A.D.3d 493, 103 N.Y.S.3d 62 (1st Dep't 2019) (noting that statute did not specify a method for the Department to use in selecting its medical officer). We are not here to challenge process, but rather the standard necessary to ensure that the person charged with depriving a civil servant of his or her substantive rights is one with the necessary education, experience, and certification as mandated by this Court.

~~122.~~138. Other government agencies that employ medical officers define that term within its statutory provisions to ensure consistency and that such persons satisfy a requisite standard. For example, a federal intelligence agency, establishes the standard for certain medical officers as persons having "maintain[ed] current, active, full, and unrestricted licensure or

---

[6] Physician, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/physician (last visited Oct. 3, 2025).

registration as a physician from a State. . . , active board certification and . . . accreditation in an American Board of Medical Specialties . . . and . . . a minimum of 96 hours per year of clinical practice in an accredited clinic or hospital facility" as well as "provides direct care services to patients in connection with the official duties of the officer." 50 U.S.C. § 3528 (2025). In other areas of the U.S. Code, the use of "medical officer" is accompanied with the qualifications for that title. Section 72 has no such standard. The absence of any language imposing industry accreditation is one of the facial deficiencies. Its application to Demia demonstrates to the court the importance of implementing such a standard.

~~123.~~139. The "medical officer" in Demia's case possesses a Ph.D. in psychology but had no license to practice psychology in the State at the time of their meeting. In fact, the law requires that a person must possess such a license to identify as a psychologist. N.Y. Ed. L. § 6512 (2023)[7]. This unlicensed practitioner was responsible for conducting the medical examination to determine Demia's fitness. Additionally, because Demia had no disability prior to being subjected to such examination, she diagnosed Demia with a mental disorder. Her diagnosis constituted practicing medicine without a license. The result was an unlicensed practitioner depriving Demia of her liberty and property interests attendant to civil service.

B. No evidence rules in a Section 72 hearing deprives a civil servant of due process

~~124.~~140. "The burden of proving mental or physical unfitness shall be upon the person alleging it. Compliance with technical rules of evidence shall not be required." N.Y. Civ. Serv. L. § 72 (2024). Rules of evidence are essential in ensuring that credible proof is

[7] The psychologists' licensure statuses and the laws governing psychologists were researched in or around 2023 in preparation for Demia's Section 72 hearing. The access to such information may have changed since that time to deny a proper legal defense or been remedied to resolve the defect.

presented to resolve facts in dispute. These rules are affected not only by the facts in question but also the rights at stake. The law is clear that when resolving issues involving a substantive right, the party must resolve the disputable fact by a preponderance of the evidence. Miller v. Debuono, 90 N.Y.2d 783, 666 N.Y.S.2d 548, 689 N.E.2d 518 (1997). Evidence meeting this standard must be more than inadmissible hearsay and must not be inconsistent so as to undermine the truth being asserted. *See, e.g.*, Gongora v. N.Y.C. Dep't of Educ., 930 N.Y.S.2d 757, 765, 34 Misc.3d 161, 168 (Sup. Ct., N.Y. Cty. 2010). The burdened party must prove the existence of the fact is more probable than its non-existence. *See, e.g.*, 2 C.F.R. § 180.990 ("Preponderance of the evidence means proof by information that, compared with information opposing it, leads to the conclusion that the fact at issue is more probably true than not.").

~~125.~~141. It is the law of probability. The evidence admitted by the burdened party should relieve the trier of fact of the improbability of disbelief. The rules of evidence limit proof to that which tends to establish a fact as more probable than if such proof was not admitted. Fed. R. Evid. 401 (2025). Such evidence must not be manifestly untrue, physically impossible, self-contradictory, or disregarded as being without evidentiary value. 58 N.Y. Jur. 2d Evidence & Witnesses § 968 (Nov. 2024); *see also* People v. Johnson, 2019 N.Y. Slip Op. 07646 (3d Dep't Oct. 24, 2019). Contradictions and inconsistent testimony and/or documentary evidence lack credibility. People v. Wells, 141 A.D.3d 1013, 1023, 35 N.Y.S.3d 795 (3d Dep't 2016). The admission of records without a proper foundation and hearsay testimony without a legitimate exception lack probative evidentiary value. *See, e.g.*, Brown v. Murphy, 43 A.D.2d 524, 525, 348 N.Y.S.2d 777, 778 (1st Dep't 1973). Section 72's explicit disregard for rules that alleviate the burden of admitting credible, probative evidence runs afoul of protecting a civil servant's

substantive rights by permitting evidence that could be facially contradictory and constitutes hearsay. Technical rules of evidence must be followed to safeguard such protections.

~~126.~~142. In keeping with the law of probability, the odds are unfavorable to civil servants. If their contest of an agency determination fails on the administrative level, they probably will seek review in state court pursuant to New York's civil procedure law, which assigns jurisdiction to that court for reviewing such matters. The probability of the rights being substantive is unquestionably high. However, it is not probable but rather statutory that the burden of proof would be substantial evidence for a state court to review the administrative determination. *See, e.g.*, Phillips v. N.Y.C. Admin. Servs. *supra* (denying relief after applying substantial evidence standard). Essentially, the agency probably never reaches the requisite preponderance of the evidence standard in depriving a civil servant of his or her liberty and property interests.

~~127.~~143. New York Civil Practice Law and Rules § 7803(4) prescribes that the court must apply a substantial evidence standard upon review of an agency determination after the civil servant was afforded a hearing.[8] Section 72 requires a hearing, and thus, judicial review in an Article 78 of a determination rendered pursuant to Section 72 will be to test whether evidence admitted at the administrative level satisfied the substantial evidence standard.

~~128.~~144. Substantial evidence is a lesser standard than preponderance of the evidence. A determination must be supported only by relevant evidence as a "reasonable mind **might** accept as adequate to support [the] conclusion." Vargas v. State of N.Y. Liquor Auth., 111 A.D.2d 925, 490 N.Y.S.2d 818 (2d Dep't 1985) (emphasis added). "Might" speaks to possibility.

[8] Subsection 4 of the provision states: Whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence. N.Y. C.P.L.R. § 7803(4) (2023).

The questions before the court become whether it is possible for the allegations lodged against the civil servant to be true; whether the hearsay statements, which need no exception, possibly are true; and whether the documentary evidence admitted into the record possibly are true. Anything is possible.

~~129.~~145. When a court is faced with deciding a case in which a substantive right is at stake, the truth should be more than possible. The law demands that it is probable. Section 72, however, specifically exempts the rules of evidence, thereby eliminating an agency's need to satisfy the requisite evidentiary standard. Taken together with the absence of a definition for medical officer, exclusion of the evidentiary safeguard deprives a civil servant of due process.

~~130.~~146. The inapplicability of technical rules of evidence in Demia's case permitted evidence that was incredible as a matter of law, inconsistent, unauthenticated, and failed to meet a hearsay exception. For example, the business records, which the Department characterized as medical, were prepared by an unlicensed practitioner who could neither diagnose nor treat Demia. The Department's primary witness, Dr. Gille, who testified regarding those "medical records" was also an unlicensed professional prohibited by law from either diagnosing or treating Demia. However, Dr. Gille diagnosed Demia. It was the Department's only record of a diagnosis.

~~131.~~147. Dr. Gille's diagnosis was problematic not only for her not being licensed, but she also undermined the validity of that diagnosis during her testimony at the Section 72 hearing. Her testimony that she did not know Demia's statements to be false contradicted her acknowledgement that the mental disorder that she assigned to Demia required her to have a false

belief. The alleviation of the technical rules of evidence allowed OATH, the CSC, and every subsequent adjudicator to disregard that contradiction.

~~132.~~148. Nearly every type of evidence that would have been discarded had technical evidentiary rules been followed was admitted and used to reach a decision in Demia's case. The case should have failed. But without applying the rules of evidence, anything was possible.

C. The City and Department failed to comply with Section 72's due process procedures[9]

~~133.~~149. It is well-established that Section 72 concerns substantive rights of the employee, thereby requiring due process protection. Laurido v. Simon, *supra* at 1177. For that reason, employers must strictly comply with the statute's procedural requirements. Barrett v. Miller, 179 Misc.2d 24, 30 – 1, 682 N.Y.S.2d 552, 556 – 7 (Sup. Ct., N.Y. Cty. 1998). The defendants disregarded those procedures. Section 72 explicitly prohibits placing an employee on involuntary leave without a hearing. It provides an exception for circumstances requiring

[9] Section 72(1) states, in pertinent part:

An employee shall be allowed ten working days from service of the notice to object to the imposition of the proposed leave of absence and to request a hearing. The request for such hearing shall be filed by the employee personally or by first class, certified or registered mail, return receipt requested. Upon receipt of such request, the appointing authority shall supply to the employee, his or her personal physician or authorized representative, copies of all diagnoses, test results, observations and other data supporting the certification, and imposition of the proposed leave of absence shall be held in abeyance until a final determination is made by the appointing authority as provided in this section. The appointing authority will afford the employee a hearing within thirty days of the date of a request by the employee to be held by an independent hearing officer agreed to by the appointing authority and the employee except that where the employer is a city of over one million in population such hearing may be held by a hearing officer employed by the office of administrative trials and hearings.

* * *

In any event, a final determination of an employee's contest of a notice of leave shall be rendered within seventy-five days of the receipt of the request for review. An employee on such leave of absence shall be entitled to draw all accumulated, unused sick leave, vacation, overtime and other time allowances standing to his or her credit. The appointing authority in the final determination shall notify the employee of his or her right to appeal from such determination to the civil service commission having jurisdiction in accordance with subdivision three of this section.

N.Y. Civ. Servs. L. § 72(1) (2023).

immediate action, but even in such situations, the employee is afforded a hearing within 30 days of his or her written request. Furthermore, a determination regarding the appropriateness of the involuntary leave must be issued within 75 days of the employee's request for review.[10] Each of these deadlines were ignored in Demia's case.

~~134.~~150. The Department ordered Demia on leave on or around July 25, 2023. Demia informed the OSA of the agency's decision before leaving the office of the Medical Division of the Department. In fact, its representative spoke with Drs. Gille and Bloom on the day of the evaluation. By and through these representatives, the parties knew that OSA was Demia's representation in connection with her being placed on involuntary leave.

~~135.~~151. The Notice of Leave informing Demia of her being placed on involuntary leave of absence is arguably deficient due to a general statement that she was found unfit by reason of a medical condition described in an attached document that fails to specify a medical condition. While the document is referenced as "Attachment A", which does not surface until later in the Section 72 process, it characterizes Demia's alleged condition as "acute psychiatric symptoms indicative of psychosis". The condition is quite generic.

~~136.~~152. The original attachment to the Notice of Leave was only a Civilian Request for Evaluation of Fitness for Duty dated July 25, 2023. *See* Ex. B. It includes the same description but notes Demia's complaints against co-workers and their alleged complaints against her. Even those notations lack specificity. Essentially, the Notice of Leave makes clear that the

[10] "The appointing authority may either uphold the original proposed notice of leave of absence, withdraw such notice or modify the notice as appropriate. In any event, a final determination of an employee's contest of a notice of leave shall be rendered within seventy-five days of the receipt of the request for review." N.Y. Civ. Servs. L. §72(1) (2023).

Department placed Demia on leave, not for a true medical condition but rather for her complaints about the harassment in the workplace. It was not by reason of a disability.

~~137.~~153. The Notice of Leave further states that a hearing would be scheduled within 30 days of receipt of the letter. The reference to 30 days likely relates to the 30-day Hearing required by Section 72.

~~138.~~154. Admittedly, the statute requires an employee to file a request for review of the agency's determination via personal delivery or certified mail. Demia neither filed a request with OATH nor submitted a writing to the Department. Demia objected to the leave before she left the offices of the Department's Medical Division. That notice was sufficient for Section 72 purposes, because the authors of the provision did not include language that the Department must be notified in the same manner as the adjudicating authority. In fact, the request for review is finite when prefaced with the article "the" as opposed to the indefinite article "a". OATH was to receive "the" request via a filing whereas the Department was to receive "a" request for review, which does not restrict the form of notification.

~~139.~~155. Thus, the Department acknowledged her objection to the involuntary leave in its letter dated August 23, 2023 addressed to Demia and signed by its counsel. *See* the Section 72 Petition, Ex. B. It further proposed two (2) dates for the conference and hearing – August 25, 2023 and August 28, 2023, respectively.

~~140.~~156. Consequently, if the court determines that the drafter's change from "the request" to "a request" is inconsequential, the Department waived receipt of a written request for review from Demia in its informing Demia that a hearing would be scheduled within 30 days of receipt of the letter. *See* Notice of Leave, Ex. I.

~~141.~~157. The Department's waiver was not the waiver at the center of the Report. It was Demia's alleged waiver of the 30-day Hearing and 75-day Determination. The defendants argued that the Waiver Email was proof that Demia, by and through her counsel provided by OSA, waived her right to due process. However, the language in the Waiver Email is inconclusive, because it requires a triggering event before Mr. Orgel would provide the alleged waivers. He specifically referenced receipt of the Section 72 Petition as the act that precedes his provision of the necessary waiver, and the Record is silent on when and how the Section 72 Petition was received.

~~142.~~158. Additionally, the Waiver Email fails to use present tense language in lieu of future tense. Mr. Orgel wrote that he would waive instead of taking the opportunity simply to state "we waive". Notwithstanding that possibility of language use, he was not authorized to waive the 30-day Hearing or the 75-day Determination. He had not consulted with his client.

~~143.~~159. The U.S. Supreme Court defined waiver as "the intentional relinquishment or abandonment of a known right." U.S. v. Olano, 507 U.S. 725, 733 (1993). In keeping with that definition, a party must know the rights being abandoned. Thus, for certain fundamental rights, a party personally must make an informed waiver. Neither Messrs. Orgel nor Parker discussed adjourning the hearing beyond the statutory timeframe or the implications of doing so in order for Demia to know that she was abandoning her right to due process. Thus, such waiver of due process was not possible. Demia neither waived nor authorized her counsel to waive her right to due process.

~~144.~~160. The Section 72 Petition refers to a promise of a waiver, but the Department never received it. The Waiver Email mentions both August dates, which were the two

(2) dates for the conference and hearing, one on each day. Even the Report states that OATH did not schedule the first hearing until that October. The language that is markedly absent is any reference to the 75-day Determination, which would have been in October, at the earliest, not August. For that reason, it would have been unreasonable to determine that Mr. Orgel waived the 75-day Determination in his general reference to dates in August, assuming *arguendo*, it is waivable.

~~145.~~161. The Record also excludes the requisite communication between OSA and Demia, in which it confirms that she agreed to waive those rights. And such communication must have occurred prior to August 23, 2023 to have any validity. While attorney-client privilege would prevent such communication from being admitted into the Record, Demia, when given the opportunity, provided OATH evidence of communication between her and OSA that as of August 24, 2023, she still was under the impression that the conference and hearing would proceed as planned. That evidence was eliminated from the Record, and subsequently, Demia's personal email account. However, additional emails show direct communication with OATH advising it of the Department's intentional deletion of evidence from Demia's personal email account, and that such deletion specifically concerned her proof that she communicated with OSA on August 24, 2023 about a hearing the next day.

~~146.~~162. OSA represented in an email dated October 5, 2023 that Demia had filed a waiver of the 30-day Hearing and 75-day Determination, but that was a lie. Demia did not waive the 30-day Hearing or the 75-day Determination, and the defendants did not produce any evidence corroborating that statement. If Demia had made such a filing, then it would have been no need for her counsel to provide a subsequent waiver. Such waivers do not exist.

~~147.~~163. Most importantly, the 75-day Determination is not waivable. The clause concerning the 75-day Determination begins with "in any event" and continues with a final determination "shall be rendered" within the established timeframe. N.Y. Civ. Servs. L. § 72(1) (2023). That phrase means "in any case" or irrespective of all other occurrences.[11] The U.S. Supreme Court established that "the use of the word 'shall' 'creates an obligation impervious to judicial discretion." Smith v. Spizzirri, 144 S. Ct. 1173 (2024); *see also* Maine Community Health Options v. U.S., 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

~~148.~~164. Reviewing the provision in its entirety, OATH had an obligation to issue a determination within 75 days, and it failed to do so. The statute directs the hearing officer to disregard all other occurrences of the case and render a decision. The 75-day Determination is distinguishable from other statutes imposing a requirement for a speedy trial. For example, the language does not speak to the holding of the hearing but rather the issuance of a determination. Section 72 also has no language barring an agency from re-submitting its petition, unlike a double jeopardy restriction in criminal cases.

~~149.~~165. Even if the 75-day Determination could be waived, it is akin to a right to plead not guilty, which the U.S. Supreme court established requires an informed waiver to be made personally by the accused party. We do not have such a waiver in the instant case. The agency shoulders the burden of proving that an employee is unfit by a preponderance of the evidence. If the employee is determined to be fit for duty, then his or her leave credits and lost

[11] In any event, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/in%20any%20event (last visited Nov. 10, 2025).

salary are restored to him or her. Waiving the opportunity for restoration must be done with actual knowledge of that right being relinquished. OSA provided no such explanation.

D. The diagnosis of a disability must precede the medical examination

~~150.~~166. Disabled persons historically are treated as pariahs of our society, but Section 72 is designed to offset that effect by ensuring that civil servants who suffer from a disability are not excluded easily from the workforce without due process. When analyzing the statutory construction of Section 72, the reader will notice that the disability diagnosis must precede the employer's request for a mandatory examination. It plainly states that if an agency's representative suspects that an employee's failure to perform his or her duties is "by reason of a disability", **then** the agency may require an examination to determine fitness. N.Y. Civ. Serv. L. § 72(1) (2023). In other words, the agency's demand for an employee to be subjected to a medical examination can happen only after said employee has been determined to have a disability.

~~151.~~167. This reasoning is supported further by the introductory phrase "[w]hen in the judgment of an appointing authority an employee is unable to perform the duties of his or her position by reason of a disability", which requires that the person with such authority must possess actual knowledge of the employee's disability at the time when (s)he demands that the employee undergo a medical examination. To reach a judgment that is rational, the appointing authority must have the necessary expertise to diagnose the employee at that moment or have received concrete evidence from a person with such expertise, such as a doctor's note, that the employee has a disability **before** the medical examination.

~~152.~~168. Demia's supervisor did not have any documentation from Demia's personal physician stating that she had a disability, and he did not establish his medical education and/or experience to determine that she in fact had a disability. For that reason, his judgment that Demia was unable to perform her duties by reason of a disability ran afoul of Section 72 and due process.

~~153.~~169. In sum, Demia's right to due process was violated, because (i) Section 72's use of medical officer without establishing an accreditation requirement deviates from this Court's requirement that Section 72 provide notice of a physician's finding; (ii) Section 72 explicitly relieves the agency from adhering to technical rules of evidence, including but not limited to satisfying the higher evidentiary standard for a fundamental right; (iii) the agency failed to admit evidence that met the preponderance of evidence burden of proof and intentionally falsified the Record for appeal; (iv) the Article 78 provision explicitly requires that judicial review of the agency determination is based only on substantial evidence even though a fundamental right is at stake; (v) Demia did not waive the 30-day Hearing or the 75-day Determination required by Section 72, and her counsel had no consent from her to waive those rights, especially without her being informed; (vi) she should not have been subjected to a medical examination prior to the Department's actual knowledge that she suffered from a disability; and (vii) she involuntarily represented herself in a proceeding in which her mental health was at issue, discussed *infra* as also violating the Thirteenth Amendment.

*First and Eighth Amendments*

A. E-mails for the basis of a Section 72 proceeding violated Demia's right to free speech

~~154.~~170. A person does not abdicate his or her right to free speech by entering public service as a choice of employment. In fact, courts established that First Amendment right to speak freely on matters of a public concern is preserved. *See* Curinga v. City of Clairton, 357 F.3d 305, 309 (3d Cir. 2004). A public employer may not restrict or penalize an employee for exercising such right unless it is likely to disrupt the efficient operation of the workplace. *See* Garcetti v. Ceballos, 547 U.S. 410, 419 (2006); Grigsby v. Kane, 157 F. App'x 539, 542 (3d Cir. 2005) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)); Locurto v. Safir, 264 F.3d 154 (2d Cir. 2001) (noting that an employer's expectation of disruption must be reasonable); Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995).

~~155.~~171. In determining whether the employee's speech was a matter of public concern, courts assess whether its content related to any matter of political, social, or other concern to the community, and if so, they further determine whether the employee's interest in the speech outweighs the potential disruption of the work environment. Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty., 513 F. Supp.3d 593, 610 (W.D. Penn. 2021). The government bears the burden of establishing that the penalty suffered by the employee outweighs his or her expressive interests. Id. (citing Festa v. Westchester Med. Ctr. Health Network, 380 F. Supp.3d 308, 322 (S.D.N.Y. 2019)).

~~156.~~172. Here, after several months of being harassed inside and outside of the workplace daily, Demia addressed the matter with her supervisors. She initially proposed that the behavior was a form of training exercises, but a supervisor dismissed that notion and the harassment became more hostile. Demia later emailed persons who she suspected were involved or the source of the harassment. When she received no response, she emailed the heads of their

commands. She filed a grievance challenging the Charges that stood as an obstacle to her promotion on or around April 6, 2023. The Department responded to her complaints hy sending her for a mandatory medical examination. On her third visit, she was determined "not sick", because she no longer complained about the issues plaguing the Department. Her speech had been stopped, not the behavior causing it.

~~157.~~173. On or around July 23, 2023, Demia sent another email to the head of Legal Matters citing constitutional violations by members of his team due to the misuse of department intelligence resources. Her goal was to afford him the opportunity to reel in their misconduct. She was again referred for a mandatory medical examination and determined unfit for duty after the one (1) visit with that practitioner. The entire visit, from sign in to sign out, was approximately one (1) hour and fifteen (15) minutes. The decision to send her on leave was made before that visit so that she could heed her previous warning not to discuss it. She has not earned income since that time. She received two (2) offers for job opportunities – (i) a promotional opportunity with the City, and (ii) a return to work opportunity with a premier, global investment firm. After receiving the offers, the opportunities simply vanished.

~~158.~~174. During Demia's Section 72 hearing, the Department's key witness attested that Demia's emails were key in her reaching a diagnosis. She further testified that she did not know Demia's statements to be false, which was necessary for her diagnosis. *See* OATH Transcript, Gille excerpts, Ex. F. Her diagnosis resulted in Demia being placed on involuntary leave without pay. The Department provided no evidence that Demia's emails disrupted the Department's ability to operate and/or solve crime. Demia appealed to the CSC, which issued a decision that the "penalty" imposed on Demia was appropriate.

~~159.~~175. The emails on which the Department relied were to internal parties who should have been aware of the abuse of intelligence resources. They also were sent to protect her interest in working in a safe environment, which the City is obligated to provide.[12] Any emails sent to external parties were attempts to retain legal assistance. How employees working in public service spend their time during working hours is undisputably a matter of public concern. Thus, Demia's emails constituted protected speech, and the City deliberately wielded Section 72 as a tool to silence her from highlighting a problem within the Department that would be of great public concern. Thus, the defendants violated her First Amendment right by perverting the Section 72 process to deter, control, and discriminate against her.

B. The Section 72 process was used to violate Demia's freedom of religion

~~160.~~176. The First Amendment of the U.S. Constitution creates a wall between church and state by forbidding our government to establish a religion or prohibit its free exercise. U.S. Const. amend. I. The U.S. Supreme Court established that the wall must be high and impregnable. Ill. ex rel. McCollum v. Bd. of Educ., 333 U.S. 203 (1948). The ten (10) words commonly known as the Establishment Clause have developed more meaning over time than merely forbidding the creation of a state church. Those ten (10) words have excluded nativity scenes from public grounds, school prayer from public schools, the Ten Commandments from decking the courtrooms' walls, and the list continues. They have yet to tread into that part of government shielded by secrecy.

[12] "The collective values set out in this preamble will guide the operation of our city government," and such values include the systemic violence against marginalized groups that resulted in loss of economic opportunity and the need for affirmative steps to remedy those harms. Preamble, N.Y.C. Charter (Am. L. Publ. 2025).

~~161.~~177. The contents of Demia's emails highlighted the methods used by law enforcement agencies to gather intelligence. However, persons employing those methods were not conducting legitimate investigations, but rather perverting its use to harass and discriminate against her. In fact, many of the persons in possession of such equipment were not authorized for its use in that they were not directly employed by the Department, and if so, not assigned to a command charged with investigations.

~~162.~~178. These methods used for investigations are religious in nature, thereby chipping at that dividing wall between church and state. The Department's occult expert taught the subject matter to other members of service as well as other departments in the country. *See* N.Y. Daily News Article dated Feb. 11, 2021, Ex. G. Thus, the Department has actual knowledge of the existence of these practices within its ranks. The time of denial passed after it was reported in the news and became the subject of a feature film. The news further reported that the Department's expert suspected that an occult attempted to infiltrate the Department. Id. There was no update on its success.

~~163.~~179. It is clear that the Department's aim is to embrace these practices and ignore the legal ramifications of its employees' actions. Demia came to learn of these methods via co-workers, supervisors, executives, and personal experience. People refer to their practices by many names. Persons within the Department preferred the term "magic". Demia now suspects the term "Candomblé" or some variation thereof might be better-suited. Irrespective of its name, the tricks or illusions became overwhelming and controlling. Demia documented the patterns of incidents around her and researched alternative scientific explanations prior to emailing anyone about these practices. One executive, a clergyman, did not deny its use but rather explained that it

was supposed to only elude the eye, not control people. *See* Email dated Jul. 6, 2023, Ex. H. Demia was being controlled.

~~164.~~180. If you cannot beat them, join them. Demia did not want to join. Her religious beliefs forbid such practices. In fact, she requested a reasonable accommodation for religious reasons so that she could get daily prayer. *See* Reasonable Accommodation, Ex. H. She was successful in "turning off" the practice one day when a priest prayed for protection. When she returned to work, an executive requested that it be "turned back on". She has been prevented from speaking to another clergyman. It is not just the casting of spells but also covert hypnosis and other practices of dark arts.

~~165.~~181. Employing these methods for investigative purposes enables law enforcement to exist in rooms unseen. It enables them to extract information from persons' memories to learn their deepest secrets. It enables them to modify and/or remove records undetected. The use of these methods obliterates the wall between church and state, and thus, violated Demia's First Amendment right of freedom of religion. She had to choose between her God and her job, a constitutionally forbidden choice.

~~166.~~182. The constitutionality of these practices as it relates to investigations and/or intelligence gathering has yet to be tested. It needs to be. It is worth noting that the Department discovered spies of foreign sovereigns within its ranks, and these methods, when employed by the wrong persons, will facilitate the sharing of classified information. The Department can shoulder the burden of demonstrating its need outweighs Demia's interest to be free in religious practice. Until such time, she should not have been forced out of work for her unwillingness to abandon her faith.

C. The involuntary leave pursuant to Section 72 is cruel and unusual punishment

~~167.~~183. Historically, the Eighth Amendment's Cruel and Unusual Punishments Clause had been reserved for punishment due to criminal misconduct. City of Grants Pass v. Johnson, No. 23-175, slip op. at 2 (U.S. June~~.~~ 28, 2024). Its aim was to ensure that the government did not impose punishment designed to cause pain, terror, and/or disgrace. Id. The unusual element spoke to the antiquated nature of such punishments, because they were no longer tolerable. Id.

~~168.~~184. History, however, can be limiting. The authors of the U.S. Constitution intended it to be a living document, evolving with the progress of our country. The writing was and is the framework to ensure the protection of civil liberties and the establishment of a democratic order. Out of 27 amendments, only three (3) of them directly speak to crime or criminal action. The Fifth Amendment reads, "No person shall be held to answer for a capital, or otherwise infamous crime . . .." U.S. Const. amend. V. The Sixth Amendment opens with "[i]~~I~~n all criminal prosecutions . . .." U.S. Const. amend. VI. The Thirteenth Amendment reserves involuntary servitude to only those persons who have been convicted of a crime. U.S. Const. amend. XIII. Our system is so intricately designed and exhibits great forethought that it removes all doubt that our founders were learned men who, when given the chance, intentionally did not restrict the Eighth Amendment to criminal actions. The word "crime" or any iteration simply is not mentioned. For that reason, they carved out space to apply this provision to other forms of punishment. While history may be limiting, the language in the Eighth Amendment is not.

~~169.~~185. The CSC characterized the Department's treatment of Demia as a "penalty". See CSC Final Determination dated May 14, 2025, Ex. M. It further stated that its

decision was on behalf of the City. Essentially, Demia was penalized for seeking help against what she perceived to be an abuse of department resources. She was constructively terminated prior to a formal dismissal. Her bank accounts were hacked and money used. He tax refunds were stolen and additional money demanded. Her vehicles were damaged then confiscated. Her house mysteriously caught fire. Her dog severely injured. Her consumer complaints of overcharging with respect to her electricity and credit cards were ignored. The money that she has been owed for years continues to be delayed by the City. These incidents were more than life happening. It was punishment.

~~170.~~186. The law is clear that a government cannot penalize its employee for their speech. The imposition of the penalty and the methods used caused Demia to suffer cruel and unusual punishment. Personnel from the Department forced her to file legal actions to demand payment of monies or reinstatement to her job, thereby making her situation public. The Department also has an unwritten rule of not publishing employees' addresses to ensure its members' safety; however, its attorneys ignored court rules governing redaction as well as the Department's practice of not releasing certain personal information. After the publication of her information, her properties, personal and real, were damaged. It was punishment.

~~171.~~187. If the Eighth Amendment governs the methods and kinds of punishment our government can impose, then Demia's case is the perfect opportunity for our courts to examine the power of our government and its leaders. It is unconstitutional for Section 72 to be a tool for punishment. It is unconstitutional for our citizens to be penalized for protected speech. It is unconstitutional for our government to circumvent the Fourth Amendment to invade our

privacy under the guise of investigation. It is no longer tolerable. And it is not because this author says so; our forefathers had the foresight to forbid it.

*Violation of Right to Privacy – Third and Fourth Amendments*

A. Section 72 was used to disregard unreasonable searches and seizures

~~172.~~188. A man's home is his castle is not just an adage, but it is the lens that we apply when assessing Fourth Amendment violations. Preserving the sanctity of our homes is critical in ensuring our right to privacy. The Fourth Amendment grants Americans the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const. amend. IV. That right is so indispensable to the full enjoyment of our personal liberties that the mandate of a warrant based on probable cause cannot be dismissed haphazardly. For that reason, **courts** retained authority over when to breach that threshold outside of exigent circumstances. Not agents of law enforcement. *See, e.g.*, Johnson v. U.S., 333 U.S. 10, 15 ("If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it would be required.").

~~173.~~189. As criminals adopt new methods to commit crimes, law enforcement has responded in kind by employing alternative means to ferret out those criminals. As times change, our fundamental rights must not be compromised. Instead, we must be vigilant in ensuring that those alternative means pass constitutional muster. Consequently, the adoption of technological methods and religious practices to circumvent privacy restrictions must be reined in and brought under judicial review.

~~174.~~190. Since at least Spring of 2021, the defendants, in part or sum, violated Demia's right to privacy by and through constant surveillance. The surveillance included, but was

not limited to, accessing her person through alternative means. For example, while sitting in her office at the Department, she experienced physiological symptoms, such as her smelling another person in spite of no one standing around her. She documented a pattern of her receiving a notification from her Ring system immediately followed by the smell of her trash can from her bathroom and two women in her office looking at each other while chuckling. Demia further witnessed one of those women standing at the copier, staring in a gaze while the sound of her voice was emitted from a nearby office in angry, high tones. Demia further noticed changes in her own mannerisms and physical features. It was if another person connected to her.

~~175.~~191. After experiencing such physiological symptoms, Demia had a conversation with a co-worker who revealed the practice of dark arts around the workplace. It is also worth noting that during a conversation with Demia's husband, she asked him if the Department was using a medium or hypnosis. He responded, "I hypnotized him the way I hypnotized you." After learning this information, Demia suspects that such methods also were used against her father-in-law who possessed highly classified information. Her husband did as well.

~~176.~~192. Upon information and belief, these methods were used by persons employed by the City, including but not limited to the Department, to obtain personal, confidential information, such as Demia's social security, bank account, and pin numbers. The theft of such information was followed by the theft of her bank cards, work identification, and possibly her identity.

~~177.~~193. Additionally, to circumvent her employer's constant monitoring, Demia purchased a cellular phone unregistered to her. After Demia responded to a text message

from a personal contact, a co-worker jumped up and reported to a superior officer, "That's her." She also heard her private telephone conversations with her friends repeated in the back of her office.

~~178.~~194. Demia called out the abuse and overreach to internal parties at the managerial level. These wayward employees did not limit the use of these methods to the workplace. They accessed her home and monitored her 24/7. These practices also enabled anyone with whom the Department shared intelligence equipment to surveil Demia as if they were law enforcement. Specifically, neighbors and family members of the Department's personnel had access to such equipment and used it to enter her property. To establish their entry, Demia collected certain D.N.A. as evidence of a person being present in the home.

~~179.~~195. After complaining about the overuse, Demia was warned to stop talking about it. One executive explained to Demia that people just wanted to get to know her, but Demia never consented to anyone accessing her person or home. If anyone wanted to get to know her, approaching her with a simple greeting was and is an acceptable form of socialization. They chose differently. The Department responded to Demia's concerns by initiating a Section 72 proceeding to force Demia out of her job instead of addressing the abuse of the intelligence resources.

~~180.~~196. It is undeniable that these methods should be scrutinized in light of the Establishment Clause, but its invasion of privacy cannot be ignored. Statutes governing the use of non-conventional investigative methods establish requirements for law enforcement to follow in order to obtain a warrant based on probable cause. *See, e.g.*, 18 U.S.C. § 2518 (2025) (federal statute regarding procedure for interception of wire, oral, or electronic communications). Courts

continue to demand adherence to these constitutionally-compliant provisions. *See, e.g.*, U.S. v. Cline, 349 F.3d 1276, 1280 (10 Cir. 2003) (stating that a government's failure to use traditional investigative techniques must be explained with particularity).

~~181.~~197. Thus, the City's ubiquitous use of alternative investigative methods, including but not limited to occultic and/or religious practices, must be subjected to judicial scrutiny to determine its constitutionality. It must be determined whether the defendants violated Demia's right to privacy by employing these investigative techniques to access her person, enter her home, and intercept her electronic communication.

B. The misuse of Section 72 facilitated the City's violation of the Third Amendment

~~182.~~198. On or around December 21, 1787, newspapers in New York published a writing penned by an author identified as "Publius". Publius was not a common scribe, but rather one of the founders of our constitutional framework. In that publication, Publius discussed armies, "keeping them up", and the requisite preparation of forces in the event of another threat within our borders.[13] Those borders were not one but rather the many state borders susceptible to a possible threat.

~~183.~~199. The Third Amendment, while infrequently subject to our courts' interpretation, has had the misfortune of being limited to discourse involving our military. In fact, in 2015, the Second Circuit specifically considered whether there was a Third Amendment violation for quartering members of the National Guard in state prison housing. *See* Engblom v.

[13] Alexander Hamilton, *Federalist* No.25, in *The Federalist Papers*, ed. Gary Willis (New York: Bantam Books, 1982), p.122.

Carey, 677 F.2d 957 (2d Cir. 1982). For that reason, the full power of that provision has not been tested, and it is underdeveloped unlike its due process counterpart. Until now.

~~184.~~200. Publius wrote, "For it is a truth which the experience of all ages has attested, that the people are always most in danger, when the means of injuring their rights are in the possession of those of whom they entertain the least suspicion."[14] We least suspect those persons charged with our daily protection. We least suspect those persons who we trust to quell our daily threats, not necessarily against our national border, but those we face in our streets, in our neighborhoods, and in all aspects of our communities.

~~185.~~201. The plain language of the Third Amendment prohibits the quartering of a "soldier" without the consent of the owner. U.S. Const. amend. III. "Soldier" is commonly understood to be a person enlisted in military service.[15] In 1787, we did not have a law enforcement agency. Arguably, the men who had just fought the British in the American Revolutionary War were the closest defense against daily unrest. In fact, when Publius contemplated keeping up an army, he proposed that the national government raise troops to "keep on foot, as long as they supposed the peace or safety of the community was in any degree of jeopardy."[16]

~~186.~~202. Approximately, two (2) years after the New York newspapers published that proposition, George Washington, as the first U.S. president, charged thirteen (13) men with enforcing our laws pursuant to the authority of the recently enacted Judiciary Act of

[14] Hamilton, *Federalist* No. 25.
[15] Soldier, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/soldier (last visited Oct. 30, 2025).
[16] Alexander Hamilton, *Federalist* No.25, in *The Federalist Papers*, ed. Gary Willis (New York: Bantam Books, 1982), p.122.

1789.[17] Those men formed the U.S. Marshals Service. By 1791, the year in which the Third Amendment was enacted, the U.S. Marshals Service grew to sixteen (16) men. The U.S. population at that time was approximately 3.9 million people.[18]

~~187.~~203. Our modern concept of law enforcement did not exist at the time that the Third Amendment was drafted. The U.S. Marshals represented only .0004% of the U.S. population in 1791. Our capacity for law enforcement today is approximately 54,000 times greater than our capacity in 1791. Our population, however, is slightly more than 100 times larger than it was in 1791. Nevertheless, the need to ensure the safety of our community was always an intention of our forefathers, as per Publius, or on that day in 1787, Alexander Hamilton. In his discussion of keeping up an army, he described the role served by our law enforcement personnel (police officers) today.

~~188.~~204. As we embark on this revisitation of the level of privacy shielded by the Third Amendment, we cannot overlook that our law enforcement agencies are paramilitary organizations tasked with ensuring the safety of our communities and enforcing our laws. They are uniformed personnel supported by the revenue generated through taxation of our citizens. Although unionized, they cannot strike and must answer the call to duty when danger or civil unrest challenges our quality of life. Arguably, they could not have been the soldiers contemplated at the time that the Third Amendment was given life, but they are soldiers in our modern understanding of who would be first to respond when we are threatened.

---

[17] https://www.usmarshals.gov/who-we-are/history/research-sources/oldest-federal-law-enforcement-agency.
[18] Census History Staff. "1790 Fast Facts - History". US Census Bureau. https://www.census.gov/programs-surveys/decennial-census/decade/decennial-facts.1790.html#list-tab-1813000050 (last visited Nov. 24, 2025).

~~189.~~205. With that responsibility, they are granted significant power and access to resources to enable them to serve that purpose. Appreciating the work that they do is not a welcome mat into our homes unwarranted and without the proper oversight. Publius also wrote in a later publication "If men were angels, no government would be necessary."[19]

~~190.~~206. The intelligence gathering resources at their disposal permit persons to enter dwellings undetected. Such cloaking affords the culprit opportunity to plant evidence or illegally steal property. It exceeds the parameters established by the Fourth Amendment's restriction against unreasonable searches and seizures. The unlicensed entry does not have to be criminal in nature; it can be merely administrative. Hiding behind the enforcement of an administrative law would be all that was needed for our everyday soldiers to cross the thresholds of our most sacred structures – our homes, our Constitution.

~~191.~~207. Demia alerted the proper authorities to the abuse of the intelligence resources. She complained about her property being stolen, including but not limited to her vehicles, which have yet to be returned. She spoke with a supervisor about her suspicions of another supervisor committing bank fraud by using her money. She informed her supervisor that she could not report to work due to an unexplainable illness, at which time she was informed that it was the person using the intelligence resources whose pain she was experiencing.

~~192.~~208. When Demia called out due to that illness, she was in her home. Thus, the person using the intelligence resources at that time somehow had presence in Demia's home without license or authority.

[19] James Madison, *Federalist* No.51, in *The Federalist Papers*, ed. Gary Willis (New York: Bantam Books, 1982), p. 262.

~~193.~~209. The Third Amendment protects citizens against having to "quarter" soldiers, either during times of peace or war without legal prescription. Quartering is only an issue of time. The term is defined as providing lodging or shelter, to lodge, or to dwell.[20] Aside from a physical structure, "lodge" means to establish or settle in place, occupy a place temporarily, or shelter an employee.[21] For one to dwell means that he "remains for a time" or "to keep the attention directed".[22]

~~194.~~210. The amount of time that a person remains in place is not a fixed period, and the Third Amendment does not delve into the length of time of a soldier's presence. In fact, evidence that our forefathers contemplated the time that a soldier remains is in Publius noting, "What time shall be requisite to ascertain the violation? Shall it be a week, a month, or a year?"[23] Language that specified time was intentionally withheld to ensure that the protection would not be restricted. Thus, for any amount of time that an owner's house is occupied without license, consent, or the necessary authority, then such presence in the home constitutes a violation.

~~195.~~211. Any investigation, regardless of legitimacy, that resulted in entry into Demia's home without her license or consent, even if not criminal in nature, constituted a violation of her right to privacy. Those aspects of privacy not covered under the Fourth Amendment's umbrella are surely captured by the Third Amendment. The right to enjoy life means "the right to be let alone." Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890).

---

[20] Quarter, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/quarter (last visited Oct. 31, 2025).
[21] Lodge, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/lodge (last visited Oct. 31, 2025).
[22] Dwell, *Merriam-Webster.com* Dictionary, https://www.merriam-webster.com/dictionary/dwell (last visited Oct. 31, 2025).
[23] Hamilton, *Federalist* No. 25.

~~196.~~212. The law must evolve to meet the demands of our society. When resources well-intended for law enforcement's use are abused and converted into paths for intrusion, we must reconsider whether to rein in such overreach. That morning when Demia called out due to illness, it was but one instance. There were and continue to be many.

~~197.~~213. After Demia had enough and explored every other alternative, including speaking with different clergy within the Department, she contacted the one person who was best situated to mitigate the damage on behalf of the Department – the Deputy Commissioner of Legal Matters. *See* Email dated July 23, 2023, Ex. M. Instead of devising a legal strategy that should have ended the harassment and misconduct, he opted to use the Section 72 process to discredit her and terminate her constructively. The message was: Do not listen to her. She is crazy.

~~198.~~214. In the meantime, the intrusion into Demia's home has persisted. She carefully documented incidents of her privacy being invaded. The evidence is uncontestable. She discovered D.N.A in places where no person could have been inside of her home. She noted the date, time, and place of such discovery. She attempted to record other evidence, but it was a task of documenting the impossible. But it is only seemingly impossible, because she does not have access to those intelligence resources. Persons with access know who the culprits are.

~~199.~~215. The fact remains that Demia's privacy in her home was violated. The ability of officers and/or other persons to thrust themselves into a home without license, consent, or judicial authority completely undermines our fundamental right to privacy. Such methods must undergo judicial scrutiny to ensure the proper safeguards are implemented. Without that oversight, we create a government in which the officers are not under the law but rather become the law.

*Thirteenth Amendment and Equal Protection*

~~200.~~216. Demia should be the master of her fate, the captain of her soul. However, the unbridled power afforded to certain persons within the City has distorted our notions of freedom and reiterated our need to review how we define slavery. In 1865, Congress adopted the Thirteenth Amendment, which states, in pertinent part, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. At that time, slavery was discussed in terms of the legal rights afforded to certain persons living in bondage. They were physically chained, and even if free, would have been legally stagnant. Congress enacted civil rights laws to dismantle a system designed to promote white supremacy. While the institution of slavery had been outlawed, its spirit lingered in the hearts of many of its beneficiaries.

A. Section 72 as applied denied Demia equal protection as a person of protected classes

~~201.~~217. While the Thirteenth Amendment was part of a trilogy of constitutional amendments established to destroy the incidents and badges of slavery, the Fourteenth Amendment housed the oft-cited Equal Protection Clause. Its objective was to prevent the continuation of discriminatory practices against Blacks. The breadth of its language has been applied to all people.

~~202.~~218. When Demia complained about the harassment suffered at the hands of her younger, white co-workers, her pleas fell on deaf ears. She instead was forced out, and the assailants were not penalized but rather promoted. It is clear that Demia does not suffer a medical

disability, and thus Section 72 was a means to stigmatize her as a professional and terminate her from civil service.

~~203.~~219. Demia falls into several protected classes. She is Black. She is woman. She is of a certain age. Her surname screams Jew. While the Department will tout that it has persons in the promotional title falling into each category, it cannot assert that it has any individual falling into all of them. An older woman with a Jewish name also was on the same promotional list, and her track was the same as Demia's – penalized, transferred, and ousted. The promotion list was rearranged to permit others to move ahead of Demia. None of whom fit all of her demographics. Instead, she was forced out of her job via an illegitimate Section 72 proceeding and prevented from litigating the Article 78 that is required for reinstatement.

~~204.~~220. The rumor mill spun a theory that DSNY blackballed Demia after she left the agency while her husband was in the intensive care unit of a hospital. A stigma devised in a human resources backroom would not be DSNY's only attempt to block her opportunities.

~~205.~~221. During the Section 72 process, three agency attorneys sat as counsel to the Department – Brian McCaffrey, Asya Abbas, and Nicole Moccio (collectively, the "Three Attorneys"). In all likelihood, they had seen the person who appeared as the administrative law judge over the years. Those encounters would be enough to become friendly with each other. The relationship would be enough to collude against Demia.

~~206.~~222. It is believed that the Three Attorneys, in part or sum, actively participated in hacking Demia's personal computer to prevent her preparing for the Section 72 hearing. In fact, Mr. McCaffrey announced to the tribunal that Demia should expect hacking as a

usual practice. Hacking her devices, while egregious, was not the greatest affront to Demia's constitutional rights. It was the theatrical illusion of due process.

~~207.~~223. The Three Attorneys intentionally presented witnesses who were not the actual parties before an administrative law judge who was not the same judge who appeared at the settlement conferences. They intentionally permitted false testimony from those parties, and in fact, it was discovered that false witness statements were encouraged as a practice by the Department. After the Section 72 hearing, Demia was denied a copy of the actual recording of the hearing, which Section 72 affords the displaced employee. Instead, she received a transcript which changed a few times. The modification of the transcript was not just false words across the page. It was a reflection of their practice, and a testament to the truth of Demia's mental condition.

~~208.~~224. Mr. McCaffrey had been admitted since 1985. He made a point to stand next to Demia and highlight for the judge that he had been practicing for a long time. During his nearly 40 years of law practice, he failed to emulate other attorneys who were recognized as better litigators in the Department. The Section 72 Petition as originally drafted and distributed to the parties mirrored an attorney indifferent to the quality of his work product. It lacked structure, cohesion, and sound legal logic. His presentation at the Section 72 hearing was more of the same. Nevertheless, his commitment to the injustice was with the expectation of being promoted and creating a pathway for his son to transfer to NYPD from DSNY.

~~209.~~225. Ms. Abbas's behavior during the hearing was detestable. She was short-tempered and unable to adjust in response to the witnesses' testimonies. As she struggled, she relied on the Department's intelligence resources to provide relief. Her friend examined Demia

in her stead. While she attempted to work around their attempts at sabotage, Demia was unaware that they were so bold as to falsify records.

~~210.~~226. Nevertheless, it does not relieve the City and the Department of its discriminatory practices.

B. The Department's control over Demia constituted slavery

~~211.~~227. "Any conduct which actually enslaves someone can be subjected to punishment under . . . the Thirteenth Amendment." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 442 fn. 78 (1968) (citing U.S. v. Cruikshank, 25 Fed. Cas. 707, 712 (Cir. La. 1874), quoting Hodges v. U.S., 203 U.S. 1, 17 (1906), and distinguishing among "mere personal assault or trespass or appropriation"). Courts coined the term "incidents of slavery" to identify any action that resembled antebellum slavery. The Southern District of California explored the meanings of slavery before the drafting of the Thirteenth Amendment and acknowledged "that there were many shades of meaning of the word," including the control one had over another. U.S. v. Ingalls, 73 F. Supp. 76, 78 (S.D. Ca. 1947). It is time to explore those meanings again.

~~212.~~228. The resources available to the City and its agencies, including the Department, to conduct investigations or gather intelligence are quite powerful. In the wrong hands or without proper supervision, they undermine the framework of our country by trampling over a person's civil liberties. They can control various aspects of a person's life, including certain behavior.

~~213.~~229. We described the invasion of Demia's privacy, but since the commencement of her involuntary leave, she has not been free. The persons with access to the Department's resources showed up in every aspect of her life and controlled key parts, such as

financial, communication, transportation, and pursuit of education. This control did not only foreclose opportunities within city service, but it kept her subservient in all aspects of her life.

(i) Interception of Electronic/Wire Communications

~~214.~~230. The taste of power has been too enticing for the defendants. Their methods have all the markings of a General Field Marshal Rommel protégé – take out the leader, cut communications, isolate the target, and destroy the supply chain. The defendants, by and through their representatives or agents, intercepted all forms of Demia's communication in order to exact control. They hacked her personal phone and disconnected the service from the end of August 2024 to on or around September 26, 2024 to prevent her interviewing with a private employer. When she called to speak with a representative of the phone company in August 2024, he alleged that Demia owed $50, but she had remitted that payment in the ~~previous month~~ June 2024 and a balance of $108 remained for July 2024. On or around July 14, 2024, the due date, the company withdrew the full amount due as well as the remainder of $108. The extra withdrawal occurred just before a weekend, and the money would not be released until the following week. Demia still had no use of her phone.

~~215.~~231. On or around September 26, 2024, Demia's cellular service was suddenly restored. She then received nine (9) voicemail messages dating back to January 2024. Even when Demia used cellular phones without her identifying information in July 2022 and January 2025, the defendants locked into those devices as well.

~~216.~~232. Such interference became a pattern. On or around October 28, 2025, Demia's cellular telecommunications were again disconnected for non-payment, *see* Verizon text notification dated Oct. 28, 2025, Ex. M, but Demia remitted payment ahead of the due date. In

fact, for the previous four (4) months, Demia not only paid by the due date but also above the amount due. The company demanded $58.81 to restore service. She was unable to speak to a representative except for one (1) occasion, and that call was abruptly disconnected when she established the denial of online access to her account and her consistent payment history.

~~217.~~233. On or around Saturday, November 1, 2025, Demia received a notification identified as being from the cellular company. It claimed that she was waiting in a queue, but she had not spoken to a representative that day. She later received another text message that the balance had been paid. Supposedly, ~~T~~the company contacted Demia's mother to demand payment. It is probable that the person was not an employee of Verizon, but rather one of the City using its resources to interfere with Demia's communications.

~~218.~~234. This case is not about extortion; that claim is reserved for another case focusing on the criminal component of their actions. I~~i~~t is a prayer for review of the constitutionality of the laws used to deprive civil servants of their fundamental rights as well as an opportunity to scrutinize the power afforded to certain persons in leadership and how they wield that power without the necessary oversight. The evidence of extortion is merely coincidental.

~~219.~~235. The defendants, by and through their representatives, hacked Demia's personal and business email accounts. Her business email was removed from her phone, and they thwarted her attempts to restore connection. She could not submit authenticating information in spite of using the authentication application. That account's data prior to 2024 is gone. It stopped receiving communication in May 2025 when Demia could no longer log into the account.[24]

---

[24] As of 3:24 PM on October 9, 2025, the author was preparing the section regarding data from her business email account. She opened the application to get the dates of the available emails. Immediately thereafter, she heard

~~220.~~236. Just before being placed on involuntary leave, Demia founded a non-profit to raise money for families with terminally ill or disabled members who were previously the family's main financial support. However, the defendants took the telephone service for that foundation as well. She attempted to establish new telephone numbers for her companies, but each number was taken allegedly pursuant to Google's reclaim policy.

~~221.~~237. In an attempt to circumvent the defendant's surveillance and/or illegal investigation, Demia purchased pre-paid phones and associated them with accounts unregistered to her. By and through the defendant's intelligence resources, those devices were compromised as well. When talking to family and/or friends, Demia heard frequency on the calls as if they were intercepted or being recorded. When she scheduled interviews with private employers, representatives for the defendants passed by with electronic devices, and Demia's calls were immediately interrupted. Thus, the defendants controlled Demia's communications.

(ii) Controlling Financial Matters

~~222.~~238. Over the past few decades, the way that we conduct business has evolved with the increasing dependence on technology in lieu of face-to-face transactions. Our concept of slavery, however, has not changed. It should. As technology develops, especially in the financial sector, our financial accounts have become more susceptible to criminal activity, or in this case, misguided persons who are usually authorized to access such accounts. In adopting the Thirteenth Amendment, Congress wanted to ensure the right of men "to buy and sell when they please, to make contracts and enforce contracts." Jones v. Alfred H. Mayer Co., 392 U.S. at 411. Demia's ability to use her money when she wants is not within her control; it's in the defendants'.

sounds she attributes to astral projection, and the entire account was then deleted from her personal device. At the time that she checked the application, it showed 399 unread junk emails.

~~223.~~239. The intelligence resources enable the defendants to use money that Demia has on deposit at a bank. When she attempted to use the money that should be in the account, the transaction declined. The time that it took for Demia to arrive at the bank in person to confirm her funds availability, the funds were restored. However, the transaction never should have declined.

~~224.~~240. Additionally, when Demia purchased certain goods, she received an error message regarding the product's availability after the transaction was complete. The funds could take three (3) to five (5) business days to return to Demia's account. During that time, she received no product and did not have the use of her funds. Representatives of the defendants used those funds during that time. In fact, the funds did not return to the account until Demia attempted to access it, and when she did, her access was delayed until the defendants corrected the account balance. Thus, her money was not there for her use when she wanted it.

~~225.~~241. We often equate the pursuit of happiness with ownership of property. In fact, while discussing the enactment of a bill to further the goal of the Thirteenth Amendment, Congress described a "great fundamental right[] . . . [as] the right to acquire property . . . and to inherit and dispose of property." Jones v. Alfred H. Mayer Co., 392 U.S at 432. The defendants have interfered with Demia's property ownership.

~~226.~~242. After her husband's passing, Demia inherited a home initially purchased by her father-in-law using the benefits of the G.I. Bill. ~~She inherited the property after her husband's passing.~~ The defendants along with certain affiliates are attempting to deny her that right. In May 2025, Demia communicated with a person who identified herself as a representative of the bank servicing Demia's mortgage. The representative informed Demia that the bank

recorded another person as a "successor-in-interest" and further demanded that Demia provide evidence that the other person had no ownership interest.

~~227.~~243. Upon information and belief, the other "successor-in-interest" has a personal relationship with an employee of the City or works for the City directly.[25] She used the intelligence resources to either defraud the bank, ~~and/or~~ defraud Demia by impersonating the bank, and/or solicit the help of a wayward bank employee. That account was referred for foreclosure on or around the same date that the City filed a motion to delay paying Demia a large sum of money owed to her in connection with her husband's pension. The nature of that case is discussed *infra*, but the money would be used to satisfy the financial obligation of the mortgage on Demia's home.

~~228.~~244. The foreclosure papers name Demia as a defendant as an heir to the property. It does not name the other alleged successor-in-interest. For the record, the other person is not related to Demia's marital family. Essentially, the bank would foreclose on Demia's interest in her inheritance, but not the other person. Interestingly, a man with whom Demia worked at DSNY asked Demia how much she could get for the house while at a gas station that confiscated her vehicle in or around December 2024. The matter is still pending in state court, but given the nature of Demia's defenses, federal jurisdiction is warranted.

~~229.~~245. The City agency that holds funds in trust for its pensioners owes Demia a substantial sum of money due to its failure to pay Demia and her husband the full pension due. For years, the pension fund underpaid her husband. On or around December 5, 2019, Demia

[25] On or around October 9, 2025 ~~C~~c. 6:37 PM, Demia received an email notification after completing the section discussing the other "successor-in-interest". She heard the sound of an angry woman's voice, and then her phone shut down. She plugged ~~it~~ the phone in to charge, but as soon as the device automatically powered back on, it shut down again.

spoke with a representative at the pension fund who feigned concern that her husband's pension would not be finalized until after his death. Demia saw that same representative working at NYPD's headquarters in 2021.

~~230.~~246. Demia's husband passed on April 8, 2022, and his pension was finalized on or around April 15, 2022. Even then, the final calculation was wrong and needed to be redone. Nevertheless, the agency refuses to pay Demia the funds due and outstanding during her husband's lifetime. In fact, after a judge awarded Demia a partial payment in June 2025, the City moved to reargue.

~~231.~~247. In October 2023, the City argued that payment of the pension monies was discretionary, and the City was under no obligation to pay. The judge issued an order further delaying payment and further required the parties to split the cost of the transcript.

~~232.~~248. The case regarding the pension fund is still pending, but the City's illogical argument coupled with the abuse of its intelligence resources demonstrates the type of control the City exacted over Demia's affairs and its determination to deprive her of fundamental rights.

~~233.~~249. An incident of slavery is a master's affirmative steps, on his own volition, to inflict punishment on his slave. U.S. v. Hatch, 722 F.3d 1193, 1206 (10th Cir. 2013) (citing George M. Stroud, *A Sketch of the Laws Relating to Slavery* 31, 38 (2d ed. 1856)). It is not necessary to entertain whether any employer could be characterized as an enslaver when it opts to discipline and/or discharge an employee. This employer is a governing entity bound by laws establishing the rights attendant to civil service employment. Consequently, it is held to a higher standard as it relates to its citizens and its employees.

~~234.~~250. The process for disciplining an employee is established by a policy issued by the City and/or Department, and such policy was not followed. The process for termination for misconduct is established by laws and policy, and such laws and policy were not followed. This employer undermined its own policies, state as well as federal laws, and most importantly, the Constitution.

~~235.~~251. It is worth noting that the Department's policy prohibits Demia from earning income while on leave. A master must establish its superiority over its subject. *See* U.S. v. Hatch, *supra*. Interference with bank accounts, unlawfully forced out of employment, prohibition against working, and withholding legally due funds are the types of violations the Thirteenth Amendment was designed to prevent. Reimagining the parties who engage in such conduct is what the country demands now.

(iii) Controlling Transportation

~~236.~~252. A man cannot be free if he "cannot go and come at pleasure." Jones v. Alfred H. Mayer Co., 392 U.S at 430. Demia is not free. By and through their representatives or agents, the defendants confiscated Demia's vehicles. To maintain the ability to travel, Demia ordered cars through a rideshare application on her mobile device, but she was charged double the standard price. When she attempted to use a taxi service, the person whose voice sounded the same as an employee from the Department quoted Demia double the standard price and further threatened that she would not be able to order car service through the mobile application. That day, she could not order the car service. She walked.

~~237.~~253. Demia has been overcharged on any and all forms of public transportation. The defendants' have a representative with intelligence equipment at the machines

when she uses them so that the price can be manipulated. She documented their presence, including transactions declining at the machines after she confirmed availability of the funds.

~~238.~~254. By and through the intelligence resources, the defendants learn the account number for Demia's MetroCard. The balance is affected at their will. She had instances when she should have received a transfer at no additional cost, but she was charged.

~~239.~~255. On at least two (2) occasions, representatives for the defendants prevented buses from stopping for Demia. Demia planned to take the last bus. She waved at the driver to make sure that he saw her. Instead, he drove past her or switched lanes to the opposite side. Because the defendants have access, irrespective of legitimacy, to Demia's banking information, they knew or could have known that she had no additional resources to opt for a different mode of travel. They attempted to leave her stranded.

~~240.~~256. Demia received several notifications from the DMV ~~New York State Department of Motor Vehicles (the "DMV")~~. These notifications advised her that her license and vehicle registration were suspended in May 2025. On or around April 11, 2025, Demia visited the DMV to resolve the issues with her vehicle and a motorcycle. However, the matter could not be resolved.

~~241.~~257. Demia's car insurance lapsed in or around August 2024. For the record, her premium was nearly three (3) times the amount as when her husband was alive. When she visited the insurance company to remit payment in person, they refused to accept payment. Upon information and belief, employees of the defendants used the intelligence resources to prevent Demia from remitting payment for car insurance so that it would lapse, create penalties, and require her to pay more money.

~~242.~~258. In November 2024, her vehicle was taken from her by persons who she readily identified as current and former employees of the City. She attempted to retrieve the vehicle on multiple occasions but was prevented from doing so. On her last attempt, the company demanded money in an amount equal to an obligation owed by Demia's husband. Upon information and belief, a city employee used the intelligence resources in performance of the services but failed to complete the work as agreed.

~~243.~~259. When Demia spoke with the financing bank and the insurance company, representatives insisted that Demia continue to pay the car note and insurance even though she did not have possession of the vehicle. She refused.

~~244.~~260. The license and registration suspensions were due to the lapse in vehicle insurance coverage. Due to the suspensions, Demia had no valid identification aside from her attorney secure pass which is issued by the New York State Unified Court System. It was often rejected as a form of state ID. Prior to that time, Demia had a clean driving record.

(iv) Controlling Her Right to Litigate

~~245.~~261. The U.S. Supreme Court reiterated that "enforce[ing] rights in the courts" is a fundamental right as a free person. Jones v. Alfred H. Mayer Co., 392 U.S at 432. Demia is not free. In March~~June~~ 2023, the pension fund for the City owed Demia a substantial sum of money due to its non-payment of monies to her husband during his lifetime. It refused to pay Demia directly. In June 2023, when Demia attempted to file the Article 78 proceeding to challenge its determination, the defendants hacked Demia's personal computer so that she could not file the document. She visited a public law library, and a representative for the defendants arrived at the library with intelligence equipment. The pages of the document suddenly went blank.

After a few more attempts within the following days, Demia finally was able to finally file the document.

~~246.~~262. This prevention method would repeat itself when Demia attempted to file another Article 78 in August 2025, in which she requested reinstatement to her job. When she attempted to file the document in the public library, the defendants interfered with the computers and printers. Again, one of her exhibits went blank as she was preparing it for filing. She moved to another floor and was told that the computer use time would be longer, but it was cut short.

~~247.~~263. When she attempted to file the document later that evening, her personal computing device continued to present issues as if there was interference. In private, she announced that the DOJ directed her to contact them if she had problems filing. There was no one present who Demia could physically see; however, suddenly, she was able to file.

~~248.~~264. On or around August 18, 2025, approximately six (6) days after filing the Article 78 for reinstatement, Demia received a notification that the case had been removed. *See* NYSCEF Notification dated Aug. 18, 2025, Ex. K. She filed the case electronically through her attorney account, and it was no longer visible even to her. The court changed the case to a paper case as well as the commencement date. The case was filed electronically prior to the running of the statute of limitations. The second date exceeds the time, and extensions of time to file are prohibited by statute.

~~249.~~265. The changing of the date of filing for the Article 78 for reinstatement was the defendants' tactic for foreclosing Demia's opportunity to seek the statutorily required judicial review of her case. The illegality of it is apparent. The unconstitutionality is also clear.

The deletion of the case was to keep in the dark what should be brought to light. The defendants are preventing her from enforcing her rights in the court.

~~250.~~266. The deletion of the Article 78 for reinstatement was not the only incident in which the defendants exerted undue influence over other parties, especially as it relates to Demia's ability to access the courts to assert her fundamental rights. During the Section 72 process, OSA assigned counsel to represent her in connection with the proceeding. Initially, Mr. Orgel confirmed OSA's representation of Demia. The record from that proceeding has been modified to distort whether the communication occurred on or around August 4, 2023 or August 24, 2023. Nevertheless, an attorney whose specialty is administrative proceedings against the City directly communicated with the Department regarding OSA providing legal representation for Demia. He allegedly waived the 30-day Hearing and 75-day Determination, the key provisions guaranteeing due process for a civil servant.

~~251.~~267. By October 5, 2023, an attorney identified as Leonard Shrier, OSA's outside counsel, represented to OATH that Demia submitted a waiver of the 30-day Hearing and/or 75-Day Determination. *See* Email from Shrier to OATH dated Oct. 5, 2023, Ex. D. Demia submitted no such waiver. Demia complained to OSA that the attorneys were not zealous advocates as required by the rules of ethics, and it assigned Demia a private attorney after her health insurance expired in December 2023. The reassignment of counsel occurred within a week of the new trial date, and that attorney did not submit exhibits to OATH by the December 14, 2023 deadline.

~~252.~~268. By December 14, 2023, OATH had not received any responsive papers on behalf of Demia. The rules of the City state that a party may file an answer within eight (8) or thirteen (13) days of service of the petition, depending on the method of service used. 48

R.C.N.Y. § 1-24 (2023). Other rules govern the submission of pre-trial motions, including dispositive motions. 48 R.C.N.Y. § 1-34 (2023). Demia's counsel could have and should have filed an answer responding to the Section 72 Petition, but they did not. They should have filed a motion disposing of the Section 72 Petition based on the non-licensure of the psychologists and lack of due process. They did not.

~~253.~~269. The legal strategy waiving Demia's fundamental rights and undermining her legal defenses is lost on even the least astute of legal minds. Unless, the City used its influence to remove OSA as Demia's defense, thereby foreclosing her access to justice. By the time Demia attempted to dispose of the case, OATH insisted on a trial, during which its bias was apparent.

~~254.~~270. Each entity defendant is governed by the City's Charter, which establishes the framework for government of the City. *See* N.Y.C. Charter §§ 1 – 3502 *et seq*. While the adjudicating and investigative agencies are charged with operating independently of other city agencies, Demia's case evidences their working in collusion with each other. Essentially, OSA failed to file any responsive pleading or motion to protect Demia's fundamental rights and watched from the sidelines as Demia was forced to represent herself in a case challenging her mental health, and thus, risking her substantive rights. OATH and the CSC overlooked the glaring discrepancies in the case in furtherance of a "penalty".

~~255.~~271. New York courts have consistently held that when a party's mental competence is a known issue, then (s)he cannot represent him- or herself unless the court performs a search inquiry to establish that the party's waiver to counsel was knowingly, voluntarily, and intelligently given. *See, e.g.*, People v. Stone, 22 N.Y.3d 520, 525, 6 N.E.3d 572, 575, 983 N.Y.S.2d

454, 457 (2014) ("It is well-settled that an application to proceed pro se must be denied unless defendant effectuates a knowing, voluntary and intelligent waiver of the right to counsel."); People v. Zi, 178 A.D.3d 591, 592, 117 N.Y.S.3d 21, 24 (1st Dep't 2019) ("Where there are 'red flags' that a defendant may be suffering from a serious mental illness affecting his or her competency to waive counsel, the searching inquiry should include a particularized assessment of defendant's mental capacity.")(emphasis removed). While the right to counsel is specifically preserved in criminal matters, it is undisputable that the right to counsel is integral in protecting due process rights for persons whose life or liberty is at risk. In fact, Section 72 includes a similar preservation by granting a party the right to representation at the hearing and reasonable time to secure such representation.

~~256.~~272. Here, OATH's decision for Demia to proceed *pro se* and the Report are facially contradictory. If, after an adequate assessment or inquiry, OATH determined that Demia was capable of handling the duties of an attorney during an administrative trial, *see* Report, Ex. C, p. R00348 ("Respondent impressed me as intelligent and self-assured. She demonstrated competence with respect to trial practice and procedure."), then it logically follows that she was capable of handling the duties of an associate staff analyst. For Demia to knowingly, voluntarily, and intelligently decide to represent herself, the tribunal concluded that she was of competent mind to decide that she could testify, examine witnesses, object and establish a basis for the objections, even from the stand, and give opening and closing statements. Thus, she also should have been able to determine that she was capable of performing the work of an associate staff analyst. However, OATH and the CSC ignored the contradiction of a party being mentally incompetent but able to represent herself at a hearing to determine if she was mentally fit.

~~257.~~273. The disregard for the Constitution did not start and end with OATH and the CSC. The Three Attorneys intentionally permitted the admission of false testimony into the record. They knowingly examined witnesses who were not the actual parties with whom Demia met on or around July 25, 2023. The administrative law judge was not the same person who attended the conferences. Their years of serving as agents for the City appeared, not with exceptional legal acumen on display, but rather their collegial relationship and the favors attendant thereto. ~~on the line.~~

~~258.~~274. The events that occurred during the Section 72 hearing may be forever lost. The defendants established a pattern of allowing the process to be completed then changing the record to conceal their inadequacies. It is the same fraud plaguing our state courts, and it is a practice crutching the City's legal teams.

~~259.~~275. Mr. McCaffrey, who has been admitted since 1985, leaned on his years in practice and pointed out to the tribunal that he had been doing it for "a really long time." However, his examination of the witnesses and summation reflected an attorney who has not mastered his craft. Ms. Abbas showed up in court as a master of tricks when she attempted to swap pages of certain exhibits with pages that had not been admitted into the record. Additionally, she employed the Department's intelligence resources so that her friend could examine Demia in her stead.

~~260.~~276. After the process was complete. The record of what transpired during the Section 72 process changed. Demia was denied a copy of the recording, which Section 72 states that she is entitled to receive. OATH, however, based its denial on the "hearing" being

held in its trials division instead of its hearings division. Hence, Demia's challenging jurisdiction on appeal.

~~261.~~277. During the appellate process, Demia complained about the incessant hacking of her personal equipment, which hindered her ability to properly prepare her brief. In fact, after fixing errors, the same ones returned later. She eventually produced a 50-plus page brief with numerous citations and references to the Record, including the transcript and exhibits. The Department never shared the Record as submitted to the CSC. Demia compiled her copies of filings and trial exhibits, bate-stamped them, and provided her copy to the CSC. However, Mr. McCaffrey warned the members of the CSC to use the version provided by the Department, as if it were different. By that time, the Report had changed from its original version.[26]

~~262.~~278. This practice of claim elimination pervaded the courts in which Demia has pending actions, and it has even tainted this proceeding. The Section 72 Petition, the transcript, the Report, and the briefs all have been changed from their initial iterations. Each change occurred as Demia responded to a flawed analysis and demonstrated litigation skills superior to the Three Attorneys. Ultimately, the Record in its original form is not accompanying this filing.

~~263.~~279. The emulation of Demia is not the issue. In fact, it is flattering. The intentional changing of the documents from their original form to derail the course of her appeal as well as this case is deeply problematic and a poor use of the Department's intelligence resources. Their tactics denied her the right to respond to their arguments in real time. An answer to the Section 72 Petition is basically admissions, denials, and counterclaims. The effort is lost when the

[26] On October 8, 2024, Demia was sitting in a public library working on a Notice of Claim to file with the City as well as a complaint asserting a violation of 18 U.S.C. § 1964(a), which governs racketeering activities. Demia was complaining that a decision had not been issued, and the Report was circulated later that day. It was as if the defendants were aware of Demia's actions at that very moment and distributed the Report to undermine her claim.

documents change. It creates the appearance that Demia responded to a different document entirely. It challenges our practice of issue preservation. Therefore, the oath betrayal denied Demia her right to litigate and respond to their claims.

~~264.~~280. As attorneys, we learn from each other, but we incorporate the lessons on the next case or the next deal. It is an abominable practice embraced by the defendants to alter documents on which the adjudicators already decided.[27]

~~265.~~281. Our Constitution and body of laws evolve over time. The evolution happens as we bring issues before the courts, thereby affording the judicial body the opportunity to shape the law accordingly. The denial is not solely to Demia but to all of us who rely on judicial process to run its rightful course.

~~266.~~282. Demia's case shows the extent of the control over her access to courts or judicial review. Each agency defendant intentionally ignored the glaring constitutional violations to prevent Demia from asserting her fundamental rights. These entities are the safeguards intended to guarantee civil servants constitutional protections, but they have been compromised and converted to be the very parties undermining those protections.

(v) Controlling Pursuit of Education and/or Employment

~~267.~~283. May "all badges of servitude . . . be abolished." Jones v. Alfred H. Mayer Co., 392 U.S at 424 fn. 31. The Jones case was decided in 1968 discussing civil rights legislation drafted in 1866 in furtherance of an amendment adopted in 1865. We are in 2025 still discussing the control exacted on a person to deprive her of her fundamental rights. Instead of state legislation, it is the abuse of discretion and poor judgment of persons charged with such authority.

[27] The federal provision governing false statement is not being presented in this case, but rather cited in another case involving additional defendants. For that reason, it is not waived.

Public service should be voluntary, not forced. The sullying of one's name forecloses opportunities. The interference with communication forecloses opportunities. Our country's founders intended the trilogy amendments of the Thirteenth, Fourteenth, and Fifteenth to open doors for those previously excluded from our society, but the defendants acted in contravention of those intentions.

~~268.~~284. Demia attempted to open doors by completing her Master of Laws in Taxation, researching sustainable investments in disadvantaged areas, and networking with persons affiliated with different legal organizations. The defendants used their intelligence resources to close those doors. The relationship with her law school was severed after employees from the City threatened certain members of the school. Upon information and belief, employees of the City either used or impersonated security guards on the school premises. Those guards ordered Demia to leave the school on the day that she was researching sustainable investments. Her call to the school was intercepted by someone at the Department. That person said that she would not be permitted at the school. Demia personally witnessed his showing up at the school and speaking with the guards. A guard issued a letter that her rights to visit the school had been revoked permanently. That guard is a retired captain from the Department.

~~269.~~285. Upon information and belief, a person who identifies as "Ashley" has a personal relationship with an employee of the City and wanted to use Demia's work regarding investments for her own benefit. Removing Demia from the school made the deceit more possible, but it hindered Demia from improving her expertise in the subject area.

~~270.~~286. Demia reached out to her other alma mater to conduct legal research. However, the courtesy was short-lived. Her only access to legal research was through public computers when a court would permit entry or the public library. After the defendants

damaged her personal laptop via hacking, she had to wait until Summer 2025 before she could purchase another one.

~~271.~~287. In the meantime, Demia contacted previous employers and scheduled interviews so that she could earn income. Those calls were intercepted or interrupted. An interview call with a global investment firm where Demia previously worked dropped every time a person passed by her with the intelligence device.

~~272.~~288. Additionally, she applied to a return-to-work program with another investment firm. She applied three (3) times. While interviewing during her first application process, Demia smelled cigarette smoke the entire time of her interview, but no one was visibly present. She even noticed the change in her facial features. The defendants' intelligence resources permit such physical changes.

~~273.~~289. On Demia's second application, she received an invitation to participate in the returnship program. After her initial interview, she directly contacted certain executives at the firm to build relationships. She was excited about her opportunity, but it was rescinded weeks before the alleged start date. She followed up via email to discuss a better strategy for the future. She had not received a response.

~~274.~~290. Upon information and belief, a person affiliated with a City employee or directly employed by the City participated in the program in Demia's stead. After Demia continued communication, she suspects that the financial firm's representatives investigated Demia's identity.

~~275.~~291. Demia received another invitation to participate in the same program in response to her third application to the investment firm. She has yet to learn any

additional information. Upon information and belief, she suspects that the defendants intended for her not to participate in the program. Her participation likely would reveal the perpetrator who stole her identifying information. Concealing that criminal offense probably is the reason for her business email being deleted and her business website being removed. The firm's investigators would see her true picture.

~~276.~~292. Upon information and belief, it probably is critical that Demia remain on leave or return to employment sans promotion to a City agency where the perpetrator has a relationship. It is probable that the person needs to the use the intelligence resources against Demia, because the person is otherwise unqualified and unable to perform at a certain level, especially in regard to specific subject matters. That limitation controls Demia's career options in violation of our laws against slavery and involuntary servitude.

~~277.~~293. Detailing every crime and/or infraction would be an overwhelming task. Employees of the City and/or Department interfered with Demia's daily living for years. She was isolated and her communication cut off from others who could help her. The mental anguish caused by constant monitoring, taunting, and invasion is immeasurable. The defendants' actions were intentional. Demia did not commit a crime, and thus, she has no conviction. Yet, the defendants, either directly or indirectly, uprooted every aspect of her life, crippling her. If the dynamics of slavery were that the owner exacted control to show the slave who was master, then the defendants wanted Demia to know that they were the masters. In fact, she received the below image in her social media feed.




~~278.~~294. The English translation is "I ruin~~ed~~ your life." That is the control that constitutes slavery – restrictions on travel, communication, transacting business, owning property and access to courts. Demia is not free, but a review of how we define and perceive slavery and/or involuntary servitude in a society with changing values, practices, beliefs, and the methods of intelligence gathering could be the very step necessary to break the chains. By and through the defendants' use of the intelligence resources, Demia had been denied the great fundamental liberties. Her life was not her own. The City and Department persisted until they were the masters of her fate. She is urging the court to test the constitutionality so that she can be the captain of her soul.

*Retaliation and Unfair Labor Practices*

~~279.~~295. The facts recited herein clearly support a claim of retaliation pursuant to N.Y. Lab. L. § 740 and N.Y.C. Admin. Code § 20-1204 against the defendants. The defendants, in part or sum, intentionally violated Demia's civil rights by taking affirmative steps to prevent her promotion to a higher title and penalize her for engaging in protected activity, such as participating in an investigatory interview, filing a grievance pursuant to the collective bargaining agreement of her title, and filing a claim asserting violations of equal employment opportunities, *inter alia*. But for deterring and penalizing Demia's complaints, the defendants had no legitimate bases to determine that she was unable to work due to a disability resulting in her dismissal.

~~280.~~296. The initiation of the Section 72 proceeding was retaliatory in nature, but the other violations, such as those noted in violation of the Thirteenth Amendment, were retaliatory and attempts to demand money in violation of federal laws governing public corruption and extortion. However, upon information and belief, the defendants used the City's intelligence resources to intercept Demia's federal complaint to the Equal Employment Opportunity Commission and deny issuance of the statutory Right to Sue letter to prevent her from filing a timely discriminatory claim.

~~281.~~297. These facts also demonstrate violation of unfair labor practices pursuant to 29 U.S.C. § 157 and N.Y. Lab. L. § 704. As previously noted, it is probable that DSNY blacklisted Demia, which explains the abrupt vanishing of the promotional opportunity with the other agency of the City after Demia accepted its offer.

~~282.~~298. But attempts to silence her, deny her due process, and interfere with her right to litigate also were apparent during cross-examination at the Section 72 hearing. The Three Attorneys attempted to circumvent the disciplinary process by directly asking Demia about the circumstances resulting in the Charges having been issued.

~~283.~~299. The evidence establishes that the Section 72 process is not intended to be disciplinary, irrespective of its misuse, but Emily Collins, an executive agency counsel assigned to the Department Advocate's Office (the "DAO"), inquired into Demia's medical examination by the Department, and whether she could be required to seek medical attention. *See* Ex. H. The DAO handles disciplinary matters for the Department, but Section 72 is not disciplinary in nature.

~~284.~~300. Ms. Collins also is suspected of being the author of the Charges. A simple reading of the Charges reveals that the Department failed to meet a *prima facie* case, and aware of this weakness, the Three Attorneys sought to save face by asking Demia whether she acted in a way as alleged by the Charges. Demia asserted her rights under NLRB v. Weingarten, 420 U.S. 251, which ensures a civil servant union representation during an interview that could result in a disciplinary action.

~~285.~~301. The Three Attorneys should have ceased with that line of questioning. They did not. Judge Hamilton should have prohibited the violation during the Section 72 hearing. She did not. The reviewers from the CSC should have recognized the significance of such a violation. They did not. If they did, then they willfully ignored it.

302. Considering the actions of these parties, reinstatement to Demia's previous position, a similar title, or preferential list is an inadequate and inappropriate remedy to right their wrongs. Reinstatement would result in return to a hostile work environment, irrespective of agency, because the impropriety is cancerous, spreading throughout agencies within the City. It also would mean that the defendants succeeded in denying Demia her title in violation of civil service laws. The law provides compensatory damages, including money expected to have been received from her pension after reaching the age of retirement, and punitive damages. The punitive damages must be sufficient to deter future misconduct. However, Demia sustained actual damages from the defendants encouraging the misuse of department resources to destroy and steal Demia's property, including money, and significantly interfering with her right to quiet enjoyment. She requests to be made whole for those acts as well.

## CLAIMS FOR RELIEF

303. First Claim for Relief. Repeating ¶¶ 134 – 9, Section 72 is facially deficient in ensuring due process protections, because this Court ordered the State to provide written notice of the physician's finding prior to an employee being placed in involuntary leave pursuant to that provision. The law as written requires a determination of fitness to be rendered by a "medical officer". A medical officer is not the same as a physician. A physician is licensed to practice medicine, but no such requirement exists for a medical officer. The only instance in which the use of a medical officer making such a decision would pass constitutional muster is if the person is in fact a physician. For that reason, Section 72 must define "medical officer", thereby establishing criteria similar to those imposed by other government entities or change the language to "physician" in lieu of "medical officer" as directed by this Court. Without such criteria, Section 72 fails to ensure due process as required by the Fourteenth Amendment.

304. Second Claim for Relief. Repeating ¶¶ 140 – 8, Section 72 runs afoul of the Fourteenth Amendment by explicitly alleviating the burden of following technical rules of evidence with respect to the hearing to determine an employee's fitness. Because it impacts a substantive right, a higher burden of proof must be met to fairly adjudicate that employee's status. The U.S. Supreme Court established that a higher burden of proof must be met when considering a waiver of constitutional rights. Miranda v. Arizona, 384 U.S. 436, 475 (1966). In those instances, the court weighs whether the burden of proof was met with clear and convincing evidence. Id. Clear and convincing is higher than a preponderance, and thus requires the presenting party to establish that a fact is highly and substantially more likely to be true.[28] Elimination of the technical rules of evidence as a requirement does not guarantee that the higher burden of proof is met. Even

[28] Steven H. Gifis, Law Dictionary 80 (Barron's Ed. Series, Inc. 1996).

if this Court declined to establish that the standard should be clear and convincing, it cannot be less than a preponderance of the evidence. Thus, Section 72 fails to guarantee due process by excluding technical rules of evidence, thereby permitting employers to meet a lower standard when impairing an employees' substantive right.

305. Third Claim for Relief. Repeating ¶¶ 140 – 8 and 304, C.P.L.R. § 7803(4) is an inappropriate standard when reviewing administrative decisions based on Section 72, because the statute demands that the court determine if the burdened party met the lesser standard of substantial evidence. With Section 72 impacting an employee's substantive rights, the employer must satisfy the evidentiary standard by a preponderance, at a minimum. Thus, C.P.L.R. § 7803(4) must be amended to impose the higher evidentiary standard when reviewing Section 72 in order to be constitutionally-compliant.

306. Fourth Claim for Relief. Repeating ¶¶ 149 – 65, the City, OATH, NYPD, Commr. Donlon, OSA, Judge Hamilton, Messrs. Parker, Shrier, and McCaffrey intentionally failed to comply with Section 72 hearing requirements in order to satisfy due process. Demia should have had a hearing within 30 days of initially being placed on leave and a determination within 75 days; however, Mr. McCaffrey, as NYPD's counsel, failed to secure a waiver of the 30-day Hearing and/or the 75-day Determination. In fact, he did not request a waiver until two (2) days before the scheduled conference and hearing, and the email communication on which he relied did not constitute a waiver. Messrs. Parker and Shrier, as OSA's representatives did not challenge that a waiver of the due process protections had not been filed, thereby allowing NYPD to deny Demia due process. Messrs. Parker and Shrier further colluded with Mr. McCaffrey to ensure Demia was not afforded such protections. Judge Hamilton, aware of the absence of waivers for the 30-day

Hearing and 75-day Determination, did not perform a proper inquiry and further request such information from OSA's representatives. Consequently, she was complicit in denying Demia's due process.

307. At any and all times, Judge Rehman as well as Cmmrs. Donlon, Tisch, and Gerber failed to implement adequate controls and supervision so that its staff did not intentionally ignore due process safeguards.

308. Fifth Claim for Relief. Repeating ¶¶ 166 – 9, Drs. Gille and Bloom violated Section 72 by deliberately finding Demia unfit to serve in her title without a disability diagnosis from a private practitioner. For that reason, it must be established that an employee must be diagnosed with a disability before an employer can find the employee unfit.

309. Sixth Claim for Relief. Repeating ¶¶ 166 – 9 and 308, Drs. Gille, Bloom, and Reddy willfully committed medical malpractice when Dr. Gille diagnosed Demia with a mental disorder without having a doctor-patient relationship with her or a license to practice medicine in the State; and Drs. Bloom and Reddy endorsed her diagnosis without conducting a medical examination independent of Dr. Gille and without having a doctor-patient relationship with Demia. *See* Ex. M.

310. Seventh Claim for Relief. Repeating ¶¶ 170 – 5, NYPD, by and through Dr. Gille and Mr. McCaffrey, intentionally violated Demia's right to free speech by citing her emails in which she complained about the intelligence resources abused by members in the Department to harass her as a basis for removing her pursuant to Section 72.

311. Eighth Claim for Relief. Repeating ¶¶ 176 – 82, DSNY and NYPD, by and through various members of the Department, including, but not limited to, Ewelina Piekut, Alfredo

Melian, Sgt. Rex Asiedu, Diana Farraggia, Melanie Braverman, Katherine Obanhein, James Haggerty, David Goldfarb, Robert Barrows, Mohammed Quhshi, Kevin Andrade, Jackie McMahon-Smith, and many more intentionally violated Demia's First Amendment right to freedom of religion by using the intelligence resources to harass and illegally surveil her, because the resources are religious in nature and do not align with Demia's faith.

312. At any and all times, Cmmrs. Lojan, Donlon, Tisch, and Gerber failed to implement adequate controls to prevent the abuse of such resources.

313. Ninth Claim for Relief. Repeating ¶¶ 87 – 133 and 183 – 7, DSNY, the DMV, the City, NYPD, Mr. McCaffrey, Ms. Abbas, Ms. Moccio, Mr. Andrade, Drs. Gille, Bloom, and Reddy, OATH, Judge Hamilton, the CSC, the Drafters of the CSC Final Determination, and many others intentionally violated Demia's Eighth Amendment right by participating in a plan to punish Demia for complaining about the abuse of the Department's intelligence resources.

314. At any and all times, Cmmrs. Lojan, Donlon, Tisch, Chaffetz, Gerber, and Chief ALJ Rehman failed to implement proper controls and supervision to ensure their staff did not abuse such resources.

315. Tenth Claim for Relief. Repeating ¶¶ 198 – 215, Demia's complaint regarding employees of the City violating her privacy by intentionally using the intelligence resources to gain entry to her person and home, thereby invading her privacy in violation of the Third Amendment. It is presumed that the culprits, of whom there were many, were not conducting a criminal investigation. In any event, when asked for a warrant, the culprits did not produce one.

316. At any and all times, Cmmrs. Donlon, Tisch, Gerber, and Lojan failed to implement the proper controls and supervision to ensure their staff did not intentionally violate privacy provisions.

317. Eleventh Claim for Relief. Repeating ¶¶ 188 – 97 and 315, to the extent that the culprits deliberately conducted a criminal investigation, their methods constituted an unreasonable search and seizure in violation of the Fourth Amendment.

318. Twelfth Claim for Relief. Repeating ¶¶ 217 – 19, the City, NYPD, DSNY, OATH, the CSC, the Drafters of the CSC Final Determination dated May 14, 2025 the Three Attorneys, and Judge Hamilton intentionally violated the State's Equal Rights Amendment by targeting Demia for her protected classes and forcing her out of the workforce.

319. At any and all times, Cmmrs. Donlon, Tisch, Gerber, Lojan, and Chaffetz as well as Chief ALJ Rehman failed to implement proper measures to ensure that their staff did not violate Demia's equal rights.

320. Thirteenth Claim for Relief. Repeating ¶¶ 227 – 94, the DMV, the City, NYPD, OATH, DSNY, Ms. Abbas, Mr. McCaffrey, Mr. Andrade, Mr. Barrows, UCS, Ms. Gibbs, OLR, Ms. Griffin, and many others violated Demia's Thirteenth Amendment right by denying her fundamental freedoms necessary to be a free person. Specifically, many members of NYPD abused Department resources that enabled them to control all aspects of Demia's life.By her being under 24/7 surveillance, she could not be free in her person.

321. Such control included illegal interception of wire communications, which was abused by several members of the Legal Bureau at NYPD and persons from the Mayor's

Office. They also hacked Demia's financial accounts, emails, and phone and intentionally manipulated the information.

322. The DMV and members from DSNY and NYPD interfered with Demia's right to travel by confiscating her vehicle, stealing her keys to her house and car, intercepting calls regarding payment to her insurance carrier, and unjustifiably suspending her license and registration.

323. The UCS, Ms. Gibbs, OLR, Ms. Griffin, OSA, Mr. Parker, NYPD, OATH, and the Three Attorneys interfered with Demia's right to litigate. UCS and Ms. Gibbs prevented her from proceeding in state court to seek reinstatement by deleting the case entirely from the system. OLR, NYPD, Mr. Parker, OSA, and Ms. Griffin colluded with each other to deny a hearing for Demia's grievance to remove charges blocking her promotion. OATH, Judge Hamilton, and the Three Attorneys disregarded traditional rules of trial practice by admitting into the record statements that were inconsistent and outright false. Additionally, Judge Hamilton failed to appreciate the dilemma with Demia representing herself in a case in which her mental state was at issue.

324. Mr. Andrade directly interfered with Demia's right to pursue education. He and other persons unduly influenced school personnel to deny Demia's entry onto the premises.

325. Unknown members of the City, NYPD, and DSNY colluded with other persons to interfere with Demia's right to quiet enjoyment of her property. By leveraging relationships in their networks, they included false charges on her utility bill, mortgage, cell phone bill, and tax statements.

326. With a perspective of slavery focused on control of an individual, the totality of these circumstances establishes that the defendants, in sum or part, violated Demia's Thirteenth Amendment right.

327. Fourteenth Claim for Relief. Repeating ¶¶ 38 – 44, 213, and 306, Cmmr. Gerber, OATH, Judge Hamilton, OSA, and Judge Hamilton violated 42 U.S.C. § 1986 ¶ by failing to prevent the constitutional violations cited herein. Cmmr. Gerber, as NYPD's legal authority and after receiving notification from Demia, failed to intervene with his staff to prevent their abuse of the Department's resources that were used to harass her and violate her civil liberties. OSA, Mr. Shrier, and Judge Hamilton failed to ensure due process protections in connection with the Section 72 process.

328. Fifteenth Claim for Relief, Repeating ¶¶ 38 – 44 and 306, DSNY, OSA, Messrs. Parker and Shrier as well as NYPD, by and through Mr. McCaffrey, intentionally colluded with each other to deny Demia's civil liberties in violation of 42 U.S.C. § 1985.

329. Sixteenth Claim for Relief. Repeating ¶¶ 295 – 302, unknown persons employed by the City, NYPD, and DSNY violated N.Y. Lab. L. 740 and N.Y.C. Admin. Code 20-1204 by retaliating against Demia for her exercise of protected activity.

330. Seventeenth Claim for Relief. OSA, DSNY, NYPD, and Messrs. Parker and Shrier violated the Taylor Law by colluding with each other to engage in unfair labor practices, including, but not limited to, blackballing Demia and intentionally throwing her Section 72 Hearing.

~~286.~~331. Eighteenth Claim for Relief. Repeating ¶¶ 295 – 302, OATH, Judge Hamilton, NYPD, and the Three Attorneys violated the Taylor Law, specifically Demia's

Weingarten Rights, by asking her a questing during her Section 72 Hearing that could have resulted in a disciplinary action and further persisting even though Demia insisted that her right was not waived. Mr. Parker was present to monitor only. Notice for adequate representation was not given, and the request was ignored. To the extent possible, these parties also violated 29 U.S.C. § 157 and N.Y. Lab. L. § 704 on the same grounds.

332. Nineteenth Claim for Relief. On June 22, 2025 c. 9:46 PM, Demia discovered a letter from OLR on her computer, but she had never seen the letter. The initial letter was a denial of holding a grievance hearing, because the Demia informed NYPD's labor counsel that she wanted to depose Emily Collins. At that point, he no longer wanted to move forward with the grievance hearing. At the time of this complaint, Demia has never attended a hearing for the grievance filed in connection with the Charges. She encountered significant interference (hacking) while revising this complaint. In any event, the letter from OLR imposed 45-day disciplinary penalty. Thus, OLR and the signatories of the letter, partially imaged below, violated due process by failing to give notice and opportunity for Demia to appear in connection with the Step III grievance.

Figure 1.



The City of New York

Office of Labor Relations
22 Cortlandt Street, New York, NY 10007
nyc.gov/olr

Renee Campion
*Commissioner*
Daniel Pollak
*First Deputy Commissioner*
Nicole Andrade
*General Counsel*

Claire Levitt
*Deputy Commissioner*
*Health Care Strategy*
Georgette Gestely
*Director, Employee Benefits Program*

July 22, 2025

**Sent via Email**

**Step III Reply**

Demia Shymanksy
*Pro Se* Grievant

OLR No. 54171
Demia Shymanksy
Associate Staff Analyst
New York City Police Department
(Disciplinary – 45-Day Suspension)

Dear Ms. Shymansky:

On July 18, 2023, the Office of Labor Relations ("OLR") received a request from Demia Shymansky ("Grievant") for Step III review of the above-referenced matter.[1] The grievance alleges that the New York City Police Department ("NYPD" or "Department") wrongfully disciplined Grievant in violation of "Administrative Guide §319-12 and Article VI, Section 2 of the Staff Analysts Agreement." The grievance does not specify the relief sought.



~~287.~~333. The above image evidences the defendants' falsification of documents, illegal interception of wire communication, computer-related fraud, and an array of other felonies. However, this case only concerns the constitutional violations.

Figure 2.

of this Agreement.

**Section 2.**

The grievance procedure shall be as follows:

**STEP I** The employee and/or the Union shall present the grievance in writing to the person designated by the agency head for such purpose, not later than one hundred twenty (120) days after the date on which the grievance arose. The employee may also request an appointment to discuss the grievance. The person designated to hear the grievance shall take any steps necessary to a proper disposition of the grievance and shall reply in writing by the end of the third workday, following the date of submission.

**STEP II** An appeal from an unsatisfactory determination at STEP I shall be presented in writing to the agency head or the agency head's designated representative, who shall not be the same person designated in STEP I. The appeal must be made within five (5) working days of the receipt of the Step I determination. The agency head or the agency head's designated representative if any, shall meet with the employee and/or the Union for review of the grievance and shall issue a written determination by the end of the tenth workday following the date on which the appeal was filed.

**STEP III** An appeal from an unsatisfactory determination at STEP II shall be presented by the employee and/or the Union to the Commissioner of Labor Relations in writing, within ten (10) working days of the receipt of the STEP II determination. Copies of such appeals shall be sent to the agency head. The Commissioner of Labor Relations, or the Commissioner's designee shall review all such appeals from STEP II determinations and shall make and issue a written determination within fifteen (15) working days following the date on which the appeal was filed.

**STEP IV** An appeal from an unsatisfactory determination at STEP III may be brought solely by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) working days of receipt of the STEP III determination. In addition, the Employer shall have the right to bring directly to arbitration any dispute between the parties concerning any matter defined herein as a "grievance." The Employer shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining. A copy of the notice requesting impartial arbitration shall be forwarded to the opposing party. The arbitration shall be conducted in accordance with the Title 61 of the Rules of the City Of New York (formerly referred to as the Consolidated Rules of the Office of Collective Bargaining). The costs and fees of such arbitration shall be borne equally by the Union and the Employer.

[INTENTIONALLY LEFT BLANK]

## CONCLUSION

Two Notices of Claim were filed with the City – (i) Oct. 2023 and (ii) Oct. 2024. The facts cited herein cover the allegations set forth in the Notices of Claim. To the extent some of the causes of action cannot be adjudicated in this Court, Demia reserves her right to seek redress in the proper court and/or jurisdiction.[29]

Additionally, the facts recited herein violate Demia's civil rights, and certain violations are properly challenged via a Title VII action. However, a Right to Sue letter was not issued to permit the commencement of such action. Upon information and belief, the defendants, in sum or part, intercepted Demia's communication and impersonated federal personnel to prevent such filing. Furthermore, this complaint is not an attempt to circumvent bringing a proper Title VII case against the defendants, but rather a genuine request for judicial review of the defendants' actions to compensate Demia as a victim and prevent continuation of unconstitutional practices for subsequent parties.

WHEREFORE, Demia respectfully requests that this Court grant the following relief:

(i) A declaration that Section 72 is facially unconstitutional for failing to guarantee civil servants due process and further direct the State to adopt statutory language that will make Section 72 compliant with this Court's directive;

[29] Please note that at the time of drafting this complaint, the plaintiff was subjected to egregious forms of harassment. Upon information and belief, the defendants employed alternative methods, including but not limited to covert hypnosis.

~~(i)~~(ii) A declaration that the technical rules of evidence must be followed in connection with Section 72 proceedings to ensure due process, and thus, the statute must be modified accordingly;

~~(ii)~~(iii) A determination~~eclaration~~ that Section 72 as applied to Demia is unconstitutional for violating her right to due process;

~~(iii)~~(iv) A declaration that the substantial evidence standard mandated by C.P.L.R. § 7803(4) is unconstitutional when applied to judicial review of Section 72 proceedings and the statute must be modified accordingly;

~~(iv)~~(v) An injunction prohibiting the use of Section 72 until the proper due process safeguards have been implemented;

~~(v)~~(vi) A declaration that the use of any and all religious or occultic methods as a form of intelligence gathering or conducting investigations within government agencies, especially the City, shall be unconstitutional unless parties have obtained judicial authority for a specific matter;

~~(vi)~~(vii) A declaration that the use of any and all religious or occultic methods as a form of punishment within government agencies, especially the City, including, but not limited to, administrative discipline, shall be unconstitutional;

~~(vii)~~(viii) A declaration that the defendants' distribution of any intelligence material to non-law enforcement personnel shall be prohibited and further use of such methods shall be subject to federal review;

(ix) A finding that the defendants violated Demia's constitutional protections granted by the First, Third, Fourth, Eighth, Thirteenth, and Fourteenth Amendments of the U.S. Constitution;

~~(viii)~~(x) A finding that the defendants violated Demia's rights granted by the State's Equal Rights Amendment;

~~(ix)~~(xi) An award of monetary damages for the violations cited herein;

~~(x)~~(xii) An award of monetary damages to compensate for lost salary and benefits, including future pension payments, and to restore any and all property damaged during the use of intelligence resources maintained by the City;

~~(xi)~~(xiii) Such other and further relief that this Court deems just and proper, including but not limited to, damages for intentional infliction of emotional distress.[30]

Dated: ~~December 30, 2025~~June 22, 2026
New York, New York

By: ______________________
DEMIA SHYMANSKY

[30] Please excuse any errors. While preparing this document, the defendants and/or their representatives intentionally hacked~~accessed~~ the author's personal computer and modified documents. ~~.~~