# EXHIBIT G

*(N.Y. Daily News Report and State of California Research)*

## *The Occult Debate: Issue #6*
## *AdultVictims of Ritualistic Abuse - Survivors or Delusionaries?*

**The veracity has been questioned of an increasing number of adults who call themselves survivors of Satanic ritual abuse. Those who support the survivor theory believe survivors are raised within a Satanic group where they are ritualistically and repeatedly victimized, survive, and later leave the group where they continue their lives under the fear of discovery and death. Proponents of the delusionary theory believe those who claim to have survived Satanic ritualized abuse are really disturbed, delusionary people who adopted Satanic fantasies for a variety of reasons.**

***Hypothesis:* Survivors are victims of ritualistic abuse who have "survived" to tell their stories.**

Proponents believe survivor descriptions of intra-familial and extrafamilial ritualistic abuse which they feel pose a threat to the social and spiritual fabric of American life. Among the primary survivor claims are that victims are either born into the group, obtained for the group's use, or are actively recruited into a coven; no physical evidence can be found because perpetrators use ritual dismemberment, cannibalism and group-controlled crematoriums to dispose of bodies; some women are forced to become breeders, conceiving undocumented children who are then sacrificed or bred for other group purposes; the groups continue to flourish because they are protected by members who have infiltrated every level of society and government and because they are breeding new members to infiltrate the next generation of professionals; those who leave must go into hiding to avoid being murdered by members of the group.

Psychiatrist Roland Summit feels the "strongest corroboration of the reality of ritual abuse comes from an increasing number of adult survivors." (Summit, 1988:6.)

Lieutenant Larry Jones of the Boise Police Department and Director of CCIN, the Cult Crime Impact Network, believes that those who discredit the claims of ritualistic abuse are "full of garbage! We have recovered ritually killed babies in Connecticut, Bend, Oregon and in Los Angeles...when you add to that the credible testimony of the survivors which can be circumstantially verified, there can be very little question." (Jones interview, May 8, 1989.)

Counselor Sharon Jackson with the Christian counseling group, Motivation Unlimited, says survivors offer the best intelligence if "you help them separate truth from fear - they are rightfully paranoid...The problem is that mental health usually prods the victim, tainting much of the badly-needed, pristine information for law enforcement." (Jackson interview, May 16, 1989.)

***Hypothesis:* Because there is no physical evidence to support "survivor" stories, many alleged victims may actually be disturbed, delusionary people who have adopted Satanic fantasies for any number of reasons.**

Proponents believe self-proclaimed survivors were physically, sexually, and/or psychologically abused as children - but not by members of organized Satanic cults. Survivor belief in Satanic ritualistic abuse was, instead, obtained through inadvertent therapist coaching and reading books by other survivors. Their skepticism is based upon several things that make it impossible for law enforcers to use survivor experiences: no survivor has produced any physical evidence of their claims; some victims' stories are inconsistently related from setting to setting; many self-proclaimed survivors are victims of Multiple Personality Disorder (MPD) who have an incomplete and sometimes inaccurate perception of reality; therapists are trained to believe their clients, not to check their veracity; some therapists inadvertently suggest information to clients that are built into their sense of reality. Among these proponents are:

Psychiatric Anthropologist Mulhern from the University of Paris has studied many survivor cases and has examined some of the psychiatric records of Michelle Smith's sessions with Dr. Pazder. She claims Smith's memories were "contaminated" by Pazder's suggestions of Satanic involvement. Further, she says that in hypnotic therapy, the hynotizer has difficulty avoiding suggestive material. If suggestion is used, when the patient comes out of the trance, he or she "will have an unshakeable belief" in the story constructed during the session, regardless of whether it is reality or fantasy. In most cases, Mulhern feels the survivor stories most often represent fantasy. (As quoted in Nathan, 1989.)

Dr. Richard Ofshe, UC Berkeley Sociology professor, provides expert testimony in occult and cult related cases across the nation. He claims many therapists "come from a Fundamentalist Christian perspective and are ideologically driven to find that their patient has been a 'survivor' of Satanic abuse. Through their suggestions, clients can unintentionally develop a whole new personality, an unremembered identity." Additionally, Ofshe contends, "some clients who are especially insecure will continue to tell their therapists about Satanic abuse because they know it is pleasing to their therapist." (Ofshe interview, May 10, 1989.)

**_The Occult Debate: Issue #7_**
**_Child Victims of Ritualistic Crime - Abused or Indoctrinated?_**

**As Jon Conte, President of the American Professional Society on the Abuse of Children recently remarked, believing or not believing the children who claim they are victims of occult-related ritualistic abuse has polarized the therapeutic community. "It's become a litmus test. If you believe, you're for kids; if you're not, your motivation is wanting." On the one side are those who believe the children have been ritualistically abused and their stories are accurate depictions of such abuse. On the other side are those who don't necessarily think they are lying, but rather, they believe the children have been indoctrinated by untrained and/or overzealous therapists and through media accounts of ritual abuse.**

***Hypothesis:*** ***Child survivors have been ritualistically abused by Satanic groups.*** Proponents are vociferous in their support of the child victims, claiming that until children can be considered reliable, ritual abuse will continue to flourish. For example:

Dr. Roland Summit says "there is *no* scientific support for the notion that children conjure up elaborate accounts of victimization to please their examiners... no logical basis for the presumption that children are so perceptive and so imaginative that they can take the cue from a question or an anatomically specific doll and then draw from the examiner's mind an explicit narrative of the most unheard-of and exotic perversities, including patterns of adult behavior not only unknown to children but to most clinicians as well. Any logical support for the indoctrination theory must explain how these exotic stories, unfamiliar even to the examiners, prove to match the best available knowledge of cult activities drawn from such diverse sources as ancient documents and the accounts of adult survivors of rituals practiced on an earlier generation of children. And if it *were* possible for examiners to cue children into false accounts, why would these examiners induce stories which they couldn't themselves believe, and which they knew would be unbelievable to their supervisors?" (Summit, 1988.)

Therapist Noel Plourde has worked with over 100 individual child victims of multi-victims, multi-perpetrators situations and over 200 individuals involved in therapy and support groups dealing with the same problem. She believes the problem is widespread, "although not prevalent in every community" and that the children must be believed because "of the nature of their disclosures and their effect, particularly the level of ongoing fear that is found in these children." While there is little physical evidence, a great deal of "emotional evidence exists that matches the disclosure content." (Plourde interview, May 18, 1989.)

Joy Byers, with the National Committee for the Prevention of Child Abuse, recently told a journalist that "children don't have the expertise that would give them the knowledge that they could make up stories of sexual abuse, sexual acts." (Charlier, 1988.)

***Hypothesis:*** ***Children who claim they have been ritualistically abused by Satanic groups have been indoctrinated by untrained and/or overzealous therapists and through media accounts of ritual abuse.*** Proponents believe the children have been misled by emotionally-involved therapists or by unsubstantiated "urban legends" passed down through the media. These proponents aim much of their criticism at the therapeutic community, claiming not that therapists are incompetent, but that they are either untrained or too biased to treat children who are allegedly ritualistically abused. For example:

Kenneth Lanning of the FBI feels many therapists have not had adequate experience with severely traumatized children or those abused by multiple offenders who threatened them with violence or death to control them. Some "tend not be very objective; they are too emotionally involved." Further, because of the lack of well-researched materials on the topic, therapists use manuals "written by law enforcement officers" which are too often full of inaccuracies, perceptions and opinions rather than facts. (Lanning Interview, April 1989.)

Child Psychiatrist Lee Coleman believes some children are "literally being trained by professionals to believe they have been molested... Children seldom 'lie' about such things, but they may be manipulated by adults into believing things that never happened." After reviewing 200 hours of interview tapes with children suspected of being molested, Dr. Coleman found a clear pattern. "The interviewers assume, before talking with the child, that molestation has taken place. The accused persons are assumed to be guilty, and the thinly disguised purpose of the interview is to get something out of the child to confirm these suspicions...I see children so horribly manipulated by our investigative system that they begin to believe what interviewers keep suggesting to them, even to the point of creating in their little minds murders which never took place, and - yes - imagining satanic cults." (Coleman, 1986.)

Psychiatrist G. Christian Harris, President of the Seattle Chapter of the American Psychiatric Association, warns that therapists are often "too gullible," are willing to "hop on the bandwagon" without adequate training, and that because their training teaches them to listen to and believe patients, they are ill-equipped to make judgments about evidence and truth. (as quoted in Gerlernter, 1989.)

## CHAPTER THREE
## INVESTIGATING OCCULT CRIME: THE LAW ENFORCEMENT PERSPECTIVE

Law enforcers are in a unique and certainly not enviable position in regard to occult crime. They must deal with an issue that is highly emotional and spiritual in nature - yet, they cannot afford to let their emotions or spiritual convictions enter into the lawful response required by their profession. Clearly, as the preceding two chapters indicate, law enforcers must focus their attention on *the criminal act*, not on the perpetrator's belief system. In short, he or she must *listen* to complainants, not *believe* them.

Indeed, as FBI Supervisory Special Agent Kenneth Lanning has remarked "As difficult as it might be, police officers must separate the religious and law enforcement perspectives when they are lecturing or investigating in their official capacities as law enforcement officers...The religious beliefs of officers should provide spiritual strength and support for them, but not affect the objectivity and professionalism of the investigation." (Lanning, 1989:19-20.) Thus, they should "stick to the Constitutional basics" by "investigating irregular behavior based on a well-founded and legally-defined reasonable suspicion and arresting based on probable cause." (Hicks, June 1989:26.)

Any crime requires an objective assessment, and occult crime is no exception. Nonetheless, few contemporary issues have so confounded and divided the law enforcement community than that of occult crime. This chapter seeks to alleviate the confusion and mitigate the divisive factors. As such, it identifies the barriers to dealing with occult crime; examines the roles law enforcers must assume in regard to occult crime; and provides the law enforcement community with resources for further information and assistance.

### Barriers to Law Enforcement Involvement in Occult Crime

Before any law enforcement officer comes face-to-face with allegations or actual instances of occult-related crime, he or she should be aware of the wide array of barriers discussed below which can and often will confuse and even overwhelm law enforcement functions.

First, criminal justice practitioners and therapists familar with occult groups sharply disagree about many issues surrounding occult crime. Among the most heatedly-debated points, as Chapters One and Two illustrate, are the actual extent of occult crime, the motives of occultists involved in criminal activity, and the veracity of self-professed "survivors". Not surprisingly, such disagreement will affect any law enforcement approach to an alleged occult-related criminal incident.

Second, many law enforcement agencies are unclear about how to actually handle an alleged occult crime case. Likely questions faced by any department include: Should law enforcers handle the crime differently than any other crime? What resources should be devoted to training officers and providing specialized knowledge about occult crime? And perhaps most importantly, what are the appropriate roles for law enforcers to play in a crime that may have religious connotations? Indeed, because most occult activities are protected under the First Amendment guaranteeing freedom of religion, many law enforcement agencies are reluctant to pursue the occult factor during any phase of an investigation.

Third, traditional intelligence operations do not work very well with occultists. Because occult groups have been historically persecuted for their beliefs, most ceremonies and rituals are highly secretive and, therefore, difficult to penetrate. However, the biggest barrier to traditional intelligence is that most occultists require all group members to participate in their rituals. In most cases, law enforcers would be morally and legally prohibited from such participation.

Fourth, many people both within and without law enforcement circles are either skeptical about the existence of occult activities or absolutely deny the existence of any criminal links. While a certain amount of skepticism may actually be beneficial to an investigation, such skepticism can also prohibit an investigation from getting "off the ground."

Fifth, the law enforcer's own personal and spiritual belief system may inhibit an objective handling of the case. Investigating crimes that are both morally and spiritually repugnant - such as grave robberies, church desecration, and ritualistic abuse - may prevent the law enforcer from objectively handling evidence and may make him or her overly fearful of involvement in this type of case.

Sixth, law enforcers who receive specialized training in occult crime may become what some people have called "oversensitized" to this type of criminal activity. The possibility increases that he or she will *expect* an occult encounter, and when confronted with unexpected or inexplicable information, may interpret it along the new lines of expectations.

Seventh, law enforcement investigators may spend a great deal of time linking the commission of a crime to an occult belief system, only to find the prosecutor and/or an expert witness recommending the link be ignored or discredited in a jury trial. In many cases where occult links have been alleged, prosecutors are not presenting such ties to the juries, arguing such evidence is circumstantial at best and that juries simply will not accept the existence of such evil-minded crimes.



AF-45
R00570

Any investigator faced with an alleged occult crime must be prepared to face these barriers and to devise some sort of strategy to overcome each hurdle as it arises.

## The Law Enforcement Role

So just what are the law enforcer's roles in regard to occult crime? The major occult-related law enforcement roles can be logically placed into two functional categories of policing: maintaining order and enforcing the law.

- Maintaining order - law enforcers may be called upon to provide a *protection role* to maintain the public order.
- Enforcing the law - law enforcers may be involved in an *investigation role* to enforce the law and help bring a suspect to trial.

### Protection Role

As bizarre as it may seem to some law enforcers, they may be called upon to provide security for an occult ceremonial gathering if members have been threatened, persecuted or intimidated by other citizens. Such requests are rare primarily because most occultists - especially Satanists and Cultural Spiritualists - generally meet in secret locations which are rarely known to either the general public or law enforcement. It is somewhat more common for law enforcers to provide such protection for Neo-Pagan festivals which sometimes are held in communities where citizens are radically opposed to the belief and behavior systems of the celebrants. In these cases, it becomes the law enforcer's job to protect the peace of the greater community by "keeping the lid" on any potential confrontations between participants and citizens who may misunderstand and fear the event and what it represents.

The protection role can and does present a real problem for some law enforcers.

First, if they are unfamilar with the belief systems of the particular group, their law enforcement role and possible actions may be tainted by personal perceptions, and perhaps, by the misunderstanding and fear shared by other citizens.

Second, if they are familiar with, but morally and/or spiritually opposed to, the group's belief system, their actions also run the risk of being subjectively tainted.

At least one recent study examined police perceptions of persons with occult belief systems as well as the perceptions of such practitioners about the police, finding that "we have a situation in which two antagonistic groups are perceiving each other through a morass of expectations and associated legends. Their preconceptions of each other consequently influence their actions in regard to the other, and their interpretations of the opposing group's behavior." (Guinee, 1987:16.) The accompanying box provides an example of how such misinterpretation and misinformation can be blown out of proportion, thus becoming a major law enforcement problem.

So what should law enforcers do in this situation? The options presented below are strikingly similar to those available to law enforcers involved with any gathering of activists —Ku Klux Klan, the American Nazi Party, or gay rights activists—whose belief systems and behavior may cause the greater community to react fearfully and perhaps criminally.

First and foremost, if a law enforcer's personal religious convictions conflict with those of the group he or she is assigned to protect, then it is his or her professional obligation to decide whether they can objectively handle the case.

Second, if the assigned officers have enough lead time prior to the event, they can learn about the group's beliefs, behaviors, symbols, and rituals. Such information can be quickly gained from several sources: another officer in the department who has attended an occult training seminar; a phone call to a law enforcement specialist in another jurisdiction or to a specializing organization (see the resource section at the end of this chapter for such individuals); or direct but friendly contact with a member of the group in which the officer states his or her educational rather than enforcement mission.

Third, again if time is available and if the community is one in which this approach would "work", the department can sponsor a community meeting inviting interested members to learn and ask questions about the group's belief system, activities, symbols and rituals to try and dispell fears and possible confrontations, as well as contain rumors.

### Investigation Role

Since occult crime has only recently become a specialized area of criminal activity, law enforcers are gradually learning how to approach an investigation. .Thus, there are some important points to keep in mind prior to conducting any investigation.

First, investigators are obligated to address the issue of the perpetrator's occult affiliation *only if it is clear that the crime was committed in direct relation to his or her belief system.*

Second, as veteran investigator Sandi Gallant says, there is really only one thing that "has become abundantly clear" about occult crime investigation: "traditional investigative responses have not provided clear cut answers in these cases." (Gallant, 1988.) In other words, if traditional methods of investigation are used, law enforcers get locked into traditional responses. Officer Gallant suggests that law enforcers have to



AF-46

R00571

**Antagonistic Viewpoints: A Law Enforcement Problem**

Folklorist William Guinee studied the reactions of the law enforcement, religious, and pagan communities to a "pan pagan festival" sponsored by the Elf Lore Family (ELF) and attended by about 140 Neo-Pagans between September 20-22, 1985 in Yellowwood Forest near Nashville, Tennessee. Law enforcers assigned to provide security did not receive pre-festival preparation or education, nor did the ELF family try to educate or allay possible law enforcement prejudices. Guinee's study illustrates how the preconceptions of each group influences the other groups' actions, ultimately causing problems within the community that may have been avoided.

***Reactions to the Event...***

"ELF customarily doesn't advertise the location of its festivals until very late to avoid the arrival of too many people who have not registered and to avoid harassment by the police. This secrecy was interpreted as suspicious by the police, and their suspicions were reconfirmed by the presence of people in robes, unusual symbols, and dancing around a fire. The response of the police to this information was to carefully monitor the activities of the gathering from a distance. This observation was interpreted by members of ELF as harassment and the impression was reinforced by the policemen's fear of getting too close to the gathering...

Members of Pastor James Brown's congregation became so concerned about the 'Satan worshippers' in the forest that they took what they considered to be a humane and Christian action. They decided to illuminate the pagans to the dangers of having converse with the Devil...Out of a very large stock of religious literature, they chose two tracts which whey felt were particularly applicable to the current situation: 'Satan; the god of this world' and 'The Burning Hell: Tortured Lost Souls Burning Forever!' The Baptists then...drove rapidly past the campsite, which was right next to the road, and threw the tracts out the window. The neo-paganists didn't respond favorably to this action. As one of them told me 'we hate having people say that we are damned.' Furthermore, the ELF family professses a tremendous concern for the environment and their handout warned participants not to litter...So the neo-pagans picked up the tracts and threw them in the fire...The burning of religious tracts could not have been favorably interpreted by the watching Baptists...

The interaction between neo-pagans, Christians, and the police was consistently motivated by preconceptions, and served only to further validate those preconceptions on all sides. Each side seemed to participate only in a world of their own creation. Without intending to do so, each group reconfirmed the antagonism of their rivals."

***Accounts of Neo-Pagan Activity***

"All accounts have certain features in common: there were a large number of people in the park for the weekend; they played music; they stood in a large circle around a fire; symbols were displayed by at least some of those present. Beyond these minimal features there seems to be only disagreement.

*Deputy Walls* noticed a large number of specific occurrences which he interpreted as signifying practices of devil worship. Walls saw people drinking blood, eating raw meat, dancing around the flames naked in a triple wedding ceremony, wearing devil-like costumes and having a ceremony with burning candles in the graveyard...

*Conservation Officer Dave Phelps,* Walls' colleague, saw almost none of these things. The most he saw was a large group of people holding hands, dancing, and yelling around a large fire. Phelps had very few complaints with the group: they should have covered over their fire pit a little better when they left; they may have been slightly too noisy after the park's quiet hour of 11:00 p.m. Phelps specifically states that he never felt that the participants were engaged in Satanism...

*Pastor James Brown* also saw some things which he interpreted as suspicious. He saw people dressed in red and black outfits, a six-sided star in a circle, three scantily clad women, and something which might have been a candle on a tombstone. Brown also saw the performances of what he calls 'their services'...and concluded that the power behind such gatherings must be satanic...

*Terry Whitefeather,* leader of ELF, absolutely denies the presence of several of the items described by Walls such as the eating of raw meat, drinking of blood, and naked dancing. Whitefeather denies the charges of 'Satanism' which he claims is only a perversion of Christianity and has nothing to do with his group at all."

Source: William Guinee, "Satanism in Yellowwood Forest: The Interdependence of Antagonistic Worldviews." *Indiana Folklore and Oral History*, Vol. 16, No. 1 (January-June 1987):3-5; 15-17.

"think as the perpetrator would think; you need to recognize that logical/rational thinking will not work. This is *your* state of mind, but not that of the perpetrators." (Gallant interview, April 3, 1989.)

Third, as Michael O'Connor of the San Diego Sheriff's Department states, "Don't ever investigate alone. This is no time to be macho. It is wise to remember, these people are smart and they can definitely outsmart us!" (O'Connor Seminar, August 16, 1989.)

Fourth, without some understanding of occult belief systems and rituals, the crime scene investigator will be at a loss. As Sgt. Richard Valdemar of the Los Angeles Sheriff's Department relates, "It's like taking a notebook to a murder scene and not writing down the essential information because you just plain missed it! The average detective is going to miss a lot because he's not familar with the information." (Valdemar, May 23, 1989.)

Once the investigator is aware of these points, then he or she is ready to embark upon a series of investigatory strategies.

## Investigatory Strategies

Currently, many "occult investigators" have identified at least four primary keys to investigations that may contribute to a successful prosecution: recognizing occult symbols and rituals at the crime scene; compiling a comprehensive search warrant that may lead to further physical evidence; conducting a carefully planned investigation of an alleged occult crime; and planning and implementing a specific investigation strategy for ritualistic child abuse crimes related to the occult. The following investigative suggestions within each of these four areas represents the combined knowledge many experienced "occult cops" shared with the author.

### Recognizing Occult Symbols and Rituals at the Crime Scene

If the on-scene investigator is called to an alleged occult crime, there are several important points he or she must keep in mind:

- At least one crime scene investigator should be familiar with the outward, physical symbols used in various occult rituals.

- If no one in the department has investigated an alleged occult crime, the participation of an outside law enforcement consultant should be obtained.

- The investigator is not responsible for interpreting the meaning of any symbols; he or she only records their existence at the crime scene.

- Finding any or all clues listed in this study does not prove a link between occult activity and occult-motivated crime.

Law enforcers who have investigated occult crimes find that the following *general* clues indicate the possibility that some kind of occult ritual may have been involved in the crime. Again, to ascertain the possibility of an actual occult connection, other professional expertise should be obtained.

### *Occult Crime Scene Clues*

An alleged occult crime scene should not be handled any differently than other crime scenes. Thus, although the crime scene clues offered below are not much different than those recruits learn at the academy, they are included as a basic investigatory review tool.

At the scene of any crime, the following items and symbols will provide clues to possible occult involvement.

*Crime Scene Clues - Outside or Inside*

- animal bodies that have been mutilated;
- human bodies that have been decapitated, mutilated, or branded with symbols;
- human and animal organs that have been removed, such as the head, heart, tongue, eyes and digits;
- human and animal bodies that have been drained of blood or cannibalized;
- waxes, powders, oils on or around a body or crime scene area;
- religious artifacts such as altars, candles, chalices;
- symbols such as inverted crosses, pentagrams, inverted pentagrams;
- a circle, eight feet in diameter which may or may not contain a pentagram;
- graffiti and the use of specific colors included in any symbols;
- messages written in blood.

*Crimes Scene Clues - Inside*

- bottles of small vials of what may appear to be blood, found in refrigerator;
- hypodermic needles used to remove blood from animals and humans;
- animal or human body parts, found in freezers;
- occult books;
- handwritten occult essays or poetry;
- writings in a non-discernable alphabet;
- handmade drawings of occult symbols;
- drawings or photographs of victims;
- calendars with peculiar days marked;
- computer bulletin boards tied to the occult.

### *Occult-Related Homicide Crime Scene Clues*

The following questions should be addressed in an alleged occult-related homicide. Pictures and notations should be taken of anything that is considered significant.

- What is the location of the cadaver?
- What is the physical position of the cadaver?

**Law Enforcement Officers with Expertise in Satanic Crime**

***The following law enforcement officers have conducted investigations related to the occult. Some officers have specialized knowledge in certain areas which are indicated in parenthesis.***

Officer Timothy B. Boyle
Public Information Officer
Maryland National Capitol Park Police
Silver Springs, MD 20906 (301) 949-8010
(Experience with juvenile practitioners)

Sergeant Randy Emon
Baldwin Park Police Department
14403 East Pacific Avenue
Baldwin Park, CA 91706 (818) 960-4011
(*Director, Christian Officers Investigation Network)

Officer Sandi Gallant, Special Investigations
San Francisco Police Department
850 Bryant Street
San Francisco, CA 94103 (415) 553-1133
(Conducts training seminars)

Detective Kurt Jackson
Beaumont Police Department
660 Orange Avenue
Beaumont, CA 92223 (714) 845-1161

Lt. Larry Jones
Boise Police Department, Criminal Investigation
7200 Barrister Drive
Boise, ID 83704 (208) 377-6606
(Director, Cult Crime Investigators Network)

Kenneth Lanning, Supervisory Special Agent
Federal Bureau of Investigation, FBI Academy
Quantico, VA 22135 (703) 640-1191
(Ask for a copy of his paper,*Satanic, Occult, Ritualistic Crime: Law Enforceent Perspective.)*

Officer Rick Martinez
Fountain Valley Police Department
10200 Slater Avenue
Fountain Valley, CA 92708 (714) 965-4486
(Conducts training seminars)

Detective Patrick Metoyer
Criminal Conspiracy Section
Los Angeles Police Department
150 N. Los Angeles Street
Los Angeles, CA 90012 (213) 485-2962

Detective Michael O'Connor
San Diego Sheriff's Dept., Juvenile Services
3240 Main Street
Lemon Grove, CA 92045 (619) 441-4034

Sgt. Richard Valdemar
Los Angeles Sheriff's Department
11515 Colima Road
Whittier, CA 90604
(213) 946-7131

***The following individuals have conducted research about Satanic activity and/or crime.***

Dr. David Bromley
Department of Sociology/Anthropology
Virginia Commonwealth University, Box 2040
Richmond, VA 23284 (804) 367-1026

Robert Hicks, Criminal Justice Analyst
Law Enforcement Section
Dept. of Criminal Justice Services
Commonwealth of Virginia
805 East Broad Street
Richmond, VA 23219 (804) 786-8421
(Former police officer)

Dr. Martin Sanchez Jankowski, Professor
Department of Sociology
University of California
Berkeley, CA 94720 (415) 642-4297

Larry Kahaner
P.O. Box 2732
Alexandria, VA 22301 (202) 548-1532
(author, *Cults That Kill)*

Stephen E. Squire
Librarian
Dept. of Criminal Justice Services
Commonwealth of Virginia
805 East Broad Street
Richmond, VA 23219 (804) 786-8478

Dr. Jeffrey Victor, Dept. of Anthropology
University of Buffalo, 380 MFAC
Ellicott Complex
Buffalo, NY 14261 (716) 636-2414

- Are any parts missing from the cadaver?
- Is the cadaver dressed or undressed?
- Does the cadaver have any cuts, slashes, teeth marks, or stab wounds? How many? Is there a particular pattern?
- Are there any tattoos or ink marks on the cadaver and are they any particular pattern or color?
- Has the cadaver been painted with any substance or spray paint and is the paint a particular color?

- Has the cadaver been branded or burned and is there a particular pattern?
- Are there any jewelry, charms, stones, talismen or amulets on or near the cadaver?
- Is there any evidence that jewelry is missing from the cadaver?
- Is there any colored string near the cadaver?
- Are there any occult ritual items or artifacts on or near the cadaver?
- Are there any oils, incense, perfumes, or potions poured or rubbed on the body?
- Are there any candle wax drippings on or near the cadaver? In any particular location, color and number?
- Are there any animal or human feces on the upper part of the cadaver, and is there any evidence such substances have been consumed?
- Is there evidence that hands or feet have been tied or shackled?
- Is there any sign of semen on or near the cadaver?

While they are not within the jurisdiction of an on-the-scene officer, four other signs should be checked during the autopsy:

- Is there evidence of urine, feces, drugs, wine or other substances having been ingested?
- Is there evidence that smoke, water or blood has been collected in the lungs?
- Is blood absent from the cadaver?
- Is there any sign of semen in the cadaver?

## Symbols Used by Various Occult Practitioners

The presence of symbols *specific* to an occult belief system may indicate that rituals were used by Neo-Pagan, Wiccan, *Santerian, Palo Mayombe*, or Satanic practitioners.

### *Rituals and Symbols Used by Pagans and Wiccans*

As mentioned above, Neo-Pagans and Wiccans as a group rarely are involved in criminal activity directly connected to their beliefs. This, however, does not preclude the need for law enforcers to be familiar with their basic symbols and rituals; indeed, such familiarity may be even more important because it can help eliminate certain suspects during an occult investigation. The primary symbols and rituals involved in many Neo-Pagan and Wiccan covens are described in the box, "Casting the Wiccan Circle."

### *Rituals and Symbols Used in Santeria*

The primary problem *Santeria* presents for law enforcers is the absence of standardized ceremonies or rituals. The only known ritual and ceremonial consistency is that altars of some sort are set up in homes where rites consisting of one or two people take place, or ceremonies consisting of two or more people occur. In essense, the rituals are of each *santero's* own making. He or she uses different animals and interprets the needs and orders of the *orishas* as they see fit; there is no consistency.

Thus, animal remains are difficult if not impossible to relate to a particular ritual or ceremony. According to specialist Marc Paulhus of the Humane Society of the United States, "Nobody can reliably look at animal remains and make an interpretation. No *santero* can interpret the sacrificial remains of another *santero*. Anyone who tells you any differently is kidding himself." (Paulhus, August 16, 1989.)

What law enforcers can do, however, is learn which ritualistic items are most often used in rites and ceremonies:

- herbs, roots, flowers;
- pieces of fruit, especially coconut, oranges and apples;
- parts of Ceiba tree, or palm and cedar substitutions;
- clothing in colors preferred by the *orishas;*
- pennies in multiples of seven;
- sacrificial animals and birds;
- animal blood and feathers;
- body oils;
- sea shells;
- corn kernels;
- iron tools.

The particular colors, symbols and sacrificial foods required to propitiate the *Santerian* gods are explained in the *Syncretisms Compared* table.

### *Rituals and Symbols Used in Palo Mayombe*

Rituals performed by the *Mayombero* always occur in private settings, sometimes in the home and sometimes outdoors. Unlike *Santeria*, the ritual symbols and signs are kept outdoors in a shed or garage rather than in the home. If this is not possible, the objects are placed in an isolated area (closet or garage) not immediately visible and always apart from any *Santeria* symbols. The item most often used in a *Palo Mayombe* ritual is the iron cauldron or *nganga*:

> "The sacred cauldron contains human bones (invariably a human skull, with or without long bones as well), sticks from the forest or wood, various herbs, feathers, railroad spikes, animal bones (skulls or other bones of various birds and sometimes turtles), small iron agricultural tools (rakes, picks, hoes, etc.), sacred stones, and other items which may be of special significance to the *palero*. The most important of these items are the sacred stones and the human skull...The *nganga* contains other items which have ritual signifiance. Gunpowder, *fula* is used for divination purposes by placing small amounts in a row and observing how they burn. Sulfur is commonly used as an incense during the practice of malevolent sorcery. *Azogue* (quicksilver or mercury) is another important component since its ease of flow and movement is believed to vitalize and energize the *nganga*. Mercury is also used in conjunction with vulture feathers and the skull to produce madness in an enemy. Ashes form another integral part of the *nganga* and are used for purification (when rubbed on the hands) and for defensive or aggressive magic." (Wetli and Martinez, 1983.)

## Casting the Wiccan Circle

Law enforcers who examine the scene of a ritual where an alleged crime may have occurred should be aware of the rituals and symbols used during the legal worship services of Wiccans and some Pagans. While Wiccans across the world worship in many different ways, one ritual commences all Wiccan worship — casting the Circle in which the sabbat takes place. Some of the words vary from coven to coven, but the same basic elements of casting and closing exist in all traditions. The circle is cast in a quiet, secluded location which is often outdoors. Services are conducted within the circle to keep unwanted forces out and to keep the desired forces and powers in. The following description has been adapted from Kerr Cuhulain's booklet, *Law Enforcement Guide to Wicca*. (Colorado Springs: CultWatch Response, Inc., 1989).

"A typical Circle is oriented to the cardinal points of the compass. The four traditional elements of Earth, Air, Fire and Water are represented on the altar and assigned cardinal points. Some traditions may vary slightly in which element they assign to each particular cardinal point. All of the coveners generally purify themselves before entering the Circle. This is normally accomplished by taking a bath in consecrated water containing a little salt.

Any Witch can cast a Circle anywhere. If a group of Wiccan gather for a ritual then one person will normally perform the task. In some traditions, the High Priestess casts the Circle, but may be assisted by others; sometimes a guest from another coven is given this honor. In traditions that share leadership between Priestess and Priest, the season or occasion might dictate whose duty it is to cast the Circle. The person casting the circle will first consecrate each of the four elements, starting with Fire (usually a candle) and proceeding on to Air (incense), Water, and Earth (usually salt).

Next, the person casting will trace the perimeter of the Circle with the Sword, an Athame, or a Wand, depending on the tradition. If others are to enter later, this person will leave a gap in the Northeast by raising the tool used as if tracing an arch or doorway. Next the person casting will go to each of the cardinal points and ask the Gods (or Guardians) to witness and protect the ritual. Often this person will trace an invoking pentagram in the air with an athame or the fingers. They will start in the East and work clockwise around the Circle. They will then take each of the four elements from the altar and make a circuit of the Circle, consecrating it with each element in turn, always in a clockwise direction.

If the coveners are not already in the Circle, they now enter through the 'doorway' left open earlier. After everyone has entered, the person casting seals this 'door' by drawing a line across it with their ritual tool to complete the Circle, sometimes adding a pentagram. The ritual to be performed is now commenced, its content depending upon the nature of the Sabbat being celebrated. Afterwards, a thanksgiving ceremony is performed, in which cakes and wines are consecrated and shared around. This is not to be confused with the Christian ritual of transubstantiation; Wiccans do not transform the cakes and wine, we merely share them to give thanks for the bounty of the harvest, the gifts of Mother Earth.

When the ritual work is completed, the person who cast the Circle will close or 'ground' the circle by making a clockwise circuit, starting in the East as always, and thanking the Gods (or Guardians) at each cardinal point. They may trace a banishing pentacle in the air."

Thus, the symbols most commonly found at a Wiccan and sometimes Pagan ritual would be the circle and the pentacle which represents the earth. The worshippers' tools consist of candles (usually white); salt; a cup representing or filled with water; a wand representing the air; a sword representing fire; incense or perfume to consecrate the water.

### *Rituals and Symbols Used in Satanism*

Very little is actually known about Satanic rituals for two primary reasons: the services of religious Satanists are open only to members; and self-styled and traditional/cult Satanists almost always devise their own individual or group rituals which are not shared with other groups or individuals. Although the following symbols have appeared in some alleged and actual Satanic-related crimes, it is important to remember that finding any or all of such symbols does not substantiate a link between occult activity and an occult crime.

- altar upon which stones or other implements are placed;
- black candles and incense;
- robes, detached hoods;
- inverted cross, serpent, serpent with horns;
- skull with eyes hollowed out and red stones, rubies, or candles placed in the sockets;
- black widow spider with a diamond on the top and bottom;
- tattoos (black widow, skull and cross bones, serpents, knife with dripping blood, black rose, Satan's name).
- animal cadavers and/or body parts;
- human cadavers and/or body parts;
- human or animal blood;
- wax drippings on the cadaver and/or in body orifices;
- slashes or cuts in patterns on the cadaver.



AF-51
R00576

**Syncretisms Compared:**
**The Gods and Saints of *Palo Mayombe, Santeria* and Catholicism**

| Gods of Palo Mayombe | Orishas of Santeria | Description, Symbols and Sacrificial Foods | Catholic Saints |
|---|---|---|---|
| *Tata Legua, Nkuyu* | *Eleggua* | A trickster god who controls roads, gates and communication. **Symbols:** Alternating red & black beads; clay image with face made of cowrie shells. **Foods:** white chicken, rooster, opossum | Holy Guardian Angel, Christ Child, St. Anthony of Padua |
| *Mama Nsasi, Nkita Nkitan Kitan* | *Chango* | Warrior deity who controls thunder, lightning and fire. **Symbols:** alternating red and white beads, sword, double-edged axe. **Foods:** rooster, sheep, goat, pig, bull. | Saint Barbara |
| *Mama Kengue, Yola, Yeye* | *Obatala* | King of the saints/*santos;* a source of wisdom, purity and peace. **Symbols:** white beads, the pearl, white objects and white clothing. **Foods:** goats, pigeons. | Our Lady of Mercy, Holy Eucharist, Resurrected Christ |
| *Mpunga Mama Wanga Choya Wengue* | *Oshun* | Third wife of Chango; controls money, love, honey and all sweet things; makes marriages. **Symbols:** alternating white and yellow beads, mirrors, seashells, copper, gold. **Foods:** white hen, goat, sheep. | Our Lady of Charity |
| *Mboma Mama Kalunga, Mama Umba, Mbumba* | *Yemaya* | Mother of the *santos* who owns the seas and protects womanhood; patroness of sailors and fishermen. **Symbols:** Alternating white and blue beads. **Foods:** duck, turtle, goat. | Our Lady of Regla |
| *Pengun Futila, Tata Funde* | *Babalu-Aye* | Patron of the sick, especially of skin diseases. **Symbols:** Alternating white and purple beads; purple objects, cigars, pennies, glasses of water. **Foods:** doves, hens. | St. Lazarus |
| *Zarabanda, Pungo Dibudi* | *Oggun* | Warrior deity who owns the metals and weapons. **Symbols:** Alternating black and green beads, iron objects, chain and pendants of agricultural tools. **Food:** roosters, dogs. | St. Peter |

Adapted from: Charles V. Wetli and Rafael Martinez, "Brujeria: Manifestations of Palo Mayombe in South Florida." *Journal of the Florida Medical Association* (August 1983): Table 1.

The descriptions, symbols and sacrificial foods are attributes of the Afro-Caribbean gods, not the Catholic saints.

## Compiling a Search Warrant

Putting together a comprehensive search warrant that may provide badly needed physical evidence is key to an occult crime investigation. Be sure to validate the need for every item prior to the search. While the following items should be included on a search warrant, it is again important to emphasize that when interpreting the actual occult connection between the evidence that is seized and an occult crime, other professional expertise should be obtained.

*Clothing and Jewelry*

- black satin or velvet right-handed glove;
- robes, detachable hoods;
- costumes and masks;
- martial arts clothing;
- medallions with Satanic symbols;
- large ruby or red-stoned ring.

*Games, Books, Wallhangings*

- occult games;
- occult books;
- handwritten diaries;
- writings in non-discernable alphabet;
- posters of heavy metal rock stars, mythological beings, nightmarish pictures, sadomasochistic sex.

*Weapons*

- heavy wooden staff;
- sword;
- knives or athame, a handmade knife with a black handle and etchings;
- bull whip, cat o'nine tails, ligeratures;
- martial arts weapons.

*Ritual Items*

- altar, wooden stand, marble slab;
- crosses;
- candles and candle holders;
- chalice, goblet, cruet;
- gongs, drums, bells;
- hair and skeletal remains;
- coffin, coffin nails;
- ashes from fire pits, fireplaces, wood stoves;
- phallus, serpent symbols;
- incense and incense burner;
- body paint, face paint;
- feathers;
- mirror;
- twine string;
- herbs, especially salt, bay leaves and garlic;
- caldron or iron pot;
- coins, statues, stones, jewels.

## Conducting an Occult-Related Investigation

After the law enforcer checks the crime scene for possible occult links and arranges for an occult-specific search warrant, he or she then must take careful investigative steps designed to build a clear case for the prosecution. An excellent example of how that was accomplished is the Clifford St. Joseph case examined in *Legal Casestudy #3.*

Based upon information obtained from many law enforcers who have investigated occult-related crimes, the following investigative guidelines - many of which are essential for *any* good investigation - are suggested:

1. *Document all evidence as soon as it is received.* Provide a detailed accounting of all that is reported.

2. *Assign at least one investigator who is not a member of the investigatory team to act as a liaison with the media and general public.* This investigator should exclusively handle the media, handle hot line tips, and prioritize leads as they are received.

3. *Involve the District Attorney in the early stages of the investigation.* Realize that by including the D.A. at the beginning, chances increase for a more successful prosecution.

4. *Keep all investigative information confidential for as long as possible.* It is especially important to keep materials confidential until the suspects have been identified.

5. *Execute search warrants as soon as needed, but not short of probable cause.* Be sure to validate the need for every item prior to the search; look for items associated with rituals and/or a belief system as described above and in the various tables.

6. *Keep the following in mind when examining the evidence:* can you determine if the crime involved ritual or violent, random acting out; did the abuse fall into a particular ritualistic pattern; if ritual was involved, was it part of a belief system identified with a particular group or was it an individualistic belief system; and is there any evidence of networking at any level?

7. *Build the case on physical evidence.*

8. *Avoid narcissistic denial.* Do not be mislead with the following types of thoughts: I don't want to be wrong and look like a fool; my supervisor is skeptical the case can be solved, so I better drop it; the suspects are credible in the community so they couldn't have done it or we won't be able to convince a jury they did it; this case will make my career.



AF-53

R00578

**Planning and Implementing a Strategy for Ritualistic Child Abuse Investigation with Alleged Occult Links**

While some of the same investigative techniques are required of ritualistic child abuse cases with alleged occult links, several specially-tailored steps are also recommended. As Sandi Gallant remarks, "These cases are complicated to investigate and manage. The crime is most clear only in the mind of the perpetrators." Indeed, the ritualistic child abuse cases bring special investigatory problems, including the following:

First, the multiple victim/multiple suspect (MV/MS) situation forces the investigator to work with multiple child victims and to investigate multiple suspects;

Second, as Officer Rick Martinez with the Fountain Valley Police Department notes, "In ritualistic abuse investigations, you can't believe everything you hear. Law enforcers have to corroborate everything they hear. They need to particularly be aware of clinicians and psychologists whose intentions are very good, but they don't have to corroborate what their clients are saying from the law enforcement perspective." (Martinez Seminar, August 16, 1989.)

Third, inadequate cooperation exists between investigators, therapists and the parents;

Fourth, as Officer Sandi Gallant warns, "cops are result oriented, but these cases don't produce results." (Gallant Interview, April 3, 1989.)

To help counter the effects of these investigatory problems, the following procedural guidelines are offered:

1. *Document all evidence as soon as it is received.*

2. *Work as a team in which the roles of each team member are clearly defined.* Recognize that the perspectives of each team member will differ, but this is a positive rather than negative factor which encourages a broader base for sharing and analyzing information. The team should be open to new theories, should review the case every 30 days, and should not eliminate any factors unless they are conclusive. Teams should be comprised of individuals with knowledge of ritualized or serial abuse and should minimally consist of investigators, clinicians and child protection workers. The Department psychiatrist may be included in case court testimony about the officer's competence and religious beliefs are attacked by the defense.

3. *Assign at least one investigator who is not a member of the investigatory team to act as a liaison with two groups: parents, custodians and other interested parties and support groups; and the media and general public.* When dealing with parents, this investigator should help find immediate therapeutic assistance for the victim which will not only help the child deal with the trauma, but will help them become a more credible witness. Additionally, this investigator must caution parents to avoid contamination; they may not question the victim but may document any unsolicited revelations. It will become the job of the investigating team to validate any such revelations if they are to become part of the case. When dealing with the public, the investigator should exclusively handle the media, handle hot line tips, and prioritize leads as they are received.

4. *Involve the District Attorney in the early stages of the investigation.*

5. *Keep all investigative information confidential for as long as possible.*

6. *Execute search warrants as soon as needed, but not short of probable cause.* Be sure to have the crime lab print victims as children touch everything; look for false I.D.'s and birth/death certificates; look for items associated with rituals and/or a belief system.

7. *Follow careful, well-documented interview procedures.* Keep in mind when designing the interview questions that you need to determine as best as you can if the abuse described by the victim actually occurred or whether it may have been an illusion designed by perpetrators to frighten or discredit the victims.

Prior to questioning, audiotape all interviews to maintain clarity about who first originated the information and to dispel the theory that interviewers "suggest" certain things to the victim; arrange to assess the victim's verbalization skills and plan questions accordingly; arrange for a clinician to be present to monitor the victim's stress level; inform the parent that it may be necessary for him or her to leave the room; and select an interview location where the child will be comfortable.

Before beginning the actual questioning, it may be helpful to play with the child in some capacity that will help build some rapport. During the actual questioning, do not wear your uniform; use the victim's terminology; do not ask leading or suggestive questions or those with "yes or no" responses; listen carefully and do not interpret what the victim is saying; let the victim speak in the narrative to allow for continuity in the interviewing process and to avoid contaminating the interview's outcome.

8. *Keep the following in mind when examining the evidence and interview results:* can you determine if the crime involved ritual or violent, random acting out; did the abuse fall into a particular ritualistic pattern; if ritual was involved, was it part of a belief system identified with a particular group or was it an individualistic belief system; and is there any evidence of networking at any level?

9. *Build the case on information obtained in the first few interviews which can be substantiated.* Consider conducting a separate investigation for information and accusations gained from interviews for which there is no currently available evidence.

10. *Approach day care center investigations cautiously; check for prior licensing in and out of the state; and conduct extensive background checks on the center and the teachers - field interrogation cards, premise location calls, property records, birth and death records.*

11. *Avoid narcissistic denial.*

## Summary

Law enforcers face many legal, spiritual and emotional hurdles when confronted with an alleged occult crime. While there are no simple solutions for jumping over these hurdles, most criminal justice professionals recognize the answer lies somewhere within the educational realm. Indeed, law enforcers must clearly understand the belief systems of occultists and know when practicing such beliefs are within legally-protected Constitutional boundaries and when such practices step over the line into clearly criminal conduct.

Additionally, law enforcers must have a clear comprehension of the barriers they will face when investigating an alleged occult crime and must be able to formulate a plan for overcoming such obstacles. They must understand and be prepared to act upon orders to preform in any of the three capacities required of occult-related law enforcement - maintaining order through a protection role; providing services through a public relations role; and enforcing the law through an investigative role.

And perhaps most importantly, those assigned the task of investigating an alleged occult-related crime must be prepared to recognize occult symbols and rituals at the crime scene or call for a professional opinion from another source; to compile a comprehensive search warrant that may lead to clear physical evidence; to conduct a carefully planned investigation in an alleged occult crime; and when ritualistic child abuse with occult-links is alleged, to plan and implement an investigation strategy specific to that crime.

### *Legal Casestudy #3*
### *Limits on Practicing Satanic Religion in Prison - Childs v. Duckworth*

Childs, a professed Satanist, held occasional informal Satanic meetings with other inmates and accumulated a library of over 200 occult-related books during his several years of incarceration at the Indiana State Prison. In 1976, he requested permission to start a Satanic church at the prison. The warden held the request in abeyance until adequate supervision for the organization was obtained. In 1979, the defendant asked permission to conduct meetings of an organization called "The Satanic Brotherhood." The request was denied on several grounds: the lack of a proper sponsor for the group; lack of information provided officials about the organization; absence of requests from other inmates for such a group; officials' belief that the defendant's profession of Satanic beliefs was insincere; and officials' feeling that Satanic worship would be contrary to rehabilitative goals. The defendant also asked to borrow books on Satanism through the interlibrary loan system for use in group study, and to use candles and incense in his cell. These requests were also denied. In 1982, the defendant filed suit, claiming that his right to conduct certain practices related to his belief in Satanism violated his First Amendment right to the free exercise of religion.

The defendant's action was dismissed after a one-day trial. Upon appeal, the majority of the U.S. Court of Appeals for the Seventh Circuit ruled that the state interest in the proper administration of the penal system outweighs the prisoner's right to organize a branch of his religious sect within the prison. Thus, the First Amendment right to free exercise of religion is less protected in the prison context.

The decision's text read in part:

> "Our concern, assuming his belief is a religion, is whether the prison restrictions were such that they unlawfully deprived Childs of his First Amendment right to the free exercise of his religion. In this connection we are mindful that while freedom to believe is absolute, the exercise of religion is not...and that prison officials may legitimately impose certain restrictions on the practice of religion in prison, including the right of association, which would be unconstitutional if imposed outside the prison...The issue then is whether the restrictions imposed on the exercise by Childs of his professed beliefs were necessary for the operational security of the prison...We conclude that the restraints imposed by the authorities of the Indiana State Prison upon the practice of the professed beliefs of Childs were reasonable and necessary to obtain legitimate penological objectives and the security of the prison and in no way violated Childs' First and Fourteenth Amendment rights."

***Legal Casestudy #4***

***A Successfully-Prosecuted Case - The People of the State of California vs Clifford St. Joseph***

***The Facts***

On June 15, 1985, the body of a 25-year-old Caucasian male about 5'5" and 130 pounds was found in the South Market area of San Francisco. According to the coronor's report and subsequent testimony, the following was noted about the body of John Doe #60: the presence of very little blood; patterned injuries on the wrists, ankles, back and buttocks indicating the slashings were not random; a cut on the upper lip; a five-sided pentagram carved on the chest; one mutilated testicle; white wax melted in the right eye. From the coronor's report, SFPD investigators felt the crime was related to some Satanic ritual.

On June 23rd, the SFPD received a report for loud behavior at a residence in the Market district owned by Clifford St. Joseph. The investigative officers arrived to find one man hammering on a door, trying to enter the residence. Four individuals - Ed Spela, Rick Hunter, Maurice Bork and Jack Friedlund - were arrested for drunkenness (647f PC). During subsequent questioning, Spela told the arresting officers that he was trying to enter the residence to rescue his friend who was "drugged against his will, forced to submit to sexual acts, and would soon be the victim of a Satanic cult murder." He also said the residents had previously sacrificed a human being. The arresting officers sent a copy of the report to Homicide as "possible information" regarding the John Doe #60 homicide.

Subsequently, Inspector Sanders issued a search warrant for the residence. Bloodstains were found on a blue blanket, on the carpet, and on the bottom center area of some french doors. When the doors were sprayed with luminal, a large blood stain also appeared. All stains were found to be human; further, John Doe #60's blood was the same type as that found on the floor.

On June 25th, Inspector Sanders spoke with Ricky Hunter, the victim in an alleged kidnap, false imprisonment and forcible sodomy case that occurred at the above-named residence subsequent to the homicide. During the interview, Sanders received Spela's name, contacted him and arranged to meet him on June 29th whereupon Spela gave a taped statement in which he confirmed Hunter's statement that he (Hunter) had been gang-raped, manacled with thumb cuffs, and sodomized by four men, including Spela and St. Joseph. Spela further stated that St. Joseph and his two other friends were trying to force Spela to sacrifice Hunter as part of an initiation into a Satanic group. He then provided details about a sacrifice that St. Joseph claimed to have committed a few weeks earlier, the description of which fit the John Doe #60 case. Shortly thereafter, the key witnesses - Spela, Bork and Hunter - disappeared. Although the investigation continued for two years, the case against St. Joseph was not made until 1987 when the witnesses resurfaced to actually corroborate the physical evidence.

***The Outcome***

Clifford St. Joseph was arrested on June 23, 1987, and charged with first-degree murder (187 PC), sodomy (286(d) PC) and false imprisonment (236 PC). The preliminary hearing occurred in August 1987, he was arraigned in September, and the trial took place in February 1988. After six hours of deliberation on March 17, 1988, the jury delivered a guilty verdict on all three counts. On May 5, 1988, Clifford St. Joseph received a sentence of 34 years to life in prison - 25 years to life for first-degree murder, the maximum 9 years for sodomy and 3 years for false imprisonment to be served concurrent with the sodomy term.

***Why the case was successfully prosecuted - the investigator's perspective***

During an interview with study author, Dr. Gayle Olson-Raymer, in San Francisco on May 10, 1989, Inspector Sanders related several investigative stages that he felt contributed to the successful prosecution of Clifford St. Joseph.

1. "Good, careful crime scene investigation that stresses how to take a circumstantial case and back it up with physical evidence." As Sanders recalled "fortuitous circumstances" led to the detection of both crime scenes —where the body was found and where the crime was committed—but physical evidence was what tied them together. "This was really a case of circumstantial evidence built upon physical evidence."

2. "Know how to back up very bizarre, shocking stories of marginal witnesses with physical evidence that can back up their stories." All of the witnesses were marginal members of society —two were male prostitutes and the third was a lifelong criminal. The jury would only believe them if the physical evidence left no doubt.

3. "Careful documentation of every circumstance at both crime scenes." The officers who responded to the call at the residence carefully documented everything they witnessed and everything that the arrestees said. Because some of the statements made by Spela sounded suspiciously like the sacrificial case assumed in the John Doe #60 homicide, the officers sent all documentation over for Sanders to inspect. This led to Sanders' careful questioning of the sodomy victim and Spela, which eventually "made the case."

4. "Knowledge of and how to utilize the best available laboratory technology relative to evidence collection." In this case, blood and fiber technology built the case: luminal's application to the french doors linked the blood directly to the victim; and fiber technology linked dog hairs and rug fibers found on the blanket in which John Doe #60 was wrapped with the dog hairs and rug fibers found in St. Joseph's residence.

5. "Vertical prosecution. These cases are just too complicated without bringing the D.A. in from the very first day. The legal ramifications are daily battles and the police need to have the legal system readily available."

***<u>Why the case was successfully prosecuted - the prosecutor's perspective</u>***

During an interview with Dr. Olson-Raymer in San Francisco on May 10, 1989, Assistant District Attorney Paul Cummins, who tried the case, related several strategies that contributed to St. Joseph's successful prosecution.

1. "Use the evidence to corroborate the shocking stories provided by the witnesses." In his opening statement, Cummins warned the jury that they were "entering a voyage into another world which you don't want to know about." He emphasized that the witnesses were awful human beings who used drugs, sodomized the victim and intended to kill him, committed beastiality, and were involved in a strange Satanic belief system. However, their character and belief system were not on trial; the alleged criminal actions of the defendent were on trial. The stories may be hard if not impossible to believe, but they *had* to be believed because everything the witnesses said was absolutely corroborated by the physical evidence.

2. "Keep your perspective and your outside life together." Cummins warned against becoming obsessed with a case characterized by such bizarre crimes and belief systems. "I've done over 300 jury trials and this was the toughest I have tried...it was really draining, emotional stuff. I almost threw up during the opening statements describing the injuries." However, no matter how bizarre the cast of characters and their actions are, Cummins warns, one must maintain perspective to win the case.

3. "Vertical prosecution should not only be used in every occult-related case, but in all homicide cases." By bringing in the D.A. from the first moments, Cummins feels successful resolution is more likely.

***<u>Summary</u>***

This was a case of clear and careful cooperation between law enforcement and the district attorney. Both agree that the case was successful not only due to vertical prosecution, but because investigatory techniques led to the discovery of physical evidence that corroborated the stories of otherwise disreputable witnesses. In other words, this case was won because solid criminal investigative methods were used *and* because the investigators and prosecutors did not allow the prevalance of a Satanic belief system to become the object of legal pursuit. A *murderer*, not a perpetrator of a Satanic crime, was tried and convicted as such!

When asked what needs to be done to assure successful prosecution of other occult-related cases, Inspector Sanders and Assistant DA Cummins agreed that first and foremost, law enforcers and prosecutors should have some basic understanding of occult belief systems. Cummins felt an overview seminar for prosecutors would be enough and there was no need for in-depth special training, adding that "the rules of evidence are the same in any criminal trial." Sanders, however, recommended more detailed training for investigators who need to "recognize occult rituals; be aware of all the occult groups in your area, and know all your comnmunity's ethnic, racial and religious cultural groups and their belief systems." Secondly, both agreed that vertical prosecution should always be the rule in occult cases. For more information, contact:

Paul Cummins, Assistant District Attorney
San Francisco District Attorney's Office
880 Bryant Street, Room 300
San Francisco, CA 94103

Inspector Prentice E. Sanders
San Francisco Police Department
Hall of Justice, 850 Bryant Street
San Francisco, CA 94103 (415) 553-9123

## Conclusion

Throughout this eight-month journey into the world of the occult, only one shared conviction was found among law enforcers, researchers, therapists, prosecutors, and victims interviewed for this study: there are no simple questions, no simple answers, and no simple truths regarding occult crime. Because this new "field" of occult crime has been pioneered by people with wide-ranging spiritual convictions, professional objectives, political agendas, and emotional commitments, it appears that everyone thinks they are right *and* that everyone else is wrong. The real problem is that everyone has a valid *perspective;* but the valid perspectives are all-too-often based upon fears, emotion, spiritual beliefs and hearsay.

It has been upon this foundation of wide-ranging *perspectives* that a whole new breed of law enforcement "experts" have arisen. They appear in seminars and workshops across the nation, presenting "evidence" gained from their personal interpretation of occult crime , often without factual foundation, physical evidence, or explanations of other perspectives. But in truth, as one seminar presenter emphasized, "There are no experts. Much of what the so-called 'experts' tell you, they *believe* to be true. But the only true experts are the practitioners, those who practice from the inside!" (Paulhus seminar, August 16, 1989.)

If there are no experts, then to whom can law enforcers turn for informed knowledge about the occult? The results of this study *indicate that law enforcers who are willing to learn accurate information about occult belief systems, eager to network with colleagues and other professionals in related professions, open to listening to opposing and controversial perspectives of other professionals, and committed to being objective fact finders, can and should rely upon themselves and their colleagues.*

Many law enforcers believe the climate exists for creating a network of such enlightened officers and that the time is right for men and women from divergent spiritual, philosophical, political, social, and economic perspectives to exchange what they *know* and what they *don't know* about occult crime. In other words, it is time for law enforcers to put aside personal convictions long enough to consider the convictions of other colleagues and try to reach some cooperative agreements about how to approach actual and alleged occult crime.

To that end, many officers have helped compile a "what is needed wish list" that would enable the law enforcement community to honestly, accurately, and constitutionally deal with occult crime. The following recommendations reflect the shared ideas of the many law enforcers, criminal justice professionals, and allied practitioners who worked with Dr. Olson-Raymer to make this study possible. The "wish list" items have been prioritized to reflect an accurate representation of all responses.

1. **Encourage the development of accurate, unbiased education and training specifically aimed at law enforcers.** While the content of such education, qualifications of instructors, and the extent to which law enforcement resources should be committed to such education are all subject to debate, law enforcers universally agreed education was the first priority. Among the most prevalent suggestions about the contents of any education effort were the following:

- a historical and contemporary discussion of occult belief systems;
- an examination of case studies in which the occult was allegedly involved or actually found to be linked to the commission of a crime;
- discussion of the distinctions between occult activity and occult crime;
- a definitional distinction between occult crime and ritualistic crime;
- profiles of occult crime perpetrators specifically addressing causal factors that may or may not be related to occult affiliations;
- an examination of the claims of occult crime victims with special emphasis on the issues surrounding alleged survivors of ritualistic abuse;
- a description of investigative tools and investigative techniques recommended for alleged occult crimes and specifically for alleged ritualistic abuse; and
- suggested resources for further assistance.

The quality of such contents is directly tied to the qualifications of instructors. The majority of law enforcers insisted instruction must be given by *unbiased* sources who have no emotional or spiritual stake in the results and whose presentations reflect none of their personal religious beliefs. This included law enforcers, researchers or other so-called "experts" with clear and public ties to any social or religious organization; most officers felt that even when such instructors state their religious beliefs are not part of the educational presentation, such spiritual commitment cannot help but permeate and prejudice the training effort.

Two characteristics are particularly invaluable in instructors:

- a track record with other law enforcement agencies that proves the trainer encourages an open atmosphere where officers may voice opinions and freely challenge any statements or assertions of which they are uncertain; and

- actual experience conducting occult investigations and/or actual research on occult crime.

Those who fit into this instructional mode should then be encouraged to elicit participant involvement in any training experience and, most importantly, should be specifically asked to limit their presentations to what they actually and factually *know* about the occult through their personal investigative and/or research experiences.

Some law enforcers recommended education be provided by a panel of people with experience in the occult and occult crime. Such a panel would ideally consist of one or more of the following: law enforcers who had investigated occult-related cases; practicing and/or former occultists; victims; therapists; researchers with in-depth journalistic or academic experience on occult topics; and prosecutors who have successfully or unsuccessfully prosecuted an occult-related criminal case.

The extent to which training should be provided in the face of scarce law enforcement sources is a hotly debated subject. Many officers felt every law enforcement officer in urban departments should receive a brief educational overview; others felt all investigators should receive in-depth training; still others felt that because occult crimes should simply be treated as crimes not specifically tied to a belief system, no specialized training was necessary as long as officers knew investigative techniques. The results of this study indicate that enough concern about actual and perceived occult crime exists across the nation that each urban department and most rural departments should have at least one specially trained and educated person in their department. He or she may not need in-depth occult education, but at the very least, should be grounded in the subjects listed above, should be in touch with other law enforcers involved in occult criminal investigation, and should be aware of other criminal justice and allied resources that could be called for further assistance.

**2. Create a regional or statewide networking task force to discuss cooperative ways to handle alleged and actual cases of occult crime.** Almost every law enforcer contacted in the course of this study suggested the need for a networking task force of some kind. Some felt membership should be exclusively law enforcement, making intelligence exchange its primary purpose. Others supported multidisciplinary membership with criminal justice professionals, therapists, medical practitioners, and researchers exchanging ideas for cooperative strategies that can lead to successful educational and prosecution efforts. A substantial number of persons interviewed for this study felt such a task force would be an ideal forum for publicly debating the many issues surrounding the occult; that is, for dealing with the many controversies surrounding occult crime and, hopefully, reaching some solutions that would meet the needs and interests of all parties currently involved in the debates.

**3. Approach occult investigation with objectivity.** Almost all law enforcers stated that investigators cannot approach a case with an "I believe the crime occurred and I will find a way to make it believable" attitude. Instead, most assert, officers must deal only with all the facts as they are presented and get past their emotions. Such objectivity requires the investigator to shed his or her own moral and spiritual assumptions about people and remember that his or her own life experiences are irrelevant to the investigation. Further, some officers were concerned about "oversensitized" law enforcers who, after attending occult crime seminars, often lose their objectivity. Such officers have a tendency to begin seeing "a Satanist under every rock" and to interpret each new "weird" or inexplicable crime as possibly occult related. In some cases, officers have reopened old cases which they believe may have had occult ties to which they were not sensitive prior to training.

**4. Develop an occult intelligence capacity.** Many law enforcers stated the need for each department to begin developing occult intelligence, especially by cultivating sources within the occult community and among former occultists. Many law enforcers emphasized that intelligence gathered about community occult organizations should be used primarily as an *educational* tool. That is, intelligence should be a vehicle for law enforcers to obtain *objective* information about occult groups operating in the community; intelligence should *not* be used to gather potentially incriminating information about occultists who are free to legally practice their spiritual beliefs and rituals.

**5. Encourage the development of occult educational materials and presentations designed for other criminal justice professionals and therapists.** Law enforcers felt they should encourage the development of and participate in the distribution of educational materials for therapists and criminal justice professionals, especially prosecutors, parole and probation officers, and jail and prison personnel. Officers were especially concerned that most persons approach a case without basic knowledge of the occult and successful prosecution strategies for such cases. Because some cases have been successfully prosecuted, officers point to the fact that the basic knowledge is available, but has yet to be tapped for training purposes.

**6. Encourage the implementation of a proactive public relations strategy designed to quell hysteria and rumors about occult activity and crime.** Law enforcers voiced a need to help create a community

atmosphere where hysteria and rumors cannot flourish in the face of an occult incident or crime. While most law enforcers felt they should not be involved directly in such a public relations/educational effort, they were eager to learn from and utilize the services of people with experience in occult activities. An additional step would involve assigning a departmental liaison to work with the media during occult and occult-related incidents. If law enforcement communicates with the media through pre-established channels, the media can help educate the public rather than spread misinformation and rumors.

**7. Stop debating the actual extent of occult crime and begin dealing with the perceptual problem.** Most law enforcers were tired of the controversy surrounding the extent of occult crime. Many admitted that by defining occult crime as crimes distinctly motivated by a spiritual belief system, then an insignificant number of actual occult crimes have been documented by the criminal justice system. Clearly, the number of crimes committed is not as important as the fact that a substantial number of citizens, law enforcers, and therapists *perceive* occult crime is a problem. Such perceptions, then, make occult crime a problem for the law enforcement community. Thus, departments must *proactively* educate their own personnel and the public about legal and alleged illegal occult activities.

**8. Create multidisciplinary boards to deal with occult crime victims.** Some law enforcers felt they should be involved in the creation, implementation and activities of a multidisciplinary board comprised of mental health practitioners, family members, occult experts and law enforcers who would consider every reported case of occult crime in which a victim was involved - especially ritualistic crime. Many felt such boards would be particularly effective if members created an individualized treatment plan for each case and then monitored the course of such treatment.

---

This law enforcement "wish list" is neither a large nor impossible agenda. In short, first and foremost, law enforcers want to be the recipients of objective information about the occult presented by objective and experienced instructors. Second, they want occult-related investigations to be conducted by objective law enforcers who base their actions upon firm educational knowledge and sound intelligence about occult groups and activities within their jurisdictions. Third, they want to help create and be involved in several types of communication forums that emphasize cooperative involvement in understanding and responding to the occult. Fourth, they want to stop dwelling on the controversy surrounding the extent of occult crime and deal with the problems presented by law enforcement and community perceptions of occult activity and occult crime.

**And the debate continues...**

Much of the information for this study has been provided by occult cops, those law enforcers who have been involved in occult crime investigations. Many of their specific recommendations have been included herein: clues to look for during a crime scene investigation; what to look for in a search warrant; what rituals and symbols might indicate occult involvement in criminal activity; what the law enforcement community needs to combat occult crime.

It should be noted, however, that a growing number of law enforcers feel investigators should not be trained to look for specific occult-related clues; to seize occult paraphernalia without legal evidence of criminal association; or train law enforcers to be mini-occult experts; and that law enforcement agencies should not devote scarce law enforcement resources to a perceived rather than actual crime problem. In the words of two leading proponents of these viewpoints:

Kenneth Lanning, Supervisory Special Agent for the FBI, states that he has been asked by many police officers "what they should look for during the search at the scene of suspected satanic activity. The answer is simple: look for evidence of a crime. A pentagram is no more criminally significant than a crucifix unless it corroborates a crime or a criminal conspiracy. If a victim's description of the location where a crime occurred or description of the instruments of the crime includes a pentagram, then the pentagram would be evidence. But the same would be true if the description included a crucifix. In spite of what is sometimes said or suggested at law enforcement training conferences, police have no authority to seize any satanic or occult paraphernalia they might see during a search. There must be a legally valid reason for doing so. It is not the job of law enforcement to prevent satanists from engaging in non-criminal beliefs or rituals. There must be a middle ground in this issue...Law enforcers need to know something about satanism and the occult in order to properly evaluate their possible connections to and motivations for criminal activity. The focus, however, must be on the objective investigation of violations of criminal statutes." (Lanning, 1989:27.)

Robert Hicks, a former police officer and currently a Criminal Justice Analyst with Virginia's Department of Criminal Justice Services, has recently written, "Officers can and should stick to the Constitutional basics: they investigate irregular behavior based on a well-founded and legally-defined reasonable suspicion; they arrest based on probable cause. No one expects police to ignore pentagrams drawn in blood at a homicide scene: complete documentation of crime scenes has always been the rule. But we have no justification for carrying on unwarranted explorations of the beliefs of the unpopular few, or from waving books at seminars and pronouncing them dangerous...In short, law enforcers must remove the 'cult' from cult crime and do their job accordingly." (Hicks, 1989: 29-30.)

# BIBLIOGRAPHY

Adler, Margot. *Drawing Down the Moon: Witches, Druids, Goddess-Worshippers, and other Pagans in America Today.* Boston, MA: Beacon Press, 1986.

American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* Revised, Third Edition. Washington, D.C.: American Psychiatric Association, 1987.

Bainbridge, William. *Satans Power: A Deviant Psychotherapy Cult.* Berkeley: University of California Press, 1978.

Bonewits, Isaac. "The First Epistle of Isaac," *The Druid Chronicles.* Berkeley: Berkeley Drunemeton Press, 1976.

Boyer, Paul and Stephen Nissenbaum. *Salem Possessed: The Social Origins of Witchcraft.* Cambridge: Harvard University Press, 1974.

Braun, Bennett and R. G. Sachs. *Recognition of Possible Cult Involvement in M.P.D. Patients.* Paper presented to 5th International Conference of Multiple Personality and Dissociative States, 1987.

Bromley, David G. "Folk Narratives and Deviance Construction: Cautionary Tales as a Response to Structural Tensions in the Social Order." In C. Sanders (ed.), *Deviance and Popular Culture.* (In press, Fall 1989.)

Bromley, David G. and Anson D. Shupe. *Strange Gods: The Great American Cult Scare.* Boston: Beacon Press, 1981.

Brothers, Joyce. *Games: D&D Role Playing Game and Game Play.* Lake Geneva, WI: TSR, 1984.

Butterworth, Robert, Florida Attorney General. "Letter to Mr. William Wetzel, Hialeah City Attorney," July 13, 1987.

Cabot, Laurie and Tom Cowan. *The Everlasting Witch.* New York: Delacourt Press, 1988.

Cavendish, Richard. *The Black Arts.* NY: Putnam Publishing, 1967.

Charlier, Tom. "Methods of Inquiry Pressure Children." *The Commerical Appeal,* Memphis, TN (January 1988.)

Christianson, Joan. *Testimony to California State Social Service Advisory Board,* Dec. 8, 1988.

Cohn, Norman. *Europe's Inner Demons.* New York: Basic Books, 1975.

Coleman, Lee. "Therapists are the Real Culprits in Many Child Sexual Abuse Cases, " *Augustus,* Vol. IX, No. 6 (1986):7-9.

Council of American Witches. "Principles of Wiccan Belief, " *Green Egg,* Vol. VII, No. 64 (August 1974).

Cuhulain, Kerr. *Law Enforcement Guide to Wicca.* Colorado Springs: CultWatch Response, Inc., 1989.

Cult Awareness Network. "Teen Satanism Evident Across the Country," *CAN News,* Vol. V, No. 1 (January 1989):1.

d'Argent, Jacques. *Voodoo.* Los Angeles: Sherbourne Press, Inc., 1970.

Demos, John. *Entertaining Satan: Witchcraft and the Culture of Early New England.* NY: Oxford Univ. Press, 1982.

Dokupil, Stanley. *Dungeons and Dragons, Fantasy Role Playing and the Occult.* Berkeley, CA: Spiritual Counterfeits Project, Inc., 1982.

Erickson, Sandra. "HSUS Begins a Crackdown on a Bloody Cult," *The Humane Society News* (Fall 1988):12-16.

Finklehor, David, L. Williams and N. Burns. *Sexual Abuse in Day Care: A National Study.* Durham, NH: University of New Hampshire, 1988.

Gallant, Sandi. *Emergence of Ritualistic Crimes, State of California.* San Francisco: San Francisco Police Department, November 16, 1988.

Gerlenter, Carey Quan. "A Conspiracy of Evil?" *The Seattle Times,* February 19, 1989, Section J.

Gonzalez-Wippler, Migene. *Rituals and Spells of Santeria.* New York: Original Publications, 1984.

Gonzalez-Wippler, Migene. *Santeria: African Magic in Latin America.* NY: Julian Press, Inc., 1973.

Gonzalez-Wippler, Migene. *Santeria: The Religion.* New York: Harmony Books, 1989.

Gonzalez-Wippler, Migene. *The Santeria Experience.* Englewood Cliffs, NJ: Prentice-Hall, Inc., 1982.

Guinee, William. "Satanism in Yellowwood Forest: The Interdependence of Antagonistic Worldviews," *Indiana Folklore and Oral History,* Vol. 16, No. 1 (January - June 1987):1-23.

Hart, Dave. *Heavy Metal Madness.* Cardiff by the Sea, CA: Menconi Ministries, n.d.

Hicks, Robert. *Cults: A Skeptical View of the Law Enforcement Approach.* Paper presented at the 11th Annual Crime Prevention Conference of the Virginia Crime Prevention Association. Chesapeake, VA: June 23, 1989.

Hicks, Robert D. *The Devil and Dick Tracy: The Police Pursuit of Satanic Crime.* Paper submitted for publication, July 1989.

Kahaner, Larry. *Cults That Kill.* New York: Warner Books, 1988.

Karroll, Jaimee. *Testimony to State Social Service Advisory Board, December 8, 1988.*

Kelley, Susan J. "Ritualistic Abuse of Children: Dynamics and Impact," *Cultic Studies Journal,* Vol. 5, No. 2 (1988):228-236.

Kelly, Aidan A. *Looking Reasonably at Outrageous Religions: "Satanism" as a Stage of Individual Religious Maturation.* Paper presented to the Philosophers for Social Responsibility Conference. Los Angeles: March 1986.

King, Paul. "Record Labeling - First Session on Contents of Music and the Lyrics of Records," *Hearing Before the Committee on Commerce, Science, and Transportation, United States Senate.* (Testimony pp 129-131.) Washington, D.C.: Government Printing Office, September 19, 1985.

Lanning, Kenneth V. *Satanic, Occult, Ritualistic Crime: A Law Enforcement Perspective.* Quantico, VA: FBI Academy, June 1989.

LaVey, Anton Szandor. *The Satanic Bible.* New York: Avon Books, 1969.

Los Angeles County Commission for Women, Ritual Abuse Task Force. *Ritual Abuse: Definitions, Glossary, The Use of Mind Control.* Los Angeles: Commission for Women, May 15, 1989.

Lyons, Arthur. *Satan Wants You: The Cult of Devil Worship in America.* New York: The Mysterious Press, 1988.

Lyons, Arthur. *The Second Coming: Satanism in America.* New York: Dodd, Mead & Co., 1970.

Martinez, Rafael and Charles V. Wetli. Santeria: A Magico-Religious System of Afro-Cuban Origin," *The American Journal of Social Psychiatry* Vol. II, No. 3 (Summer 1982):32-38.

Mathers, S. L. *The Kabbalah Unveiled.* London, 1887.

Melton, J. Gordon. *Encyclopedic Handbook of Cults in America.* New York: Garland Publishers, 1986.

Melton, J. Gordon. "Witchcraft: An Inside View," *Christianity Today.* (October 1983):22-25.

Moody, Edward J. "Magical Therapy: An Anthropological Investigation of Contemporary Satanism." In Irving I. Aaretsky and Mark P. Leone (eds.), *Religious Movements in Contemporary America.* Princeton, NJ: Princeton University Press, 1974.

Murphy, Joseph M. *Santeria: An African Religion in America.* Boston: Beacon Press, 1988.

Nathan, Debbie. "The Devil and Mr. Mattox," *Texas Observer* (June 2, 1989):10-13.

Okun, Ira, Director, Family Service Agency of San Francisco. "Public Hearing - Ritualistic Satanic Abuse." Letter to California State Social Services Advisory Board, January 9, 1989.

Pazder, Lawrence. *The Emergence of Ritualistic Crime in Today's Society.* Paper presented to North Colorado - South Wyoming Detectives Association. Fort Collins, CO: September 9-12, 1986.

Pulling, Patricia. *Teen Devil Worship.* Richmond, VA: B.A.D.D., 1989.

Pulling, Patricia. *The Devil's Web.* Richmond, VA: B.A.D.D., 1989.

Rosenbaum, Jill and Lorraine Prinsky. *Sex, Violence and Rock 'n Roll: Youths' Perceptions of Popular Music.* Paper presented to annual meeting of the Western Society of Criminology. Newport Beach, CA: February 1986.

Russell, Jeffrey Burton. *The Prince of Darkness: Radical Evil and the Power of Good in History.* Ithaca, NY: Cornell University Press, 1988.

Sharp, A.G. "Cult Investigation: A Devilish Problem," *Law & Order,* Vol. 35, No. 4 (April 1987).

Smith, Michelle and Lawrence Pazder. *Michelle Remembers.* New York: Congdon & Lattes, 1980.

Stafford, Greg. *Games Don't Kill: A Close Look at the Claims.* Plano, TX: Game Manufacturer's Association, 1988.

Stevens, Phillips. "Satanism: Where Are the Folklorists?" *New York Folklore,* Vol. XV, Nos 1-2 (1989):1-22.

Summit, Roland. *Letter to California State Social Services Advisory Board.* October 26, 1988.

Terry, Maury. *The Ultimate Evil: An Investigation into America's Most Dangerous Satanic Cult.* Garden City, NY: Doubleday & Company, Inc., 1987.

Trostle, Lawrence C. "Nihilistic Adolescents, Heavy Metal Rock Music, and Paranormal Beliefs," *Psychological Reports,* Vol. 59 (1986).

United States Department of Defense. *Religious Requirements and Practices of Certain Selected Groups: A Handbook for Chaplains.* Washington, D.C.: U.S. Department of Defense, 1976.

Victor, Jeffrey S. "A Rumor-Panic About a Dangerous Satanic Cult in Western New York," *New York Folklore,* Vol. XV, Nos 1-2 (1989):23-49.

Wedge, Thomas W. *The Satan Hunter.* Canton, OH: Daring Books, 1988.

Wetli, Charles and Raphael Martinez. "Brujeria: Manifestations of Palo Mayombe in South Florida," *Journal of Florida Medical Association* (August 1983.)

Wetli, Charles and Raphael Martinez. "Forensic Sciences Aspects of Santeria, a Religious Cult of African Origin," *Journal of Forensic Science,* Vol. 26, No. 3 (1981):506-514.

Wolfe, Burton. "Introduction to *The Satanic Bible.*" In Anton LaVey, *The Satanic Bible.* New York: Avon Books, 1969.

# ORAL INTERVIEW BIBLIOGRAPHY


Baker, Sandra. Executive Director of the Child and Family Institute in Sacramento. Interview with the Author in Sacramento, California on March 20, 1989.

Berardino, Dominic. Executive Teaching Co-ordinator, SCRC. Interview with the Author in Redondo Beach, California on May 5, 1989.

Besenty, Wayne. Senior Animal Control Officer, Long Beach Department of Health and Human Services. Telephone Interview with the Author on August 9, 1989.

Boyle, Timothy B., Officer, Maryland National Capitol Park Police. Interview with the Author in Silver Springs, Maryland on April 13, 1989.

Burkholder, Jeff, Law Enforcement Trainer. Telephone Interview with the Author on June 5, 1989.

Coultress, Tony. Sergeant, San Joaquin County Sheriff's Department. Telephone Interview with the Author. August 29, 1989.

Cummins, Paul. Assistant District Attorney, San Francisco District Attorney's Office. Interview with the Author in San Francisco, California on May 10, 1989.

Emon, Randy. Sergeant, Baldwin Park Police Department and Director, Christian Occult Investigation Network. Telephone Interview with the Author on May 9, 1989. Interview with the Author during P.O.S.T. Certified Course on Occult Crime at Rio Hondo Police Academy on May 20, 1989.

Sandi Gallant. Officer, San Francisco Police Department. Interview with the Author in San Francisco, California on April 3, 1989.

Gilbert, Beverly. Director, Motivation Unlimited. Telephone Interview with the Author on May 9, 1989.

Hicks, Robert D. Criminal Justice Analyst, Law Enforcement Section, Virginia Department of Criminal Justice Services. Telephone Interview with the Author on March 27, 1989.

Jackson, Kurt. Detective, Beaumont (CA) Police Department. Telephone Interview with the Author on May 16, 1989.

Jackson, Sharon. Counselor, Motivation Unlimited. Telephone Interview with the Author on May 16, 1989.

Jankowski, Dr. Martin Sanchez. Professor of Sociology, University of California at Berkeley. Interviews with the Author in Berkeley, California on April 4, 1989 and May 10, 1989.

Jones, Larry. Lieutenant, Boise, Idaho Police Department and Director, Cult Crime Impact Network. Telephone Interview with the Author on May 8, 1989.

Kahaner, Larry. Writer and Author of *Cults That Kill*. Interview with the Author in Alexandria, Virginia on April 11, 1989.

Dennis Kirkpatrick. Vice President, Witches Public Assistance League. Telephone Interview with the Author on May 9, 1989.

Lanning, Kenneth. Supervisory Special Agent, FBI Academy. Interview with Author in Quantico, Virginia on April 13, 1989.

Martinez, Rick. Officer, Fountain Valley, California Police Department. Interview with Author during California Association of Animal Control Officers Seminar in Cypress, California on August 16, 1989.

McCarthy, Jim. Executive Director of Research, Bethesda Psychiatric Health Institute in Denver, Colorado. Telephone Interview with the Author on June 21, 1989.

Melton, Dr. J. Gordon. Director, Institute for the Study of American Religion in Santa Barbara, California. Interview with the Author in Santa Barbara, California on March 30, 1989.

Metoyer, Patrick. Detective, Los Angeles Police Department, Criminal Conspiracy Section. Interview with the Author in Los Angeles, California on May 5, 1989.

Monagan, Marilee. Executive Officer, California State Social Services Advisory Board in Sacramento. Interview with the Author in Sacramento, California on May 8, 1989.

O'Connor, Michael. Detective, San Diego Sheriff's Department. Interview with Author during California Association of Animal Control Officers Seminar in Cypress, California on August 16, 1989.

Ofshe, Dr. Richard. Professor of Sociology, University of California at Berkeley. Interviews with Author on April 4, 1989 and May 10, 1989.

Paulhus, Marc. Director, Humane Society of the United States, Southeast Regional Office in Tallahassee, Florida. Interview with Author during California Association of Animal Control Officers Seminar in Cypress, California on August 16, 1989.

Pettinicchino, Darlene. Probation Officer, Orange County, California Probation Department. Telephone Interview with Author on May 2, 1989.

Plourde, Noel Joy. Licensed Marriage, Family and Child Counselor in Redondo Beach, California. Interviews with Author in Redondo Beach, California on May 5 and 18, 1989.

Pulling, Patricia. Director, Bothered About Dungeons and Dragons in Richmond, Virginia. Telephone Interview with Author on April 18, 1989.

Reddick, Sherry. Director, Texans Against Ritual Abuse. Telephone Interview with the Author on April 18, 1989.

Riddell, Myra. Chairperson, Los Angeles County Commission for Women, Task Force on Ritual Abuse. Telephone Interview with the Author on April 19, 1989.

Rosenbaum, Dr. Jill. Professor of Criminal Justice, California State University at Fullerton. Telephone Interview with the Author on May 2, 1989.

Russell, Dr. Jeffrey Burton. Professor of History, University of California at Santa Barbara. Interview with Author in Santa Barbara, California on March 17, 1989.

Sakach, Eric. Field Investigator, Humane Society of the United States, West Coast Regional Office in Sacramento. Telephone Interview with the Author on August 9, 1989. Interview with Author during California Association of Animal Control Officers Seminar in Cypress, California on August 16, 1989.

Sanders, Prentice E. Inspector, Homicide Detail, San Francisco Police Department. Interview with the Author in San Francisco, California on May 10, 1989.

Singer, Dr. Margaret Thaler. Counselor. Interview with the Author in Berkeley, California on April 4, 1989.

Squire, Stephen E. Librarian, Commonwealth of Virginia, Department of Criminal Justice Services. Telephone Interview with the Author on March 23, 1989.

Valdemar, Richard. Sergeant, Los Angeles Sheriff's Department. Telephone Interviews with the Author on May 23, 1989 and August 1, 1989.

Wetli, Dr. Charles. Deputy Chief Medical Examiner in Dade County, Florida. Telephone Interview with the Author on July 24, 1989.